UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL NO. 98-1664 (CCC) |
| | ) | CIVIL NO. 98-2344 (CCC) |
| vs. | ) | Consolidated Cases |
| | ) | |
| 33.92536 ACRES OF LAND, MORE OR LESS, SITUATED IN VEGA BAJA, COMMONWEALTH OF PUERTO RICO, AND JUAN PIZA BLONDET, AND UNKNOWN OWNERS | ) ) ) ) ) ) | |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE TO DOCUMENTS PRODUCED BY DEFENDANT RELATING TO HIGHEST AND BEST USE AND PROPER APPRAISAL METHOD

Plaintiff United States of America (the "Government") respectfully submits this Response to the documents that Defendant Juan Piza-Blondet ("Defendant") produced in response to this Court's November 22, 2004 Order (Docket No. 82). That Order required Defendant to present copies of all "obtained" permits and zoning variances, and any other evidence to support his contention that the highest and best use for the condemned parcel in this proceeding is residential use. The Government, after consulting with its appraiser and land use experts who reviewed the newly-produced documents, asserts that these documents do not rebut the Government's evidence (or alter the Court's analysis in the December 23, 2004 Order) that (1) the highest and best use of both the condemned parcel and the remainder of the larger parcel is passive recreation, and (2) the "before and after" method is the proper one in this case.

### STATEMENT OF FACTS

On December 2, 1998, the United States filed a Declaration of Taking in this consolidated action, thereby acquiring from Mr. Piza-Blondet a parcel of approximately 34 acres (the

"Condemned Parcel") in Vega Baja, Puerto Rico for use by the Federal Aviation Administration as a Non-Directional Radio Beacon Facility. The Condemned Parcel was part of various tracts of land totaling approximately 400 acres that was owned by Mr. Piza-Blondet on the date of taking. As depicted in the maps attached as exhibits to this motion, the taking essentially created a 34-acre "hole in the donut" in the "Eastern Portion"[1] of the 400 acres. See Declaration of Appraiser Gonzalo Ferrer (attached as Exhibit 1) at Ex. A-F.

## I.   The October 26, 1999 Evidentiary Hearing

On October 26, 1999, upon Defendant's motion Judge Gilberto Gierbolini held an evidentiary hearing to determine the proper appraisal method to be used in arriving at the amount of just compensation owed to Mr. Piza-Blondet for the taking. See United States v. Reynolds, 397 U.S. 14, 19-20 (1970) (under Federal Rule of Civil Procedure 71A(h), "except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual, that may be presented."); see also Charles A. Wright et al., Federal Practice & Procedure § 3051 (2d ed. 1997). At the hearing, the Government presented its appraiser, Gonzalo Ferrer, as an expert witness to testify about the proper appraisal method to be used in this case. Mr. Ferrer testified that the condemnation in this case was a "partial taking" that should be appraised using the

---

[1] The term "Eastern Portion" refers to the area of the 400 acres that is zoned B-2 and that lies in a predominately wetlands area located in Flood Zones 1 and 2. The Eastern Portion is the area located to the east of any existing development on Mr. Piza-Blondet's property. The Condemned Parcel, or "hole in the donut," lies in the middle of the Eastern Portion.
   The term "Western Portion" refers to the much smaller area zoned C-R, which is located on the western part of the 400 acres near State Road 687. The Government cannot provide a precise measurement of the acreage, but it is clear that the Eastern Portion constitutes the vast majority of the 400 acres. The term "Already Developed Area" refers to the part of Mr. Piza-Blondet's property zoned A-D, is a small sliver of land along Calle Felipe Garcia that borders the Eastern Portion. See Defendant's Ex. 7-9.

2

"before and after" method, because the Condemned Parcel was part of a unitary holding or "larger parcel" that had a highest and best use of passive recreation. See Transcript of Proceedings (Docket No. 75) at 40-44.

### A. Mr. Ferrer Testified That In Light of Applicable Zoning, Flood Zone, and Federal Wetlands Regulations, the Highest and Best Use Is Passive Recreation.

Mr. Ferrer testified about the multitude of land use regulations that apply to the Condemned Parcel.[2] He stated that most of the 400 acres, including the Condemned Parcel, is governed by the Tortuguero Hydrographic Basin Zoning Regulations (the "THBZR"). Tr. at 21, 26. The purpose of the THBZR is to control development in the vicinity of the Tortuguero Lagoon, one of the few pristine freshwater lagoons remaining in Puerto Rico. Tr. at 25-26. Mr. Ferrer explained that the Eastern Portion, which includes the 34-acre Condemned Parcel, is zoned "B-2" under the THBZR. Tr. at 21-22. Mr. Ferrer testified that in this B-2 zone, residential use and lot subdivision are prohibited, and that land use is restricted to very low-impact uses such as fishing and recreational use. Tr at 27-28. He further stated that the Western Portion is zoned "C-R" under the THBZR. Tr. at 21. According to Mr. Ferrer, land uses are also restricted in this C-R zone, but the restrictions are not as strict, nor are they as stringently enforced, as they are in the B-2 zone. See Tr. at 28. In addition, Mr. Ferrer noted that much of the neighborhood surrounding the 400 acres was on the date of taking zoned "A-D" under the THBZR. Tr. at 86. According to Mr. Ferrer, an A-D zone indicates an area that has already been developed. Tr. at 85-86.

---

[2] During his testimony, Mr. Ferrer referenced a number of maps that depict the wetlands, flood zones, and zoning designations for the 400 acres which the Government introduced as Exhibits 2, 3, and 4. See Tr. at 19-21. Copies of the maps that were submitted as Government Exhibits 2, 3 and 4 have been attached as Exhibits A, B, and C to Mr. Ferrer's Declaration.

3

Mr. Ferrer further stated that most of the 400 acres is also governed by Flood Prone Zone Regulations, the purpose of which are to restrict or prohibit development in low-lying areas that are prone to flooding. Tr. at 20, 29. Mr. Ferrer testified that much of the Eastern Portion is located in Flood Zone 1, which is "the critical zone where no development is permitted." Tr. at 20. According to Mr. Ferrer, for property located in Flood Zone 1, it is "practically impossible" to obtain approvals or permits for development. Tr. at 30-31. Mr. Ferrer further explained that the rest of the Eastern Portion is located in Flood Zone 2. Tr. at 20. According to Mr. Ferrer, development is permitted in Flood Zone 2 on the condition that steps are taken to eliminate flood risk, such as by filling in low-lying wetland areas. Tr. at 20, 31.

In addition, Mr. Ferrer testified that the Eastern Portion, including roughly half of the Condemned Parcel, is covered by wetlands, while the Western Portion is primarily an uplands area. See Tr. at 19, 32. Mr. Ferrer stated that these wetlands fall under the jurisdiction of the Army Corps of Engineers. Tr. at 33. He went on to explain that in order to fill any of these wetlands for a development project, the landowner must first obtain a permit from the Army Corps of Engineers under the applicable federal wetlands regulations. Id.

In light of these various legal restrictions that severely restrict and/or prohibit any kind of development, Mr. Ferrer concluded that the highest and best use for the Condemned Parcel on the date of taking was passive recreation. Tr. at 40. Mr. Ferrer reached this conclusion after considering and rejecting other potential uses, including residential housing and sand extraction, which are not legally permissible under the applicable zoning, flood zone, and federal wetlands regulations. Tr. at 38-40. Furthermore, Mr. Ferrer identified the Eastern Portion as the "larger parcel" for purposes of his appraisal, because this area shared the same highest and best use of

4

passive recreation with the Condemned Parcel. See Tr. at 40-42. In other words, Mr. Ferrer determined that the Western Portion, which is not governed by the same zoning, flood zone and wetlands regulations, and where Mr. Piza-Blondet already had obtained approvals and permits for development, did not share the same highest and best use of passive recreation and therefore was outside the larger parcel.

      B.    On Cross-Examination, Mr. Ferrer Testified That the Permits and Approvals Defendant Had Obtained Did Not Affect the Highest and Best Use Conclusion.

Defense counsel cross-examined Mr. Ferrer in an attempt to show that the highest and best use of the Condemned Parcel was medium density residential housing and that the condemnation should be appraised as a "total taking" of the 34-acre parcel.[3] Defense counsel challenged Mr. Ferrer's highest and best use conclusion by pointing out that Mr. Piza-Blondet had received permits and approvals to develop residential housing, a gas station, and a restaurant on parts of the 400 acres Mr. Piza-Blondet owned. Tr. at 48-52, 77-80. In response, Mr. Ferrer pointed out that all of these approved projects were located in the Western Portion, which is governed by the less restrictive C-R zoning regulations, and most of which is uplands rather than wetlands. Tr. at 52-53, 78, 80, 88-91. By contrast, the 34-acre Condemned Parcel is located in the Eastern Portion, which is governed by the more restrictive B-2 zoning regulations, as well as by Flood Zone 1 and 2 regulations and federal wetlands regulations. Tr. at 68. Mr. Ferrer testified that, after checking the records of various government agencies, he had not found any permits or approvals for development in the part of Mr. Piza-Blondet's property zoned B-2. Tr.

---

[3] Judge Gierbolini ruled that Defendant was not permitted to present expert testimony because he had failed to provide written reports for his experts in accordance with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. Tr. at 13, 15.

at 49, 52-53, 88. Moreover, when pressed, Defense counsel was unable to produce any documentary evidence to show that permits or approvals had been granted for development in the Eastern Portion as of the date of taking. Tr. 90-91, 96.

In essence, Mr. Ferrer testified that the approvals and permits that Mr. Piza-Blondet had obtained for development in the Western Portion did not affect the highest and best use of the 34-acre Condemned Parcel or the Eastern Portion surrounding this "hole in the donut." Mr. Ferrer reached this conclusion because the regulations governing the Condemned Parcel and the Eastern Portion are far more restrictive of development than the regulations governing the Western Portion, as evidenced by the fact that Mr. Piza-Blondet had not obtained any approvals for development in the Eastern Portion as of the date of taking.

## II. **Defendant's Newly-Produced Documents**

Six years have passed since the initial hearing, during which time Defendant has had ample opportunity to apply for and obtain permits and zoning variances to develop residential housing in the Eastern Portion. In recognition of this fact, the Court has permitted Defendant to provide any evidence of development permits and zoning variances that he has <u>obtained</u> in the past six years to support his theory that the highest and best use of the Condemned Parcel was residential use. Defendant has submitted 16 marked exhibits to the Court.[4] Yet, as explained more fully below, most of these 16 exhibits concern development projects located in the Western

---

[4] Defendant did not provide an accompanying motion or legal memorandum to explain the authenticity or significance of these exhibits, many of which are written in Spanish, and some of which are of a technical nature that renders them potentially indecipherable to those unfamiliar with the development process in Puerto Rico. Accordingly, the Government has provided its appraiser and land use experts in Puerto Rico with copies of Defendants' exhibits in an effort to ascertain whether these documents are relevant to the issue of the highest and best use for the Condemned Parcel.

6

Portion, which were discussed at the October 29, 1999 hearing. See Ferrer Decl. at ¶ 5. None of these documents are permits or zoning variances that Defendant has obtained for residential development on land in the Eastern Portion.

    A.    <u>Defendant's Exhibits 1-4 and 12-14 Concern Development in the Haciendas de Tortuguero Subdivision Located in the Western Portion.</u>

Defendant's Exhibits 1 through 4 are documents concerning residential development in the Haciendas de Tortuguero subdivision. Ferrer Decl. at ¶ 6. Defendant's Exhibits 12 and 13 are photographs and drawings of the construction and floor plans for the residential development in the Haciendas de Tortuguero subdivision, while Exhibit 14 appears to be a set of documents pertaining to the sale of lots in this subdivision. Id. at ¶ 13. Mr. Ferrer acknowledged at the evidentiary hearing that he was aware that approvals had been granted for the Haciendas de Tortuguero development. This development is located in the Western Portion. Id. at ¶ 6.

    B.    <u>Defendant's Exhibits 5 and 6 Concern Development of a Gas Station and Restaurant Located in the Western Portion.</u>

Defendant has identified Exhibits 5 and 6 as documents relating to development of a gas station and restaurant, respectively. Ferrer Decl. at ¶ 7. Although it is unclear from the face of these documents whether they constitute final approvals for development, at the hearing Mr. Ferrer acknowledged that he was aware that approvals had been granted for a gas station and restaurant in the area zoned C-R. These developments are located in the Western Portion. Id.

    C.    <u>Defendant's Exhibits 7-9 Concern Residential Lots Located in the Already Developed Area.</u>

Defendant has identified Exhibit 7, which bears a stamp dated December 28, 2000, as "Survey Map Approved by ARPE for sale of (9) 900 meter lots Zoned R-1." Similarly,

7

Defendant has identified Exhibit 8, which bears a stamp dated October 1, 2002, as "Survey Map Approved by ARPE for sale of (1) 1200 meter lot Zoned R-1." Defendant's Exhibit 9, which bears a stamp dated August 6, 2004, is identified on the Exhibit List as "Construction Permit for (1) 1200 meter lot zoned R-1." It appears that the 1200 meter lot identified in Exhibit 9 concerns the same 1200 meter lot in Exhibit 8. Id. at ¶ 10. This development is located in the Already Developed Area, which is an uplands area that is zoned A-D and is not governed by the regulations for Flood Zones 1 and 2.[5] Ferrer Decl. at ¶¶ 8, 9; Ex. B, C.

### D. Defendant's Exhibits 10 and 11 are Merely Applications for Approval of Proposed Projects in the Eastern Portion.

Defendant has identified Exhibit 10 as "Walk Up Building Resolution filed and pending before ARPE." Yet, this document, dated July 10, 1997, does not bear an official agency stamp noting its receipt or approval. Thus, the document contains no information about whether this is an application that has been filed or whether it is still pending approval. Ferrer Decl. at ¶ 11. Notably, this document appears to be a completed application form for approval of a 74-unit apartment development called "Blondet Gardens." Id. In other words, Defendant's Exhibit 10 is not a permit or variance that Mr. Piza-Blondet has obtained, but rather, it is merely a seven year-old application for approval of a proposed development.

Similarly, Defendant's Exhibit 11, which is identified on the Exhibit List as "Survey map

---

[5] While Defendant has characterized the underlying zoning for this area as "R-1," there is no indication on the face of these documents that R-1 is the correct zoning designation. Ferrer Decl. ¶¶ 8, 9. The Zoning Map submitted by the Government at the October 26, 1999 hearing, which depicts the approximate boundaries of the zoning designations, seems to indicate that this area is near the border between the B-2 and A-D zones. See id. at Ex. A. Defendant's Exhibit 9, which is an official agency document, states that the underlying zoning is A-D. Furthermore, Mr. Ferrer recalls from inspecting the area in 1999 that this area had already been developed at that time, which suggests that the underlying zoning for these lots is A-D. Id. at ¶¶ 8, 9.

for (18) lots filed and pending before ARPE for authority to sell lots," bears no official stamp and otherwise does not contain any indication that it is currently pending approval. Id. at ¶ 12. Thus, like Exhibit 10, this document appears to be a mere application for site approval. Furthermore, Exhibit 11 is dated July 10, 1998, which means that like Exhibit 10, this document purportedly has been pending approval for more than six years. This document apparently is an application for approval to subdivide the Eastern Portion. The document depicts the "Blondet Gardens" apartment development referenced in Exhibit 10 in the B-2 zone adjacent to the Condemned Parcel.

    E.    Defendant's Exhibit 15 Depicts Approved Projects in the Western Portion of the Tract and Proposed Projects Pending Approval in the Eastern Portion.

Defendant's Exhibit 15, which is identified as "Survey map of expropriated property," is a map containing handwritten notes on yellow "Post It" paper showing the various approved projects in the Western Portion, along with the proposed projects in the Eastern Portion that supposedly are still pending approval. One of the handwritten notes also identifies the "Paseos de Dorado Project" in the Eastern Portion. However, Defendants have not provided any official documentation regarding this project, and this handwritten note appears to be the only reference to this project in Defendant's newly-produced documents. Notably, Exhibit 15 depicts the vast majority of the Eastern Portion as vacant and undeveloped.

    F.    Defendant's Exhibit 16 is a Proposed Zoning Map That Was Not in Effect on the Date of Taking.

Defendant's Exhibit 16, which is identified as "Survey map depicting Zoning classification for various lots and developments," is a zoning map that was proposed for the Tortuguero Lagoon Hydrographic Basin, but there is no indication on the face of this document

9

that this map was ever approved. Ferrer Decl. at ¶ 14. In addition to these authenticity issues, Mr. Ferrer attests that this is not the zoning map that was in effect on the date of taking, December 2, 1998. Id.

### ARGUMENT

The Government contends that Defendant's newly-produced documents do not constitute evidence that the highest and best use of the Condemned Parcel on the date of taking was residential use. Accordingly, the Government argues in Part I below that just compensation for the taken parcel should not be based, as a matter of law, on a highest and best use of residential housing, and that Defendant should be prevented from presenting to the jury any highest and best use evidence other than passive recreation. In Part II below, the Government asserts that the proper appraisal method to determine just compensation in this case is the "before and after" method.

### I.   Just Compensation for the 34-Acre Condemned Parcel Should Not be Based on a Highest and Best Use of Residential Housing.

The ultimate issue to be decided in this condemnation proceeding is the amount of just compensation that is owed to Defendant for the taking. See Reynolds, 397 U.S. at 20. It is well-settled that "just compensation" under the Fifth Amendment is measured by the fair market value of the Condemned Parcel as of the date of taking. Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 9-10 (1984); United States v. 125.2 Acres of Land, 732 F.2d 239, 244 (1st Cir. 1984). Market value in a condemnation proceeding is determined by the condemned property's highest and best use, which corresponds to "the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future . . . to the full extent

10

that the prospect for demand of such use affects the market value while the property is privately held." National R.R. Passenger Corp. v. Certain Temporary Easements, 357 F.3d 36, 39 (1st Cir. 2004) (citing Olson v. United States, 292 U.S. 246, 255 (1934)).

In determining the highest and best use for a condemned parcel, "[t]here is a presumption, however, in favor of the existing use of the land which can only be overcome if the landowner can show the reasonable probability that the property, at the time of the taking, was adaptable and needed, or likely to be needed in the near future, for the potential use." See United States v. 8.41 Acres of Land, 680 F.2d 388, 394 (5th Cir. 1982) (citing Olson, 292 U.S. at 255-56). Accordingly, the burden of proof lies with the landowner defendant to show that a potential use is reasonably practicable and reasonably probable within the near future. See United States v. 7.92 Acres of Land, 769 F.2d 4, 10 (1st Cir. 1985). The potential use must be a legal use, or, rather, "legally permissible." See United States v. Meadow Brook Club, 259 F.2d 41, 45 (2d Cir. 1958). Thus, if existing zoning or land use restrictions preclude a more profitable use, such use cannot be considered absent evidence that there is a reasonable probability that the regulations will be changed. See id.; United States v. 27.93 Acres of Land, 924 F.2d 506, 512 (3d Cir. 1991). The court in a condemnation proceeding should screen the landowner's proffered potential uses and exclude from the jury those uses that have not been demonstrated to be reasonably practicable and reasonably probable on the date of taking or in the reasonably near future. See Olson, 292 U.S. 257; United States v. 341.45 Acres of Land, 633 F.2d 108, 111 (8th Cir. 1980); 320.0 Acres of Land, 605 F.2d at 815.

A.  Defendant Has Failed to Provide Evidence That the Potential Use of Residential Housing Was Reasonably Probable or Reasonably Practicable on the Date of Taking or in the Reasonably Near Future.

On the date of taking, the 34-acre Condemned Parcel and the rest of the surrounding land in the Eastern Portion were vacant and undeveloped.[9] It is therefore undisputed that residential housing was not the use at the time of the taking of Defendant's 34 acres that were condemned. Consequently, the burden of proof lies with Defendant to provide objective evidence showing that the potential use of residential housing was reasonably practicable and reasonably probable within the near future of the date of taking, including evidence that there was a reasonable probability that the zoning, flood zone, and wetlands regulations would be changed to permit residential use in this area. See 7.92 Acres of Land, 769 F.2d at 10.

Defendant has failed to show that there was a reasonable probability that the zoning, flood zone, and wetlands regulations would be changed to permit residential housing development in the Eastern Portion. Defendant provided no evidence that the Puerto Rico Planning Board would likely re-zone the Eastern Portion to eliminate the B-2 and Flood Zone 1 and 2 restrictions in order to permit residential development in this area. Nor has Defendant presented any evidence that he would be able to obtain permits from the Army Corps of Engineers to fill wetlands in order to develop residential housing in this area. Notably, Defendant's Exhibits 10 and 11, which are applications requesting approval to develop

---

[9] On the date of taking, the 34-acre Condemned Parcel was actually developed with a Non-Directional Radio Beacon Facility, which the FAA had operated on the site since 1978 pursuant to a lease agreement with Mr. Piza-Blondet and his predecessors in title. However, this use by the Government must be disregarded when assessing the highest and best use of the land. See United States v. Chandler-Dunbar Co., 229 U.S. 53, 80-81 (1913); United States v. 320.0 Acres of Land, 605 F.2d 762, 783 n. 26, 811 n. 107 (5th Cir. 1979); United States v. 46,672.96 Acres of Land, 521 F.2d 13, 15-16 (10th Cir. 1975).

12

residential housing in the Eastern Portion, apparently have <u>not</u> been approved in the more than six years that have passed since they were submitted. This fact alone should rebut Defendant's unsubstantiated contention that obtaining a variance or change in zoning was reasonably probable within the near future after the date of taking. See, e.g., 27.93 Acres of Land, 924 F.2d at 513-14 (upholding district court's finding that landowner failed to produce evidence that change in zoning to permit proposed use was reasonably probable).

Defendant has failed to show, either at the October 26, 1999 hearing or in the recently-produced documents, that he has obtained any permits or approvals to develop residential housing on land that has the same physical characteristics (low-lying wetlands) and legal restrictions (B-2 zoning, Flood Zones 1 and 2) as the Condemned Parcel. Nor has Defendant provided the Court with any examples of residential development on other land in the Tortuguero Hydrographic Basin that has similar physical characteristics and applicable land use restrictions. The only evidence of development approvals that Defendant has presented to the Court are for projects located in the Western Portion and the Already Developed Area. Yet, development in these areas is much less restricted than in the Eastern Portion where the Condemned Parcel is located. The restaurant, gas station, and residential subdivision that have been approved are located in a C-R zone in a predominately upland area falling outside Flood Zones 1 and 2. Similarly, the residential lots on Calle Felipe Garcia are located in an A-D zone in an upland area falling outside Flood Zones 1 and 2. By contrast, the Condemned Parcel and the Eastern Portion are located in a B-2 zone in an area that is predominately wetlands and that is governed by Flood Zone 1 and 2 Regulations. In light of the different applicable legal restrictions and physical characteristics between these areas and the Eastern Portion, these permits and approvals for

development do not constitute evidence that residential use was reasonably probable and reasonably practicable in the Eastern Portion, where the 34-acre Condemned Parcel is located.

Because Defendant has failed to demonstrate that a potential use other than passive recreation was reasonably practicable or reasonably probable within the near future of the date of taking, the Court should prevent Defendant from presenting to the jury any other highest and best use evidence. See, e.g., 158.24 Acres of Land, 515 F.2d at 233 (upholding district court's decision to exclude evidence of potential use when landowner failed to show reasonable probability that property was adaptable and needed for that use); 27.93 Acres of Land, 924 F.2d at 514 (upholding district court's decision to exclude potential use when defendant failed to provide evidence of reasonable probability of re-zoning to permit potential use).

## II.     The Before and After Method is the Proper Appraisal Method in this Partial Takings Case

This case involves a partial taking that should be appraised using the "before and after" method. See United States v. 158.24 Acres of Land, 515 F.2d 230, 232 (5th Cir. 1975) (stating that the "before and after" appraisal method is appropriate in partial takings case). A "partial taking" occurs when the government condemns only a portion of a landowner's unitary holding or "larger parcel." See United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999). The question of whether a condemned parcel should be appraised as part of a larger parcel is a factual determination that is properly decided by the Court. See Reynolds, 397 U.S. at 18-19; United States v. 105.40 Acres of Land, 471 F.2d 207, 212 (7th Cir. 1972). As this Court stated in its November 22, 2004 Order (Docket No. 82), the following three elements must be met in order for a condemned parcel to be considered part of a larger parcel: (1) unity of ownership; (2)

14

physical unity; and (3) unity of use. See also 8.41 Acres of Land, 680 F.2d at 394 (5th Cir. 1982).

The Court previously held that the first two factors have been satisfied in this case. Thus, the larger parcel determination in this case turns on whether the Condemned Parcel and the various tracts owned by Mr. Piza-Blondet together totaling some 400 acres share unity of use. As demonstrated in Part I above, the highest and best use of the Condemned Parcel is passive recreation, because all other uses are prohibited under the applicable zoning, flood zone, and wetlands regulations. The Eastern Portion is governed by the same regulations as the Condemned Parcel, and therefore has the same highest and best use of passive recreation. Because these two parcels share the same highest and best use, the Condemned Parcel and the Eastern Portion together form the Larger Parcel.[2] Accordingly, the "before and after" method is the proper appraisal method to be used in this proceeding to ascertain the value of the partial taking.

## CONCLUSION

At the initial hearing that the Court held in 1999 to determine the proper appraisal method, Defendant failed to provide any objective evidence to support his theory that the highest and best use for the Condemned Parcel was residential housing. More than six years have passed

---

[2] At the hearing, Mr. Ferrer described this Larger Parcel as "the portion of [Mr. Piza-Blondet's] property that is to the east of the area that has already been developed." Tr. at 41. Despite earlier pleadings characterizing the Larger Parcel as the entire 400 acres, Mr. Ferrer testified that the Larger Parcel does not include the Western Portion or the Already Developed Area, which have been put to a different use than the Condemned Parcel and the Eastern Portion. Put another way, Mr. Ferrer's conclusion that the Larger Parcel incorporates the Eastern Portion and the Condemned Parcel (which have a use of passive recreation), but not the Western Portion or the Already Developed Area (which have varied residential and commercial uses) is in keeping with case law dictating that "[i]ntegrated use is the key test for unity of a tract." See 8.41 Acres of Land, 680 F.2d at 393.

since then, and Defendant is still unable to present any evidence that residential use was reasonably probable or reasonably practicable on or within the near future of the date of taking. Accordingly, Defendant's proposed highest and best use of residential housing should be rejected as speculative, and just compensation for the taken parcel should be determined based on a highest and best use of passive recreation using the before and after method.

Respectfully submitted this 7[h] day of April 2005.

Counsel for Plaintiff United States

/s/ Jeffrey Tapick

JEFFREY M. TAPICK
PAUL HARRISON
Attorneys, United States Department of Justice
Environment & Natural Resources Division
P.O. Box 561, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0297
Fax: (202) 305-0398

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of April 2005, a true and correct copy of the foregoing Plaintiff's Response to Documents Produced By Defendant Relating to Highest and Best Use and Proper Appraisal Method was served via email to:

>Maurice V. Piza, Esq.
>5500 Prytania Street
>New Orleans, LA 70115
>maurpi1@yahoo.com
>
>David C. Vidrine, Esq.
>9061 West Judge Perez Dr.
>Chalmette, LA 70043
>dcv1234@cox.net

_____
JEFFREY M. TAPICK