UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

       Plaintiff

         Vs.

| | |
|---|---|
| 33.92536 ACRES OF LAND, MORE | CIVIL NO. 98-1664(CCC) |
| OR LESS, SITUATED IN VEGA BAJA, | CIVIL NO. 98-2344(CCC) |
| COMMONWEALTH OF PUERTO RICO, | CONSOLIDATED CASES |
| AND JUAN PIZA BLONDET, AND | |
| UNKNOWN OWNERS | |

         Defendant's

### Declaration of Carlos E. Gaztambide

Defendant-landowner Mr. Juan Pizá Blondet respectfully submits this Response to the Declaration of Gonzalo Ferrer and the Plaintiff's response stated in the title of this document.

### I.  ISSUES CRITICAL TO THIS CASE

**The Highest and Best Use of the property condemned as of December 2, 1998 given its characteristics is medium density residential development:** Below we will demonstrate that the zoning of the subject (LTB-2) is not an insurmountable limitation to the development of the subject into a medium density residential subdivision. The limitations of  the LTB-2 zoning should not be applied to the subject area that is not wetland, mangrove and salt flats.  The purpose of this district is specifically addressed to the three types of terrain and not as a blanket to all the terrain of the subject.

**The sand deposits underlying the Homer Beacon Facility and its surroundings are exploitable and have a value: This potential was capped with the construction of the aforesaid facility.** Current development procedures allow for the substitution of the high valued sand deposits with borrow stable fill (available within the main tract) for any construction including the current facility on the subject site.

**The before and after method should not applicable because the subject property has an area in excess of the minimum that may be segregated under**

**open zoning.** The subject property should be treated as a parcel with legal character of its own because it may be segregated from the main farm. In fact, the owner stated that the subject had been segregated as an independent property prior to the taking. (Document to be provided by the owner; deed #14 dated December 26, 1997 before Carlos Colón Marchand, Esquire; subsequently approved by ARPE as per information provided by the owner to the appraiser). Moreover, even if that were not the case local jurisprudence* recognizes that when appraising a large tract (an the court uses "in excess of 150 cuerdas" as an example) which has easily identifiable sectors that may be dedicated to different highest and best uses, it is justified and convenient to appraise the property on the basis of sectors or portions.  In this case "upland" and "wetland" are easily identifiable and distinct.

---

*Pueblo v. Sucesión Quiñones, 71 D.P.R. 261, ELA v. Soc. Civil Agrícola e Industrial, 104 D.P.R. 392, Nichols, on Eminent Domain, Vol 4, sec 12-314

USA V. 33.92534 Acres
Page 2

Below we will enumerate concepts and evidence that attests to our position with reference to the above issues.

## II.  RESPONSE, ARGUMENTS, AND EVIDENCE

1.      Summary of Study recently performed by Gustavo Adolfo Rodríguez, Ecologist and provided to the appraiser.

"An evaluation of the <u>Soil Survey of Arecibo Area - Northern Puerto Rico</u>, published by the U.S. Department of Agriculture Soil Conservation Service in March 1982, shows that there are four types of soils present in the study area owned by Mr. Piza (Figure No. 1). Three of the soil units are sandy ("*Algarrobo fine sand, 2 to 12 percent slopes*", or "*AgC*"; "*Corozo fine sand, 2 to 12 percent slopes*", or "*CsC*", and "*Guerrero sand, 2 to 12 percent slopes*", or "*GeC*"), and the fourth soil unit is muck ("*Vigia Muck*" or "*Vg*"). The three sandy soils are described as deep, well-drained or excessively drained soils, with low available water capacity and low fertility, i.e., they are poorly suited for cultivated crops.   Altogether, these soils make approximately 75% to 80% of the available land".

"On the other hand, the "Geologic Map of the Manatí Quadrangle, Puerto Rico (Map I-671)", by Watson H. Monroe, published by the U.S. Geological Survey (USGS) in 1971 (Figure No. 2), shows that there are two distinct geological units in the study area: "*Swamp Deposits*" or "*Qs*", and "*Silica sand*" or "*Qss*".  The sand consists of very pure quartz sand, with a thickness that ranges from one (1) meter to four (4) meters, that is derived by leaching from the marine terrace deposits and blanket deposits.  The composition is usually more than 99% silica sand, but the deposits may contain some organic matter.  Silica sand is an important commercial component of products such as glass and cement. Approximately 75% to 80% of the available land is composed of silica sand".

"In addition, an evaluation of Sheet No. 7B of the "*Map of Zones Susceptible to Inundations (Mapa de Zonas Susceptibles a Inundaciones)*", published by the Puerto Rico Planning Board (PRPB), with an effective date of 5 January 2002 (Figure No. 3), shows that Mr. Piza's property is found within three distinct zones:

  a.  Zone 1 - located on the eastern portion of the property. This zone covers a small area of the entire property (approximately 10% to 15% percent).  Puerto  Rico's Department of Natural and Environmental Resources (DNER) does not   condone development in this area.

  b.  Zone 2 - covers approximately 75% of the property.  The DNER authorizes development in this zone if adequate precautions are taken to fill the land to elevations that protect property from rising waters and/or floods.

      c.   Uplands (not zoned) - located on the northwestern portion of the study area. These uplands cover approximately 10% of the study area".

"Finally, a document titled <u>Critical Coastal Wildlife Areas of Puerto Rico</u>, by Mr. Julio E. Cardona and Mr. Manuel Rivera, published by DNER in 1988, shows that there are no critical, threatened or endangered species, listed by either the Commonwealth of Puerto Rico or the Federal Government, in the property owned by Mr. Piza nor in the adjacent hill ("Cerro Guarico")".

2.      Mr. Pizá Blondet has obtained approvals for residential development up to R-3 equivalent density within the eastern portion of the main tract. As exhibit of this document we include those permits, some of which are under development. It is not correct that the permits obtained are exclusively on the western portion of the main tract. Therefore, those permits obtained in the eastern portion of the main tract must be considered in the analysis to determine the Highest and Best Use of the condemned property. (Defendant's Exhibits 17 and 18)

USA V. 33.92534 Acres
Page 3

3.      It is pertinent to mention that the western portion of the main tract (which is not where the condemned parcel is located) abuts the Tortuguero Lagoon and therefore is the most sensitive area of the entire property due to this proximity to the body of water which the zoning of the area pretends to protect. Notwithstanding this sensitivity, a restaurant was approved within the western portion.

4.      The B-2 zoning is not a definite negation to development because R-1 and R-3 equivalent subdivisions have been approved not only on the main tract owned by Mr. Pizá Blondet but in numerous properties that have this zoning and subsequently were approved for development presumably because these do not represent and adverse factor with respect to the protection of the lagoon. To that effect we are presenting an aerial photograph showing numerous residential developments east and south of this lagoon. (Defendant's Exhibit 19)

5.      A study which will be included as an exhibit to this response reflects that the superficial and subsurface runoff of the subject property flows in an easterly direction away from the lagoon. Therefore, the main farm and the subject property do not represent a threat to the lagoon. The residential developments directly south of the lagoon are built on land that appear to drain into the lagoon, yet development was approved. (Defendant's Exhibit 20)

6.      Given the aforementioned determinations that the runoff of the properties east of Road 687 do not affect the lagoon, the property to the immediate east of Mr. Pizá's main tract was removed from the B-2 district. Now the line that depicts the B-2 district runs along Mr. Piza's main tract east boundary. It is highly suspicious because the conditions of the property to the immediate east of the main tract are similar to those of the main tract. The boundary between two properties do not constitute a boundary between eco-systems especially if both properties have similar characteristics. (Defendant's Exhibits 21- 22).

7.      In addition to the above, Road 687 was identified in another study prepared by the Puerto Rico Department of Natural Resources as a man-made barrier between Mr. Pizá's main tract and the lands that drain into the lagoon. Therefore this is another factor that isolates the subject away from those properties that may be considered a threat to the lagoon. (Defendant's Exhibit 25).

8.      Mr. Gonzalo Ferrer recognizes that the portion of the main tract closer to the lagoon has been the subject of approval for residential developments, a restaurant, and a gasoline service station. It is pertinent to mention that this portion is closer to the lagoon; yet, it was approved for development. Therefore, it is contradictory to state that the portion (the subject) farther away from the lagoon has more restrictions than the portion closer to the lagoon. This is further confirmed by the aforementioned facts that the portion where the subject is located enjoys a man-made barrier between the subject's area

and the lagoon coupled with the now known fact that the eastern portion of the main tract drains away from the lagoon.

9.     With respect to the aerial photograph included as an  exhibit of this document it is important to point out:

        a)     a significant number of houses (approximately 600) have been developed west of Road 687 at a very short distance from the shoreline of the lagoon.

        b)     72 walk-up units are under construction on the east side of Road 687 as part of a remnant of another residential development in excess of 200 units.

USA V. 33.92534 Acres
Page 4

       c)    There is a ten store commercial project under development in the neighborhood.

       d)    Brisas de Tortuguero Community is encroaching the Piza tract in an area that could be approximately 20 acres. The government "motu-propio" has changed the zoning of this portion of the main tract from B-2 to developed area  (A-D). Therefore, the government may forego the B-2 zoning declaring as developable a portion of the tract but wants  to enforce the B-2 zoning on the portion that it wants to condemn. (Defendant's Exhibits 21-22).

10.    Mr. Gonzalo Ferrer recognizes that residential housing exist within the main tract. It should be added that Engineer José Hernández is developing a six unit residential project virtually within the perimeter of the Piza property and he has been approved to remove the sand deposits, sell the sand and substitute it with borrow fill as a normal activity within this development permit. This area is zoned B-2 (Photos included). (Defendant's Exhibits 24-25).

11.    Mr. Pizá has a walk-up project presented and under consideration within the B-2 district which is currently in suspense pending further information.   However it is pertinent to mention there is no outright denial. (Defendant's  Exhibit 26).

12.    Within the B-2 district and adjacent to the subject the government is developing Guarico Special Community within the R-3 parameters. This community consists of approximately 80 units in redevelopment within the B-2 zone including all the necessary infrastructure to include a sewer system. (Defendant's Exhibit 27).

13.    As part of the permits secured by Mr. Pizá from the Permits Administration there is a 20.80 meter wide avenue partially constructed today which will open for development the eastern portion of the main tract where the subject is located funneling traffic into Road 687. Therefore a legal access has been approved for the area where the subject is located. (Defendant's Exhibit 28)

14.    There are other variances identified within the B-2 area.  One of these is a change to a developable flood rating under resolution JP044-Z1 dated January 23, 2002 presented by Gregory L. Moritz and Associates.  Besides, B-2 zoning was lifted on a portion comprising in excess of 300 acres which is identified as a variance on the map which is presented as an Exhibit of this document. (Defendant's Exhibits 29, 22)

15.    Enclosed please find an aerial photograph of the condemned property. Please notice it is predominantly upland with significant sand deposits. (Defendant's Exhibit 30).

16.     The owner obtained approvals for ten lots within the B-2 area. This is another example of the flexibility within this zoning district. (Defendant's Exhibit 7, 8 and 31).

17.     Mr. Pizá obtained approvals for the development of 44 lots within the CR district which has similar restrictions with respect to subdivision when compared to the B-2 and is closer to the lagoon. (Defendant's Exhibits 32 and 2).

18.     The owner secured approvals for a 27 lots subdivision within the CR district. (Defendant's Exhibits 33 and 1).

19.     Mr. Pizá obtained permits for a gasoline service station within the CR district adjacent to the lagoon. (Defendant's Exhibit 34).

USA V. 33.92534 Acres
Page 5

20.     Studies from the Department of Natural Resources reflect that the area in the immediate sector of the subject does not generate tributaries into the lagoon (Defendant's Exhibit 35).

21.     Mr. Pizá obtained permits for removal of the sand as early as 1989. (Defendant's Exhibit 36).

22.     The Department of Natural Resources recognizes that the main problem with the accumulation of water in the area of the subject is caused  by the neglect of the government maintenance of the drainage channels in the area. (Defendant's Exhibit 37).

23.     We include herein a copy of the original of Defendant's Exhibit 6 which is already on the record. (Defendant's Exhibit 38).

24.     Letter from the Municipality of Vega Baja to the Corps of Engineers stating that the flooding is caused by poor maintenance of the drainage channels (Defendant's Exhibit 39).

25.     Letter authorizing fill of 0.77 cuerdas of freshwater herbaceous wetland as part of the construction of Haciendas de Tortuguero (Defendant's Exhibit 40).

26.     Approvals for extraction stating that sensitive flora has already been destroyed by fires set off by the neighbors (Exhibit 41).

27.     Approval of Walk-Up project in sensitive Agricultural Land (A-1) north of subject  (Exhibit 41).

28.     Summary of Mr. Juan Pizá Project (Defendant's Exhibit 42).

29.     Drawing showing R-3 equivalent development approved within B-2 zoning (Defendant's Exhibit 43).

30.     Flood Map showing most of the subject outside Flood Zone 1 (Defendant's Exhibit 44).

31.     Title search showing subject as a segregated  parcel (Defendant's Exhibit 45).

32.     Letter from Department of Natural Resources stating they will recommend to the Planning Board modifications to the Tortuguero Lagoon Zoning Map to cover changes occurred since 1979 (Defendant's Exhibit 46).

33.     Permit obtained by Juan Pizá as of May 18, 1999 (Defendant's Exhibit 47).

34.     Segregation of nine lots within the B-2 (Defendant's Exhibit 48).

35.     Letter from Mr. Juan Pizá offering Land for the installation of the sewer pump at the adjacent special community (Defendant's Exhibit 49).

36.     Mr. Piza's walk-up project in suspense but not rejected within the B-2 Zone (Defendant's Exhibit 50).

37.     The details of the different projects approved within the B-2 and CR areas of the main tract which appear in Defendant's Exhibit 15 have been explained within this document.

USA V. 33.92534 Acres
Page 6

## **CONCLUSION**

Based on the above we may conclude:

     a)     There is a reasonable probability that the subject may be approved for medium density residential development if adequate protection to or mitigation of the wetland is provided.

     b)     There is evidence that as an incidental legal practice under a development scheme, the sand deposits on the subject may be substituted with stable borrow fill that exists in another portion of the main tract.

     c)     The before and after method is not applicable because the subject had a legal independent identity as of date of the taking as per owners information. This must be subject to the presentation of pertinent evidence. Moreover, even if that were not the case local jurisprudence* recognizes that when appraising a large tract (an the court uses "in excess of 150 cuerdas" as an example) which has easily identifiable sectors that may be dedicated to different highest and best uses, it is justified and convenient to appraise the property on the basis of sectors or portions. In this case "upland" and "wetland" are easily identifiable and distinct.

Finally, I declare under penalty of perjury pursuant to 27 U.S.C. § 1746 that the aforegoing to the best of my knowledge is true and correct, and that I am a licensed real estate appraiser .

Respectfully submitted this _____day of May 2005.

_____
Carlos E. Gaztambide