# EXHIBIT D

# Gaztambide Deposition

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

```
*******************************
UNITED STATES OF AMERICA         :
                                 :
            Plaintiff            :
                                 :
      v.                         :CIVIL NO. 98-1664(CCC)
                                 :CIVIL NO. 98-2344(CCC)
33,92536 ACRES OF LAND, MORE     :
OR LESS, SITUATED IN VEGA BAJA,  :
COMMONWEALTH OF PUERTO RICO,     :
AND JUAN PIZA BLONDET, AND       :
UNKNOWN OWNERS                   :
                                 :
            Defendants           :
                                 :
*******************************
```

DEPOSITION OF:

CARLOS E. GAZTAMBIDE

was taken on April 5, 2006 at the offices of CARLOS GAZTAMBIDE & ASSOCIATES, Banco Popular Center, Suite 1515, 208 Muñoz Rivera Avenue, Hato Rey, Puerto Rico, commencing at 9:40 a.m.

**BONAFIDE & CERTIFIED REPORTING**
P.O. BOX 9022272
SAN JUAN, PUERTO RICO 00902-2272
(787) 250-8507

APPEARANCES:

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
Counsel for Plaintiff
PO Box 561
Ben Franklin Station
Washington, DC 20044
BY: PAUL HARRISON, ESQ.
    JEFFREY M. TAPICK, ESQ.

J. WAYNE MUNPHREY LAW FIRM, LLC
Counsel for Defendants
109A Smart Place
Slidell, Louisiana 70458
BY:  J. WAYNE MUNPHREY, ESQ.
     PAUL E. HARRISON, ESQ.
     MAURICE PIZA, ESQ.

ALSO PRESENT:
RAUL RODRIGUEZ

SHEET 21   PAGE 78

1    A    Yes.
2    Q    Okay. I'd like to ask you about each of those
3  criteria.
4    A    Sure.
5    Q    I'm going to go through them and I'd like to
6  begin with legal permissibility. On December 2nd, 1998
7  which is the date of valuation, as you and I discussed,
8  there were a number of legal restrictions affecting the
9  subject property. Is that true?
10   A    Well, there was a zoning in place that implied
11 some restrictions.
12   Q    What was the zoning in place?
13   A    B2.
14   Q    What types of activities were permitted under
15 B2 zoning in 1998?
16   A    Certainly not residential.
17   Q    Do you list the activities on Page 28 of your
18 report?
19   A    I don't recall. Yes, they're there.
20   Q    You say, "The only presumable uses are
21 activities related to aesthetic values, refuge and
22 species breeding places, the coastal protection,
23 scientific investigation, passive recreation as long as
24 they do not affect the natural eco system, plus the

PAGE 79

1  construction of fishermen's piers without affecting the
2  mangroves." Is that right?
3    A    That's correct.
4    Q    And where did you get that list of uses, do
5  you recall?
6    A    Probably from the regulations.
7    Q    The zoning regulation in effect in 1998?
8    A    Yes.
9    Q    Were there any other restrictions affecting
10 the property in 1998, aside from zoning?
11   A    Not that I recall.
12   Q    Were the flood zone restrictions affecting the
13 property?
14   A    That's correct. It was under Zone 2 which is
15 a, a Zone 2 is a, is a flood zone where development is,
16 was then authorized if the appropriate, see, because if
17 we could, now that you talk about floodability, it is
18 important that we look on that same page, 28, on the
19 same paragraph you read it says on the third sentence
20 here, this one, "The LT-B2 District stands for Laguna
21 Tortuguero Bosque de Mangle...", "mangle" is mangrove,
22 and, you know, when they, I know, I was already an
23 appraiser when they enacted this Laguna Tortuguero --   Q
24      Do you recall what year they enacted the Laguna

PAGE 80

1  Tortuguero restrictions?
2    A    It was many years ago. Probably, Jesus
3  Christ, probably, I don't remember but over 20 years
4  ago.
5    Q    Nineteen seventy nine, does that sound right?
6    A    Could have been, could have been but I know it
7  was a long time ago and, you know, somebody panicked and
8  they just boom, everything big, but really the intent,
9  the intent was to zone the mangrove areas, the wetland
10 areas.
11      Now we know that 19 "cuerdas" from the subject are
12 not mangrove and that the balance is a mangrove so there
13 are two things here that need to be studied, analyzed,
14 considered feeding that reasonable probability.
15      First of all, is that now they're in the process
16 and they have been in the process of revising these maps
17 because they recognize that the maps are not necessarily
18 correct.
19   Q    When you say "they", who do you mean?
20   A    The government.
21   Q    When you say "the government", you mean a
22 specific agency of the government?
23   A    Yes. The Planning Board.
24   Q    The Planning Board.

PAGE 81

1    A    The Planning Board and there are
2  professionals, there are professionals that have been
3  highly successful studying these areas and presenting
4  both to FEMA and to the local government mistakes in
5  these maps because what they really say is, don't touch
6  the mangrove and we agree with that but why carry the
7  upland and then what is imperative in these situations
8  and many land owners have done is a JD; a jurisdictional
9  determination in which they study very carefully the
10 characteristics of a particular property and I've been
11 exposed to one here in San Juan and a client of mine,
12 Caribbean Petroleum, they have a farm that has mangroves
13 over there and --
14   Q    Is that farm zoned B2?
15   A    No, no. It's not zoned, it's something worse
16 than that, I think, but the important thing is,
17 irrespective of the zone, is that you do a JD, a
18 jurisdictional determination on your property and you
19 find out what areas are in reality mangroves and you
20 leave those alone and then they allow you to develop
21 what is not mangrove.
22   Q    It's interesting. Let me ask you a little bit
23 more about what you just told me. You say that the
24 intention of the B2 was to identify and protect the

SHEET 22  PAGE 82

1 "bosque de mangle" which you translated as mangrove.
2    A    Mangrove.
3    Q    Is that correct?
4    A    Yes.
5    Q    Is there any place that that intention is
6 written on a document?
7    A    It is because the ultimate concern was and is,
8 the runoff of the water towards the lagoon.
9    Q    I'm not sure your answer is responsive to my
10 question, Mr. Gaztambide. My question is, is that
11 intention to protect the mangrove stated or articulated
12 in any document that is in your file or in your
13 possession?
14    A    It's probably somewhere in the file but it's
15 just a matter of getting that regulation and most
16 probably the, the reasons for enacting that regulation
17 is to protect the mangroves, the habitat in the
18 mangroves and the "laguna".
19    Q    I understand that's what you're telling me but
20 I'm asking if you can point to any evidence to back that
21 statement up?
22    A    At this moment, no. At this moment, no.
23    Q    Do you cite to any evidence in your appraisal
24 report to back that up?

PAGE 83

1    A    Do I cite any evidence to back that up. I
2 don't know.
3         MR. P.E. HARRISON: Counsel, to the extent it
4 misrepresents his report, it's the best evidence of its
5 terms and conditions, and I do think he references the
6 regulations.
7         MR. TAPICK: My question is, is there any
8 reference to the interpretation that he has offered in
9 his testimony about the reason for establishing the B2
10 zone.
11        THE DEPONENT: Yes. The reference is the
12 regulation. I don't have it with me here but this is
13 what I recall. For example, when we saw the, when we
14 saw the map before, you know, it says that the B2 is
15 "bosque de mangle" specifically mangrove, mangrove
16 forest and where there's no mangrove forest, there's no
17 B2. It should not be any.
18              EXAMINATION CONTINUED
19 BY MR. TAPICK:
20    Q    You also said that currently ongoing in the
21 present development climate, if land owners or
22 developers present a jurisdictional determination to the
23 government, presumably the Planning Board --
24    A    No. This, they do this to the Fish and

PAGE 84

1 Wildlife.
2    Q    I'm sorry, Mr. Gaztambide, let me finish my
3 question.
4    A    I'm sorry, I'm sorry, I'm sorry.
5    Q    That they present a jurisdictional
6 determination to an agency of the government, be it the
7 Planning Board or Fish and Wildlife, that if such a
8 jurisdictional determination shows that there is no
9 mangrove, that that would result in changing the
10 classification of the zoning from B2 to something else,
11 is that what I understand you to say?
12    A    That's correct but I must say this, you don't
13 present a jurisdictional determination. You present a
14 study and you request a jurisdictional determination
15 from the Fish and Wildlife a firm, a firm that
16 specializes in this work, the land owner can contract a
17 firm to prepare the study, to classify your land and say
18 listen, Fish and Wild life people, you have my land
19 classified whatever, B2 or some other zone what doesn't
20 permit any, any development, please, here I'm presenting
21 you and actually the professional that does the work,
22 does the study and then proves to the people or the Fish
23 and Wildlife that part of that farm, yes, is a mangrove
24 forest but part of the farm is upland and then comes the

PAGE 85

1 jurisdictional determination that says to Fish and
2 Wildlife I retain jurisdiction on the wetland, I don't
3 have jurisdiction of the upland.
4    Q    When you say Fish and Wildlife, do you mean
5 the Army Corps of Engineers?
6    A    Yes, yes.
7    Q    And are you talking about a procedure by which
8 a land owner is attempting to change the zoning?
9    A    That's correct.
10   Q    And it's your testimony that it's the Army
11 Corps of Engineers or the Fish and Wildlife Service or
12 some other federal agency that makes the determination
13 to change the zoning?
14   A    No, no, because you request the change to the
15 Planning Board but the Planning Board will not move
16 until the agency with the authority to declare wetlands
17 and uplands in Puerto Rico, which is the Corps of
18 Engineers and the Fish and Wildlife Service so they wait
19 for the jurisdictional determination from the Fish and
20 Wildlife and then they let you know, okay, in this
21 particular case I'm talking to you about here, this is
22 about a 100 "cuerdas" farm and they declare about 60 of
23 them developable and 40 percent, more or less, was
24 retained under the jurisdiction of the Fish and Wildlife

BONAFIDE & CERTIFIED REPORTING SERVICE (787) 250-8507

SHEET 23   PAGE 86

1 to correct, to correct the mistakes that happened when,
2 boom, somebody said --
3    Q    Just to make sure I understand your testimony,
4 to put all these pieces together, you're telling me that
5 the B2 area is over inclusive to include areas that are
6 not actually mangrove forest?
7    A    That's correct. That's correct.
8    Q    And that in order to rectify that situation,
9 the landowner would apply to the Planning Board, who
10 then looks to the Army Corps or the Fish and Wildlife
11 Service to make a determination based on a JD whether
12 there is in fact mangrove in the area. Is that --
13    A    The landowner has to retain a firm which
14 specializes in this determination and that firm is the
15 one that presents the request for jurisdictional
16 determination to the Corps of Engineers.
17    Q    Who makes the jurisdictional determination,
18 the Corps or the firm?
19    A    No, the Corps.
20    Q    The Corps makes it. Is it ever the case that
21 you hire a private firm to do a jurisdictional
22 determination and then submit that to the Corps?
23    A    That's the way it works because the Corps
24 just, just studies what the private consultant and like

PAGE 87

1 in every profession, there's some consultants that are,
2 well respected here in Puerto Rico and that have been
3 very successful in correcting, if you will.
4    You cannot make wetland upland. You just have to
5 recognize it and then they do their studies. They
6 present it on behalf of the, of the land owner and the
7 situation is corrected.
8    Q    So are you saying that that type of rezoning
9 process, if you will, is ongoing all the time in Puerto
10 Rico at the moment?
11    A    I would say so, I would say so. Land owners
12 that have the ability and the capacity, economic
13 capacity to spend whatever, 20, $30,000., I don't know
14 what they charge, something like that, and they want to
15 develop their land, they, they look in that direction.
16    Q    Do you have any evidence that this is ongoing?
17 Do you have any experience working on such cases? Do
18 you know of any people who have -- You need to take a
19 break?
20        THE DEPONENT: Yes. For a minute just to take
21 a call.
22    (A recess was taken at this time.)
23        EXAMINATION CONTINUED
24 BY MR. TAPICK:

PAGE 88

1    Q    Do you have any evidence of this rezoning
2 procedure going on presently in Puerto Rico and by
3 rezoning procedure, I mean landowners going through the
4 process of getting B2 reclassified for its over
5 inclusive --
6    A    Presently I'm involved in two cases; one in
7 which the jurisdictional determination was done with
8 respect to the classification of the land into upland
9 and a wetland and the other one in which the flood
10 rating of a property was corrected from Zone 1 to Zone
11 2, being Zone 2 a portion, a section that can be
12 developed provided fill is provided for.
13    Q    Can you tell me more about those particular
14 cases like just basic facts, who you're representing and
15 who was the developer, etcetera.
16    A    Okay. Well, no, I'm not representing anyone,
17 I'm just appraising the property. In one case it's
18 about 100 "cuerdas" that belongs to Caribbean Petroleum
19 here in the, in the bay area. This is a big piece of
20 land that lies between the refinery and the expressway
21 and they requested a JD; a jurisdictional determination
22 and I, I walked the property and you could see exactly
23 where they marked the wetland.
24    They, they put some permanent markers there to make

PAGE 89

1 sure, not forever, but at least for the foreseeable
2 future, everyone knows where the wetland starts.
3    Q    Was that zoned B2?
4    A    I don't remember, no, I don't remember the
5 zoning.
6    Q    So it's more about wetlands and uplands, is
7 that what that case involves?
8    A    Right, but this is what this B2 has to do
9 with, because, you know, "bosque de mangle" is in
10 reality wetland, you know, it's a different way to call
11 it wetland because "bosque de mangle" is one type of
12 wetland. It could be other types of wetland.
13    Q    And what was the other case?
14    A    The other case is a, is a, is a property in
15 Caguas. It's about an eight to ten "cuerdas" property.
16 Well, there's an issue about the size too but that's
17 besides the point and they requested, they requested
18 that the flood map be corrected because a good portion
19 of the property was rated part of the, we call it in
20 Spanish, "causa mayor", the major flood way of the, of
21 the river and they, these people did a study and they
22 present it to FEMA and FEMA corrected the, the map.
23    Q    Is there any other cases or is there any other
24 experience you have with respect to this rezoning

SHEET 27  PAGE 102

your site work so that the first level is protected from the floods.
   Q   Did you include the regulations for flood zones in your report on your work file?
   A   No, because they are regulations that we refer to every day and as a rule, most readers of the appraisals are aware of Regulation 13. We usually include something out of the ordinary.
   I's just like Regulation No. 4 which is public domain, if you will.
   Q   So if one were to want to develop in a flood Zone 2 that is zoned B2, what sorts of permits or approval would be necessary from which agency?
   A   You will have to submit a "consulta de ubicación", locational consultation, and then you will need to get the endorsements of the different agencies that have a say in it.
   Q   Would you submit that to the Planning Board?
   A   You usually submit that to the Planning Board but I'm pretty sure, I don't do that every day but I'm pretty sure that they require additional copies of your project so they can circulate it throughout the agencies.
   I don't know, since I don't do this every day, I

PAGE 103

don't know if they allow you to do the circulation or they do it themselves but I know they ask 22 copies or whatever copies of the, of your project.
   Q   How long does it take to consult, for all those agencies to be consulted for their opinions about a project?
   A   This is, this is a big publication today. Everywhere you go and then in Puerto Rico it's no different. It all depends on how complicated the project is, number one, and number two, it all depends on how diligent you are, the proposer is trying to follow through to make sure that you, that you get things going.
   On a residential area but let me qualify this, on a residential project, a typical residential project, if everything goes well, you should have all your permits in place within a year, maybe less than that but when you get to commercial projects, it's a different story because commercial projects usually are more complicated.
   You need more public hearings and you need to consult with the Department of Commerce and you need to consult with the local chambers and you need to analyze supply and demand for commercial space.

PAGE 104

   Q   Since we're talking about a residential project in this assignment, let me ask you specifically about residential permits. You said it would, it would normally be issued within, within a year or so. Is that correct?
   A   I would say, if everything goes well, it should be in place within a year.
   Q   Is that based on your personal experience?  A   Not really my personal experience. It's based on my clients.
   Q   Do you have any, any sort of documentation to show that normally it would only take about a year for a residential project to be approved?
   A   Not really. It's just observation. Like I say, you know, a simple development of 47 lots or 57 lots is a different story when you propose 1,000 units.
   Q   What about in situations that would require the examination of wetlands or wetland jurisdictional determination, a delineation of areas that are in flood Zones 1 and 2, essentially the circumstances we find on the subject property, how long would that take?
   A   I, I can't answer you with a straight answer that I would say I'm sure about this but I would, based on what experience I had with some of my clients, I

PAGE 105

think probably it would take another year or so to get the whole thing over.
   Q   So you're saying it takes one year?
   A   It may take probably two years.
   Q   Two years. And, again, that's just based on your experience and profession?
   A   Yes, yes.
   Q   Is it based on anything else that you say two years?
   A   No, not really because there's nothing written, you know. Every project, it all depends on how well, how well it is presented and how diligent you are in answering their questions.
   Q   Are you familiar with the history of this property and the history of Mr. Piza's applications for various residential developments on the other parts of properties he owns in Vega Baja?
   A   I wouldn't say I'm really familiar because what I know is piecemeal information with respect to the project that he has got approvals and the projects that he has on hold, things like but let's put it this way, I don't have enough information to say, yes, I know the track record of Mr. Piza as a developer.
   Q   Do you know if he has had a proposed project

BONAFIDE & CERTIFIED REPORTING SERVICE (787) 250-8507

SHEET 28   PAGE 106

1 that's been pending with the Planning Board since 1997
2 that has not received approval as of today, 2006?
3    A    He mentioned a project that was put on hold, I
4 think was a walkup or something, but that's
5 understandable because it was not until now that they
6 had the sewer capacity.
7    Q    When you say "now", what do you mean by now?
8    A    This year, late last year or this year so
9 really for walkups it's a different story than for lots
10 because when you, when you develop.
11       For example, 900 meter lots they would not require
12 you a sewer so it's, when you talk about walkups you
13 definitely need sewer so it would be, not foolish but it
14 would be impractical to push a project if you know you
15 don't have the sewer capacity yet.
16   Q    Are you familiar with any other permits he
17 sought on other parts of his property for the Haciendas
18 Tortuguero Development?
19   A    I'm familiar with several of the projects he
20 got permits.  I have them, actually I analyzed those
21 permits to establish the reasonable probability that he
22 could get permits on the site, on the subject site.
23   Q    Do you remember how long it took from the time
24 he applied for those permits to the times they were

PAGE 107

1 issued?
2    A    I don't know exactly the time, no.
3    Q    You state on Page 36 of your appraisal that,
4 I'm in the middle of the page --
5    A    Yes.
6    Q    "Based on the above, there is a reasonable
7 probability that the subject may be approved for median
8 density residential development if adequate protection
9 to or mitigation of the wetlands is provided."  Is that
10 true?
11   A    Yes.
12   Q    I'd like to ask you about the basis for this
13 conclusion.
14   A    Okay.  I --
15   Q    I will first ask you, because you state on, on
16 Page 36 at the top of the page, "The B2 zoning is not an
17 absolute negation to development because R1 and R3
18 equivalent subdivisions have been approved, not only on
19 the main tract owned by Mr. Piza Blondet but in numerous
20 properties that have this zoning and subsequently were
21 approved for development, presumably because these do
22 not represent an adverse factor with respect to the
23 protection of the lagoon."
24   A    Uh-huh.

PAGE 108

1    Q    Is that right?
2    A    Yes.
3    Q    What subdivisions are you talking about in
4 that statement?
5    A    Well, first of all, we're talking about the
6 different projects that, that he obtained permits at the
7 tract, I believe they were at least four or five
8 different, different permits that, which I would like to
9 refer to them if you give me a chance.
10   Q    Sure.
11   A    We should break maybe for a few minutes.
12   Q    So you can look through your permits?  Before
13 we do that, let me keep asking you --
14   A    Okay.
15   Q    -- and then we'll go back to the specific
16 permits.
17   A    Because I want, I want to illustrate to you
18 which ones I took into consideration.
19   Q    But in essence are you saying are the R1 and
20 R3 subdivisions you're talking about on Page 36 are the
21 Haciendas de Tortuguero subdivisions that Mr. Piza
22 Blondet obtained permits for?
23   A    Yes.
24   Q    Okay.  And we will get to those permits

PAGE 109

1 themselves in a few minutes.
2    A    That's correct.
3    Q    I just wanted to know --
4    A    Sure.
5    Q    -- which subdivisions you were referring to.
6 You say in that paragraph "To that effect...", this is
7 the next sentence, "To that effect, we are presenting an
8 aerial photograph showing numerous residential
9 developments to the east and south of this lagoon."
10   A    Yes.
11   Q    This is the photograph that you presented as
12 one of the defendant's exhibits, Exhibit 19, I believe.
13 Do you recall --
14   A    I will have to check.  I will have to check
15 because I think there might be an aerial photograph in
16 the report but there should be some other, some in the
17 exhibits so let's check that before we go any further.
18      Yes, here this aerial photograph is the one I'm
19 talking about.
20   Q    Is that an exhibit to your appraisal report?
21   A    Well, it's not an exhibit, it's part of
22 because it's part of the photos.  They're on Page 31.
23   Q    Okay.  So this is the aerial photograph that
24 you're referring to on this statement on Page 36?

SHEET 46 PAGE 178

1  A  Yes. This is, this is a local jurisprudence.
2  Q  Do you know if Puerto Rico law controls in
3 this case?
4  A  Excuse me?
5  Q  Do you know if Puerto Rico law would control
6 in this eminent domain action?
7  A  I don't know. I'm appraising based on, in the
8 local jurisprudence. I am appraising a farm that is
9 situated in Puerto Rico so I would say that.
10  Q  Were you advised by counsel --
11  A  No. No. This is just my --
12  Q  So you were not advised by counsel regarding
13 what law to follow --
14  A  No.
15  Q  -- in making your present assignment?
16  A  No, no, no. The other one is ELA --
17  Q  That's okay, Mr. Gaztambide.
18  A  -- versus Sociedad Agricola Industrial, 104
19 DPR392 and also Nichols on eminent domain covers that in
20 Volume 4. Nichols is sitting up there.
21  Q  Yes, sir. I'd like to switch topics.
22  A  Sure.
23  Q  And ask you about your addendum report on sand
24 extraction.

PAGE 179

1  A  Sure.
2  Q  And this is a report that, as we previously
3 discussed, was also produced with an effective date of
4 June 13, 2005. Is that correct?
5  A  Yes. I had a copy around here.
6  Q  You did. Is it --
7  A  I don't see it. That could be it.
8     MR. HARRISON: Paul, is that your copy that's
9 or --
10     MR. P.E. HARRISON: No, I don't think so.
11         EXAMINATION CONTINUED
12 BY MR. TAPICK:
13  Q  Who decided to retain Dr. James Joyce in this
14 case?
15  A  I recommended it.
16  Q  Okay.
17  A  Because in a previous case this was, you know,
18 when we're talking about sand volumes and what have you,
19 of course, I'm not a geologist so I recommended that he
20 be retained so that he could estimate the sand volumes
21 involved.
22  Q  How do you know there was sand on this
23 property?
24  A  Because I walked on it.

PAGE 180

1  Q  Is there sand on the other portions of Mr.
2 Piza's farm?
3  A  There's sand on the other portions? Frankly,
4 I haven't walked the other portions.
5  Q  When you went to the Haciendas de Tortuguero
6 subdivision, did you see sand on that portion?
7  A  I wasn't looking for it, frankly. I was
8 looking for, for the characteristics of the subject and
9 I looked throughout the subject the best I could but the
10 rest of the farm, I haven't even walked on it.
11  Q  But you walked on the Haciendas de Tortuguero
12 subdivision or you --
13  A  The streets right on the sidewalks.
14  Q  But you couldn't tell if there was sand there?
15  A  I wasn't looking for it so I really can't tell
16 you if I was really looking for that.
17  Q  So you decided --
18  A  It is because when you get to the subject, it
19 strikes you.
20  Q  You decided to retain Dr. Joyce, is that fair?
21  A  I recommended and then they went along with me
22 and, and retained him.
23  Q  You recommended that to counsel or to your, to
24 Mr. Piza?

PAGE 181

1  A  I don't remember. I don't remember to whom I,
2 I made the recommendation directly.
3  Q  And you don't have any expertise in sand
4 extraction yourself, that's why you look to Dr. Joyce,
5 is that --
6  A  Exactly.
7  Q  Okay. And have you ever appraised mineral
8 interests prior to this case?
9  A  Yes, we did it in another case in, in Jayuya.
10  Q  The one you were telling us about this morning
11 in Jayuya?
12  A  Yes.
13  Q  Other than that case, have you ever appraised
14 mineral interests?
15  A  I don't remember. I might have but I don't
16 remember.
17  Q  And the case in Jayuya involved sand that's
18 used in the construction industry, is that correct?
19  A  Primarily, yes.
20  Q  Now, you looked at Gonzalez Ferrer's appraisal
21 of this property and Ivan Canino's appraisal of this
22 property as you mentioned previously. Did those
23 appraisals mention sand extraction, that you recall?
24  A  I don't recall.

SHEET 49  PAGE 190

1   A   Yes.
2   Q   Did you find any comparable sales that had
3 silica sand with a highest and best use of residential
4 development?
5   A   No.
6   Q   Did you look for it?
7   A   We looked for sales and we got our hands on
8 everything that was out there but none would respond to
9 that scenario, if you will.
10  Q   Did you look at any sales that had occurred to
11 the east of Mr. Piza's property?
12  A   To the east of Mr. Piza's property were the
13 sales of this development that I mentioned.
14  Q   The Playa Hermosa Development?
15  A   Playa Hermosa but none of that were sand.
16  Q   You didn't find any other sales in the
17 vicinity of the subject property that were filled with
18 sand deposits and were sold for residential development?
19  A   No.
20  Q   But you looked?
21  A   Yes.
22  Q   Now, on Page 23 of your report you address the
23 highest and best used of the sand deposits, if I'm to
24 understand the report.  Is that a fair reading?

PAGE 191

1   A   Say it again.
2   Q   You addressed highest and best use of sand
3 deposits, is that correct?
4   A   Will you please say it.
5   Q   Let me back up and maybe this will make it
6 clearer.  This report is addressing the market value of
7 the sand deposits on the property, is that correct?
8 This addendum --
9   A   The sand deposits, yes.
10  Q   Okay.  So your highest and best use section
11 would be highest and best use for the sand deposit, is
12 that fair?
13  A   Yes.  Would the highest and best use of the
14 property as a source of land.
15  Q   As a source of sand?
16  A   Of sands, yes.
17  Q   So you assessed the highest and best use of
18 the deposits of sand and determined that the highest and
19 best use was for extraction and sale, is that fair?
20  A   Section of sand, yes.
21  Q   Okay.  So you went through the four criteria
22 for highest and best use as you did in your other report
23 and those four criteria being legal permissibility,
24 physical possibility, financial feasibility and maximum

PAGE 192

1 productivity, is that correct?
2   A   Yes.
3   Q   Now, as to legal permissibility, you say on
4 Page 23, "Most of the expropriated property lies in the
5 zone where sand extraction is permitted by the
6 Department of Natural and Environmental Resources."
7 What zone are you talking about?
8   A   Primarily the main tract.  Where it says, "is
9 permitted", it should say "has been permitted".
10  Q   Okay.
11  A   Because it wasn't, as of the date of the
12 appraisal, had been permitted before.
13  Q   When we're talking about the expropriated
14 property here, do we mean the 34 "cuerdas", the 33.9
15 acres?
16  A   Yes.  It lies on its own where sand extraction
17 has been permitted, the zone being the greater tract.
18  Q   Okay.  So the zone you're referring to is the
19 greater tract --
20  A   Yes.
21  Q   -- of Mr. Piza's farm --
22  A   Yes.
23  Q   -- if you will?
24  A   Yes.

PAGE 193

1   Q   Okay.  Now, the subject property is zoned B2,
2 as we've established, is that correct?
3   A   Yes.
4   Q   Is sand extraction permitted as a use under B2
5 zoning?
6   A   Sand extraction does not necessarily, is
7 governed by the zoning.  The, the Department of Natural
8 Resources would allow you to extract the material and
9 substitute it with fill prior, for example, to
10 development but they will look at other criterias or
11 that the zoning per se, it could be anything or any
12 other zone so the sand extraction is, is more a permit
13 that has to with the Department of Natural Resources
14 criteria of the activity per se.
15  Q   Do you know if they first have to go to the
16 Planing Board to get approval for sand extracting in an
17 area zoned B2 before they can issue a sand extraction
18 permit?
19  A   I don't know.  I don't think they have to.
20  Q   But you don't know?
21  A   No.  You have to definitely get it from the
22 Department of Natural Resources.
23  Q   You state further on Page 23, "It should be
24 added that Engineer Jose Hernandez is developing a six

BONAFIDE & CERTIFIED REPORTING SERVICE (787) 250-8507)

SHEET 50   PAGE 194

1 unit residential project virtually within the perimeter
2 of the Piza property and he has been approved to remove
3 the sand deposits, sell the sand and substitute it with
4 borrowed fill, as a normal activity within this
5 development permit.  This area is zoned B2."
6     A    That statement is incorrect.
7     Q    It's incorrect?
8     A    It's incorrect.
9     Q    Can you tell me what's incorrect about it?
10    A    That, the information I originally got when
11 the appraisal was prepared back in June, they had
12 informed me that he was allowed to sell the sand.  It
13 turned out to be that he was not.  He was allowed to
14 remove the sand but not to sell it.
15       I think he, I've heard as a "chisme" that he
16 bartered it but that's a problem that he had to deal
17 with.
18    Q    Do you recall where Mr. Hernandez' property is
19 in relation to the subject property?
20    A    From the top of my head, I have a vague
21 recollection.
22    Q    Is there any document in your work file that
23 indicates where that is?
24    A    There are some photos there but I don't think

PAGE 195

1 the location is the location of the, I have a vague, a
2 vague idea.
3     Q    How did you determine that the area of his
4 project is zoned B2?
5     A    Because in the general area, this property is
6 pretty well inland with respect to the road and in that
7 area is already B2.
8     Q    So you determined based on what you could
9 ascertain from the photographs where the property is
10 located in relation to the road --
11    A    Yes.
12    Q    -- that it's zoned B2?
13    A    Uh-huh.
14    Q    Okay.  So I presume you looked at the zoning
15 map as the source of the zoning then?
16    A    Yes.
17    Q    Do you have any other documentation discussing
18 his six unit residential development project, aside from
19 those photographs?
20    A    No.  I don't recall who gave me this
21 information initially.  I don't, I hate to say this but
22 it could have been Benjamin Pomales but I really don't
23 remember.
24    Q    And --

PAGE 196

1     A    And afterwards -- I'm sorry.  Afterwards this
2 is why I made the clarification at the onset today, that
3 the extraction permit could be two fold, two types, you
4 know.  A permit like Mr. Piza got, a formal permit in
5 which you can extract the sand and sell it and
6 extraction permits which are incidental to construction
7 in which you can move the sand but not sell it.
8     Q    And you haven't seen a copy of this permit?
9     A    No.
10    Q    And we don't know who Jose Hernandez is?
11    A    I don't know who he is.
12    Q    We don't know what quantity he was allowed to
13 move?
14    A    No.
15    Q    Now, then on Page 24 you state at the top,
16 "Furthermore, our engineer consultant opines that the
17 extraction and sale of deposits like the ones of the
18 subject are incidental to any development permit and are
19 customarily attainable."  Who is the engineer
20 consultant?
21    A    That's Pomales.
22    Q    Mr. Pomales.
23    A    Has to do with the same issue.
24    Q    And you believe Mr. Pomales was retained for a

PAGE 197

1 period of time by Mr. Piza, is that correct?
2     A    I'm going to be very honest with you.  I don't
3 know what the relationship was but he was presented to
4 me as a consultant.
5     Q    Now, based on this information that you've
6 stated in your report and that we have just discussed,
7 you determined that the use of sand extraction, the
8 extraction of sand and the sale of that sand, would be
9 legally permissible on the subject property.  Is that a
10 fair statement?
11    A    It's based primarily on the historical fact
12 that he had been permitted previously.
13    Q    Was he ever permitted to extract sand from the
14 33 acres that was expropriated in this case?
15    A    I don't know.
16    Q    You don't know or you can't remember from the
17 documents?
18    A    No, I don't know because I don't have evidence
19 prior, the oldest evidence I have is 1988 and I think as
20 of 1988 that land was already leased to FAA so I can
21 come to the conclusion that he could not have requested
22 a permit from the land he had under lease agreement but
23 that's just my conclusion based on, based on the
24 documentation I have.

SHEET 51   PAGE 198

1    Q    So your finding of legal permissibility is
2  based on this information plus your understanding of the
3  historical granting of permits on property that Mr. Piza
4  owns in Vega Baja?
5    A    Primarily.
6    Q    And some of those documents are contained in
7  your work file, is that correct?
8    A    Yes.
9    Q    Did you speak to anybody at the Department of
10 Natural Resources about the permitting process for sand
11 extraction?
12   A    I did not. What I don't know is either Dr.
13 Joyce or Juan checked that.
14   Q    Did you rely on Dr. Joyce to provide you with
15 information that you used in making your legal
16 permissibility determination?
17   A    I don't think so. Again, I say I base it
18 primarily on, on historical data.
19   Q    As of the date of taking, were there any
20 permits for extracting sand on the 33 acres parcel?
21   A    No.
22   Q    Were you aware, are you aware of whether there
23 were any permits that had been applied for sand
24 extraction on the subject property as of the date of

PAGE 199

1  taking?
2    A    I'm not aware.
3    Q    And in your report at no point do you make the
4  conclusion that it's reasonably probable that such
5  permits would be issued, is that correct?
6    A    That's correct.
7    Q    Now, turning to the question of physical
8  possibility, you say that, "The potential for sand
9  extraction has been determined in the accompanying
10 report by Dr. James Joyce."
11   A    Uh-huh.
12   Q    Correct? So you based your physical
13 possibility determination on Dr. Joyce's report?
14   A    Yes.
15   Q    Okay. Did you do any independent
16 investigation or talk to anyone else about how much sand
17 is on the site?
18   A    No. I relied on his report.
19   Q    Did you do any independent investigation or
20 rely on anybody else to determine the quality of the
21 sand on that site?
22   A    No, I relied on his report.
23   Q    So you didn't rely on any past or historical
24 sale of sand on the property, on the property in, in

PAGE 200

1  making your determination about physical possibility?
2    A    Can you restate it. I lost my --
3         MR. P.E. HARRISON: And I want to enter an
4  objection so, you know --
5         THE DEPONENT: Go ahead.
6         MR. P.E. HARRISON: Objection. Asked and
7  answered. You got what he did, he relied upon the
8  report so, okay.
9         MR. TAPICK: Are you instructing him not
10 answer or --
11        MR. P.E. HARRISON: No, no, he can answer.
12            EXAMINATION CONTINUED
13 BY MR. TAPICK:
14   Q    And do you need me to repeat the question?
15   A    Yes, please.
16   Q    My first question was about the quality of the
17 sand, I believe and the question is, did you do any
18 independent investigation or rely on anybody else to
19 determine the quality of sand?
20   A    No, no. This why I recommended that Dr. Joyce
21 be retained and I relied on his expertise.
22   Q    So you did not rely on past, past documents or
23 documents of past sand extraction or sale in making your
24 physical possibility determination --

PAGE 201

1    A    No.
2    Q    -- is that correct? Okay. Now, turning to
3  the question of financial feasibility you state that,
4  "The demand for sand in Puerto Rico is fueled by the
5  construction industry." On Page 24. Is that correct?
6    A    That's correct.
7    Q    So you go on to say that, "It is reasonable to
8  anticipate the financial feasibility of such an
9  extraction operation.", correct?
10   A    Yes.
11   Q    Okay. Now, is the silica sand that Dr. Joyce
12 describes as being present on the property used in the
13 construction industry?
14   A    No, it's used in the industries. It's where I
15 mention, "The sand of the character at the subject has
16 strong demand for industrial production."
17   Q    Who is interested in purchasing this sand,
18 purchasing this sand?
19   A    Owens Illinois.
20   Q    For what purpose?
21   A    They, they have, there's a factory out in Vega
22 Baja, very close, relatively close to the subject, that
23 silica sand is a, a primary of raw material for their
24 production of glass.

SHEET 4   PAGE 241

1   A   That's correct.
2   Q   So as support for the statement on Page 2,
3 Paragraph 2 you cite to Exhibit 17 and 18.  Do you have
4 copies of those exhibits here with you today?
5   A   Okay.  I should have.  Let's check that now.
6 Okay.  Okay.  It says here --
7   Q   Mr. Gaztambide, if I showed you a copy of
8 Defendant's Exhibit 17, would that help you find it?
9   A   Sure, sure.
10  Q   Mr. Gaztambide, you've just been looking
11 through your work file and you couldn't find the
12 original of Exhibit 17.  I'm going to show you a copy of
13 what I represent to be Defendant's Exhibit 17.  Will you
14 take a look at this, please.
15  A   Sure.
16  Q   Can you determine whether this is a true and
17 authentic copy of your Exhibit 17?
18  A   Yes, yes, it is.
19  Q   So using that copy, can you tell me what that
20 document is?
21  A   Seventeen?
22  Q   Yes.
23  A   Okay.  It says that on 20 September 1995 the
24 Planning Board approved consultation number 95-09-0858-

PAGE 242

1 JTU referenced with a residential development.  The land
2 where this development is located has an area, a total
3 area of 368 "cuerdas" and it's located at Puerto Rico
4 Road 687, Kilometer 3.1, Jeguada Ward, Vega Baja.
5     The land comprised are within a CR district
6 according to the special zoning of the hydrographical
7 basis of the Tortuguero Lagoon.
8   Q   Can I stop you there for a second, Mr.
9 Gaztambide?
10  A   Sure.
11  Q   Does that document say that the land
12 referenced therein is in a CR district?
13  A   It says so but it's wrong.  It's wrong because
14 the farm has both CR and B2 and it's very clear in the
15 map.  We can check that.
16     Then it says that Mr. Piza, through Santiago, filed
17 on 12 December 2000 an amendment of this consultation so
18 that the number of units approved could be increased
19 from 49 to 126 with a minimum size of 326 meters per
20 lot.
21     This request was considered by the Planning Board
22 and after the analysis and arguments presented,
23 considered them reasonable and it says, "Taking into
24 consideration the above and according to law and

PAGE 243

1 regulations in place, the Puerto Rico Planning Board
2 through this extension, authorizes an amendment to
3 consultation No. 95-09-0858JPU to authorize that the 49
4 lots previously approved now may have a minimum area of
5 300 square meters each."
6     Now, it will be a condition, a sine qua condition,
7 that the projects be connected to a sanitized system and
8 it says, "All the other parcels in the previous report
9 not altered by this extension remain in full force."
10  Q   Can I ask you a question now, Mr. Gaztambide?
11  A   Sure, sure.
12  Q   This Planning Board resolution references a
13 prior development approval, is that correct?
14  A   It references a prior development approval as
15 of 1995.
16  Q   That development approval was for the
17 Haciendas de Tortuguero Development, is that true?
18  A   Well, let's put it this way, if we're going to
19 call Haciendas de Tortuguero all the approvals, the
20 different approvals that Mr. Piza obtained, I could say
21 yes, but if we're going to differentiate the different
22 approvals that he has obtained at this time, then maybe
23 we should call them La Julia which is the name of the
24 farm because I don't know for sure if these lots, the 49

PAGE 244

1 lots, are part of what he calls Haciendas de Tortuguero
2 because the location of these 49 lots, according to the,
3 to the drawings I have somewhere here in this file, does
4 not coincide, does not coincide with where the actual
5 houses constructed at Haciendas de Tortuguero are.
6   Q   Did you read a Planning Board number
7 associated with this development approval?
8   A   Yes.
9   Q   Can you tell me again what that number was?
10  A   Ninety five which is the year, 09085AJPU.
11  Q   And if we find other documents with that same
12 Planning Board number that are identified as being
13 approvals for the Haciendas de Tortuguero Development,
14 would that indicate to you that this resolution is also
15 for the Haciendas de Tortuguero residential development.
16  A   It could.  We should check it very carefully.
17 It could.
18  Q   Now, this document states that the zoning is
19 CR which you dispute, according to your prior testimony,
20 is that correct?
21  A   Well, I'm not, I'm not disputing it from its
22 face.  What I'm saying, if they're talking here about a
23 368 "cuerdas" farm and they say the farm is within a CR
24 district, it's wrong because we know the 368 "cuerdas"

BONAFIDE & CERTIFIED REPORTING SERVICE (787) 250-8507)

SHEET 7   PAGE 253

1  your interpretation of the zoning map, is that true?
2      A    That's correct.
3      Q    And do you have any special experience,
4  through your training as an appraiser or as an attorney,
5  in determining zoning boundaries?
6      A    Zoning boundaries, we deal with that problem
7  every day basically because of the scale of the zoning
8  maps so we deal with that problem every day.
9      Q    Do you have any documents in your work file
10 that refer to any of these four projects and label them
11 as being on B2 zoning?
12     A    I have the documents.  We will have to check,
13 we will have to check to see what they say.
14     Q    Do you recall offhand whether any of them
15 identify any of these four projects or any other
16 projects as being on B2 zone land?
17     A    I don't recall but the documents are here.  We
18 can check.
19          MR. MUNPHREY:  Let me interrupt you.  I want
20 to make some --
21     (Mr. Piza entered the deposition room.)
22               EXAMINATION CONTINUED
23 BY MR. TAPICK:
24     Q    Mr. Gaztambide, do you have any other

PAGE 254

1  documents besides Exhibit 17 that would refer to what
2  we're calling the 49 lots R3 equivalent approval
3  development?
4      A    I will have to check.  Maybe I have other
5  documents.  I remember distinctly of 417 which is the
6  approval per se and this drawing which is the, the
7  development plan.
8      Q    Any documents you would have regarding this 49
9  lots development would be in your work file, is that
10 true?
11     A    Yes.
12     Q    And those would have been produced to us, the
13 government?
14     A    Yes, yes, but I cannot say for sure which ones
15 there are.
16     Q    With respect to what you've labeled as No. 1,
17 special community, do you have any documents in your
18 work file addressing that development?
19     A    Yes.
20     Q    Okay.  Do you think you can find those
21 documents for me?
22     A    Yes.
23     Q    Okay.
24     A    Okay.  I have here a minute of a meeting

PAGE 255

1  dealing with this particular special community.
2      Q    And you're referring to Defendant's Exhibit --
3      A    Twenty seven.
4      Q    -- 27?
5      A    Let me see what else we've got referring to
6  that.  While we're at this subject, I have here as
7  Defendant's Exhibit 18, the first approval of the 27
8  lots were originally approved.  Remember in that Exhibit
9  27 it says a modification from the original permit is
10 not R3 equivalent.
11     Q    I'm sorry.  Exhibit 27 or Exhibit 17?
12     A    Exhibit 17 is the one that modifies the permit
13 that appears under Exhibit 27.
14     Q    So is it your testimony that Exhibit 18 also
15 references the development that we've labeled as No. 2
16 on Exhibit 4 to this deposition and what's been
17 identified as Defendant's Exhibit 43A, is that correct?
18     A    Exhibit 18 is the original approval of the
19 project which subsequently became exhibit, the 300 meter
20 lot which is identified as Exhibit 17.
21     Q    Does Exhibit 18 state anywhere on it that the
22 zoning is B2?
23     A    It does, I'm pretty sure it doesn't either, it
24 doesn't say one way or the other but let's take a little

PAGE 256

1  bit of time here to look at it.  It makes no reference
2  to the zoning.
3      Q    It makes no reference to the zoning
4  whatsoever?
5      A    No, no reference.  It leaves that to
6  interpretation, I suppose.
7      Q    Now --
8      A    This is, excuse me.  This is actually a permit
9  for the actual construction of the, of the site work.
10     Q    You're looking at the back side of Exhibit No.
11 18?
12     A    That's correct.  That's correct.
13     Q    And does that side of the exhibit state what
14 the zoning is one way or the other?
15     A    No, it doesn't say but it says, "This permit
16 is for the construction of the urbanization forming 27
17 residential lots, unit family residential lots with a
18 minimum area of 900 square meters."
19     Q    Mr. Gaztambide, I don't mean to be rude but we
20 do have a lot of documents and if you could confine your
21 answers to the questions I ask.
22     A    Sure, sure.
23     Q    Unless you feel that your answer is being more
24 responsive --

SHEET 8  PAGE 257

1    A    Sure. No problem.
2         MR. TAPICK: Is that fair, counsel?
3         MR. P.E. HARRISON: It's fair, but I mean,
4 you've got to him some latitude to fully explain --
5         THE DEPONENT: No problem.
6         MR. TAPICK: I will. To the extent that --
7              EXAMINATION CONTINUED
8 BY MR. TAPICK:
9    Q    You were in the process of answering a
10 question about the special community which you've marked
11 as Exhibit No. 1 --
12   A    That's right.
13   Q    -- which you've marked as No. 1 on Deposition
14 Exhibit 4 and you referenced Defendant's Exhibit 27
15 which is what you've identified as a minute to a meeting
16 about that project. Is that correct?
17   A    That's correct.
18   Q    Now, Defendant's Exhibit 27, does that state
19 anywhere in the exhibit that the zoning for this project
20 is B2?
21   A    I don't think so. I would like to take a
22 minute to check through my list of exhibits because you
23 asked me what else I have about that special community
24 to see if I have, find something here, okay.

PAGE 258

1         MR. TAPICK: We'll go off the record while you
2 look.
3         THE DEPONENT: Sure, sure.
4    (Off the record.)
5              EXAMINATION CONTINUED
6 BY MR. TAPICK:
7    Q    So Mr. Gaztambide, you've just been reviewing
8 your work file. Have you found any other documents
9 referring to what you've labeled as the special
10 community number 1 on Deposition Exhibit No. 4?
11   A    Yes. Defendant's Exhibit 129 is of interest
12 to us because it, it's a letter from the special
13 communities program, specifically Guarico Viejo, Vega
14 Baja, and it give a number to us that might lead us into
15 other documents referring to the special community. It's
16 labelled ADMV-03-103 Robios de Hierra, RS and this
17 particular special community project which I told you is
18 surrounded by the Piza property, states that they have,
19 and this is dated 24 January 2006 and that in 19 January
20 26, they proposed to turn over, if you will, to Mr. Piza
21 the equivalent of 150 units capacity for future
22 development without any cost in exchange of land
23 measuring 80 meters by 50 meters that my best
24 recollection is that they needed to complete the

PAGE 259

1 project, something, it have something to do about the
2 small sewer or something that they need to have a
3 retention pond, and they don't have the land within the
4 community so they exchanged 150 units as the one they
5 have approved for the special community and they needed
6 these units, they had to get originally the, the units
7 because they're developing under the R3 density and the
8 R3 density requires sewer so they got a number of units,
9 I think the number of 500 rings a bell to me but I'm not
10 sure, but I think I heard the number and of those 500
11 they're, they're given transfer to Mr. Piza 150 units
12 from his Hacienda de Tortuguero Project in exchange of
13 this land.
14   Q    Does the document you're reviewing --
15   A    And it says here -- I'm sorry.
16   Q    Does the document you're reviewing presently
17 state what the zoning is for the special community that
18 you've labeled as No. 1 on Deposition Exhibit 4?
19   A    No, it does not but since now we have a case
20 number, we might pursue that.
21   Q    Have you pursued that prior to today?
22   A    No, I just figured this one as I read this
23 letter. It says that this land will be utilized for a
24 retention pond, as I told you.

PAGE 260

1    Q    Are there any other documents in your work
2 file regarding the government community you've labelled
3 as No. 1 on this map?
4    A    Apparently not and I say apparently because
5 I've been unable to find or identify so apparently,
6 apparently not.
7    Q    Do you know when this government community
8 project was approved for development?
9    A    I don't know the exact date but it must have
10 been during 2004-2004 Sila Mar¡a Calderon
11 administration.
12   Q    Why do you say that?
13   A    Because this was a project, the special
14 community projects was started by Sila Mar¡a Calderon
15 when she was governor.
16   Q    And she came to power in 2000, is that
17 correct?
18   A    Yes.
19   Q    Do you have any documents that refer to what
20 you've labelled as residential Project 3 on Exhibit 4 to
21 this deposition?
22   A    Let's look for it.
23        MR. TAPICK: Off the record.
24   (Off the record.)

SHEET 9   PAGE 261

1              EXAMINATION CONTINUED
2 BY MR. TAPICK:
3    Q    Mr. Gaztambide, have you finished looking
4 through your work file for written documents that
5 reference what you've marked as residential development
6 3 on Exhibit 4 to this deposition?
7    A    Yes, sir.  I have so many documents here all
8 of a sudden I could not identify that and with your
9 permission I sought some help from Mr. Piza which is
10 present and he helped me locate the map and we have it
11 now.
12   Q    Okay.  So what have you found in your work
13 file that refers to residential development No. 3 on
14 Exhibit 4?
15   A    Okay.  We have one page of the set of maps,
16 drawings that have to do with this particular project
17 that we have labeled No. 3 at Exhibit No. 4 of this
18 deposition and I got a piece of paper here that says
19 that's part of Defendant's Exhibit 18, although it's
20 not, the plan is not identified itself although the
21 permit, the development permit is labeled Defendant's
22 Exhibit 18.
23   Q    So you're looking at a plan that you say is
24 attached to Defendant's Exhibit 18?

PAGE 262

1    A    That's correct.
2    Q    Do you know if this plan was produced to the
3 government at any point?
4    A    I can't be absolutely sure.  I think we'd
5 better identify it as part of it and I make you a copy
6 of this copy rather than risk not, not having it.
7         MR. TAPICK:  Counsel, I would request a copy
8 because I don't believe the government received it.
9         MR. P.E. HARRISON:  Okay.
10        THE DEPONENT:  So we'll call it part of
11 Defendant's Exhibit 18.
12             EXAMINATION CONTINUED
13 BY MR. TAPICK:
14   Q    So you're referring to part exhibit,
15 Defendant's Exhibit 18?
16   A    As it, as it sits in my file of the original
17 documents but it's not, it's loosely labeled with a note
18 from my secretary and it coincides with the permit that
19 was attached to it but it doesn't have a label on it.
20   Q    What does this drawing show?
21   A    Okay.  This drawing shows several of the
22 projects approved on Mr. Piza's main farm that we can
23 match with the other drawing that we identified as
24 Exhibit 4 of this deposition and this particular drawing

PAGE 263

1 that Mr. Piza has communicated me a few minutes ago that
2 he has the entire set and it will be available to the
3 Court if necessary, we just have the, Page 6 of 9 which
4 identifies the 27 lots that pertain to this permit that
5 we have identified as Project No. 3 on the exhibit.
6    Q    Have you reviewed any of the other plans that
7 you just mentioned Mr. Piza --
8    A    No, no.  This is all he provided me with
9 because we were more interested in the permissology
10 aspect of it, the permit than in the actual --
11   Q    My question is, does this plan or does the
12 permit Exhibit 18 indicate anywhere on it that this
13 development is in a B2 zone?
14   A    Okay.  We'll check that.
15        MR. TAPICK:  Off the record for a second.
16        (Off the record.)
17             EXAMINATION CONTINUED
18 BY MR. TAPICK:
19   Q    Mr. Gaztambide, does this document indicate
20 anything about what the zoning is?
21   A    No, it does not.  It just grants the permit
22 under the R1 criteria; 900 square meters so in reality,
23 this is R1 equivalent.
24   Q    According this document, this is an R1

PAGE 264

1 equivalent?
2    A    Right.  This, this density of 900 meters is R1
3 equivalent.
4    Q    Okay.
5    A    The number 1R2 that we refer to are R3
6 equivalent.  This one is R1 equivalent.
7         MR. TAPICK:  I'm going to ask that we label
8 this as Exhibit 5 to this deposition.
9              (Whereupon the above-mentioned
10             document was marked as
11             Exhibit No. 5 for
12 identification.)
13        THE DEPONENT:  And that I'll provide you with
14 copies and I will label it and have my secretary label
15 it here Defendant's Exhibit 18 which was the original.
16             EXAMINATION CONTINUED
17 BY MR. TAPICK:
18   Q    Okay.  Are there any other documents that you
19 have referring to what you've identified as Residential
20 Zone No. 3 on this map?
21   A    I might have but I don't pinpoint at this --
22   Q    Have you reviewed your work file and you can't
23 find any others?
24   A    There might be some there but I don't think

SHEET 10 PAGE 265

1 it's necessary to go back.
2     Q    Now, you're saying there may be other
3 documents in reference to Development No. 3 but you
4 haven't found them, is that correct?
5     A    There might be in this stack somewhere, might
6 be something else but nothing that will really change
7 what we've talked about. You know, the permit is there,
8 R1 equivalent, nothing different.
9     Q    Based on your recollection you're saying there
10 would be no other documents to change your opinion --
11    A    No, not to change that.
12    Q    Would there be any other documents that you
13 believe would indicate what the zoning is?
14    A    No, no, no. I would, I would have used that
15 document.
16    Q    With respect to the development you've labeled
17 as No. 4 on Exhibit 4 to the deposition --
18    A    This one is Defendant's Exhibit 31, 31, this
19 one is also planted under the R1 zoning criteria of
20 density. The plan is labeled Defendant's Exhibit 7 and
21 the approval is Defendant's Exhibit 31.
22    Q    And does Defendant's Exhibit 8 also refer to
23 what you've labeled as Residential Development No. 4 in
24 this map?

PAGE 266

1     A    No. 8?
2     Q    If I showed you a copy of Defendant's Exhibit
3 8, would that refresh your recollection?
4     A    Oh, sure, please. No. Not that has nothing
5 to do -- Oh, yes, I think this is, yes, this is the
6 additional, this could be the additional lot, yes. I
7 checked that. I have here, I was going to mention to
8 you that within the docket labeled Defendant's Exhibit
9 31, there's a, the first page is the notification, the
10 simple notification of the first nine lots.
11       The second page is the notification of another lot
12 which makes ten and this could be, let me check the
13 number here, 17, yes. Defendant's Exhibit 8 refers to
14 the tenth lot, Defendant's Exhibit 8 refers is the
15 approved drawing for segregation of the ten lots which
16 appears in a separate notification permit under or
17 within the documents labeled Defendant's Exhibit 31.
18    Q    So am I understanding you correctly that
19 Defendant's Exhibit 7, 8 and 31 all refer to what you've
20 labeled as Residential Development No. 4 on Exhibit 4
21 to this deposition?
22    A    Absolutely correct.
23    Q    Now, Exhibit 31 you previously testified is
24 the approval for that development, is that correct?

PAGE 267

1     A    That's correct.
2     Q    Does Exhibit 31 state what the zoning is?
3     A    Yes. It says AD.
4     Q    AD. What does AD mean?
5     A    Means developed area.
6     Q    Is AD the same thing as B2?
7     A    No, it's not but by inspecting the, by
8 inspecting the zoning map, I can guarantee you it's
9 wrong.
10    Q    When you can guarantee, does that mean that
11 you studied the zoning map --
12    A    Carefully, carefully. I know this is, no
13 question with that. If there's any doubt with No. 2 and
14 No. 3, that part of it might be in and out, you know, it
15 would take a very careful studies of distances and
16 scales and what have you. This one there's no doubt
17 because this one is further east.
18    Q    Have you seen any correspondence from ARPE
19 regarding the zoning of this residential development?
20    A    Any correspondence other than what they say
21 here or where they remain silent? No, I don't think so,
22 no.
23    Q    Do you know if ARPE has opined that this is
24 actually in the AD zone instead of the B2 zone?

PAGE 268

1     A    I don't think I got into that. I think ARPE
2 all they do is they look at the project, and they look
3 at the merits of the project and if they need to go to
4 the Planning Board, then they'll go to the Planning
5 Board to check that but I don't think, my personal
6 opinion, I don't think ARPE gets into the, the issue of
7 whether it's B2 or AD or whatever.
8     Q    Do exhibits -- I'm sorry.
9          MR. P.E. HARRISON: I'd also like to enter a
10 general objection to the referencing of zones without
11 definitive determination of the year, you know, you
12 start referencing documents, I don't have any problem
13 about what the document says but --
14         MR. TAPICK: That's a good point.
15              EXAMINATION CONTINUED
16 BY MR. TAPICK:
17    Q    Mr. Gaztambide, do you know the year that this
18 residential subdivision was approved?
19    A    Yes, we can check each and any of them. Let's
20 check this one first. Okay. This one says, okay,
21 Defendant's Exhibit 48, this is segregation of the nine
22 lots, it has a seal here that says December 28, 00.
23    Q    Is Exhibit 48 that you referred to,
24 Defendant's Exhibit 48, essentially the same as Exhibit

SHEET 11  PAGE 269

1 7?
2    A    Yes, yes, yes.  The only one that this one is
3 been used.
4    Q    And what is the date on the --
5    A    December 28th, 2000.  Yes, its' clear here.
6    Q    Okay.  That's approximately two years after
7 the date of taking, is that correct?
8    A    That's correct.  That's correct.
9    Q    Do Exhibit 7, 8 or 48 reference the zoning of
10 this development one way or the other?
11    A    Seven, 8, no, no, the maps doesn't reference,
12 7, 8.
13    Q    Okay.  Do you have any other documents in your
14 work file referencing what you've indicated is
15 residential development No. 4 in Exhibit 4 to the
16 deposition?
17    A    I might have something else but not as
18 relevant as this.  Let me check.  Excuse me.  Let me
19 check this one.  No.  These are all the segregations
20 that don't pertain to this.  No, that's it.  This is
21 yours, this is 8, this is yours and this is 7.
22    Q    So if I understand your response, Mr.
23 Gaztambide, you don't believe there are any other
24 documents in your work file that refer to residential

PAGE 270

1 project No. 4?
2    A    It's that I don't believe is that, there might
3 be some reference in the work file about this project
4 but these are these the two really relevant documents.
5    Q    These are the documents you relied upon --
6    A    Yes, exactly, exactly.
7    Q    -- for the determination of the rezoning?
8    A    The permit, the permit and the, the drawing
9 with the, the drawing with the permit.
10    Q    You also referenced in your declaration and in
11 your appraisal report a 72 unit walkup apartment project
12 in the B2 zone.  Do you recall that?
13    A    Yes.  What I recall about that is that it was
14 a, a solicitation by Mr. Piza that was put on hold, I
15 presume because there was at that time no sewer
16 capacity.
17    Q    If you look at Page 4 of your declaration,
18 Paragraph 11, is that where you reference the 72 unit
19 apartment project?
20    A    Right.
21    Q    And you reference Defendant's Exhibit 26, is
22 that correct?
23    A    Yes.
24    Q    Okay.  Do you have Exhibit 26 here with you

PAGE 271

1 today?
2    A    It should be.
3    Q    Okay.  Do you want to find it?
4    A    Sure, sure.  Let me keep track of this one we
5 have already gone through.
6    Q    Do we need to go off the record, Mr.
7 Gaztambide? Maybe you can --
8    A    Sure, sure, why not.
9        MR. TAPICK: Okay.  We'll go off the record.
10             EXAMINATION CONTINUED
11 BY MR. TAPICK:
12    Q    So you found Exhibit No. 26, is that --
13    A    Yes, I found it.
14    Q    What does Exhibit 26 tell you?
15    A    Yes.  It's a resolution from the Planning
16 Board that refers to consultation 98091164, 1164 I say
17 again, JPU which has to do with, with a 72 apartment
18 walkup project.
19        At that time the Planning Board had not received
20 the comments from the agencies concerned so they didn't
21 have a complete file, at that point in time having not
22 received the comments from the agencies, they tabled,
23 they tabled the project, leaving everything in suspense,
24 that's all it says but it was not denied, it was not

PAGE 272

1 approved.  Just tabled.
2    Q    What is the date of that document, No. 26?
3    A    9 February, yes, 9 February '99 but the
4 meeting, I'm sorry, the meeting was 15 January and it
5 was certified by the Planning Board's Secretary on 9
6 February.
7    Q    Of 1999?
8    A    Of 1999.
9    Q    So approximately one month to two months after
10 the date of taking, is that correct?
11    A    That's correct.
12    Q    Does the letter state why the consulting
13 agencies had not responded?
14    A    No.
15    Q    Does the letter say anything about consulting
16 agencies needing more information from Mr. Piza before
17 they could respond?
18    A    It says, "From the study of this consultation,
19 this Planning Board in the meeting of 15 January
20 determined that it is necessary to receive the comments
21 from the concerned agencies.  Therefore, it tables this
22 consultation until the comments from the concerned
23 agencies are received.  Taking the above into
24 consideration, the Planning Board tables, tables this

SHEET 13  PAGE 277

1 report?
2    A    Maybe.  Yes.
3    Q    And it's not, the page is not numbered but
4 it's an exhibit in your appraisal report entitled Aerial
5 View of the Subject Neighborhood, is that correct?
6    A    That's correct.
7    Q    And you've identified comparable sale
8 locations on this map.  Is that correct?
9    A    That's correct.  The land sales No. 3, 1 and
10 2.
11   Q    Okay.  Looking at this exhibit in your
12 appraisal and comparing it to what's been marked Exhibit
13 19, can you identify the residential developments that
14 have been approved in a B2 zone?
15   A    No, this, this one is not in a B2 zone.
16   Q    When you say "this one", which --
17   A    Land sale No. 3.
18   Q    Okay.  Do you recall what the zoning was for
19 Land Sale No. 3?  Do you recall if it was AD?
20   A    Well, that's a good question.  I inspected
21 the, the zoning map and I think my report says AD but I,
22 I checked the dates on the zoning map and that map that
23 says AD, is it sale 3?  Yes.  But I didn't, after the
24 fact I checked the zoning map, it says AD but this, the

PAGE 278

1 zoning map that says AD, my best recollection, and we
2 can check it, is 2002, a variation that they did on 2002
3 but this sale took place in January 1999 and I believe
4 that the zoning map that was in effect in 1999 doesn't
5 identify that area as AD.
6    Q    Mr. Gaztambide, if I ask you to look at what
7 we've marked as Exhibit 2 to this deposition which
8 yesterday we discussed as being an exhibit from a Danes
9 & Moore report that purports to identify the zoning in
10 the vicinity of the subject property, could you locate
11 on that map the proximate area where land sale No. 3 is
12 located?
13       I'll ask you to do so with the blue pen, if you
14 could.  Take your time.
15   A    Yes, again, I, I --
16       MR. P.E. HARRISON:  You want to compare the
17 Danes & Moore map to the actual --
18       THE DEPONENT:  I will, yes, I will do because,
19 because this map doesn't have a date here so we have to
20 check the dates so --
21       EXAMINATION CONTINUED
22 BY MR. TAPICK:
23   Q    Mr. Gaztambide, if you're going to be thumbing
24 through that appraisal, you could actually look through

PAGE 279

1 this one, one that doesn't have my notes on it.
2    A    No problem, no problem.  This is the 1997 map
3 and it shows the general area where this property is
4 located.  It shows the general area where the property
5 is located.
6        Then on this is the 19, 2003 which already shows
7 the development.  This is that comparable sale.
8    Q    Okay.
9    A    This rustic zone especially protected, Laguna
10 Tortuguero AD.
11   Q    Okay.
12   A    So in the 1997 map, it already showed this as
13 AD.
14   Q    Okay.  And the 1997 is the map that was in
15 effect on the date of taking, is that correct?
16   A    That's correct.
17   Q    Okay.
18   A    And on the date of the sale too.
19   Q    And you've now had a chance to look at the
20 1997 map from your file and compare it to what we've
21 marked as Defendant's Exhibit 2, the Danes & Moore
22 zoning map and are you satisfied that the Danes & Moore
23 map reproduces the accurate zoning of this area?
24   A    Yes.  What we still have doubts is about the

PAGE 280

1 configuration of the Piza property.
2    Q    With respect to land sale No. 3, do you think
3 now you could indicate now where it is located on
4 Exhibit 2 to this deposition with the blue pen, just put
5 a dot and I'm just asking you to do so for purposes of
6 determining where it is on the zoning map with respect
7 to zoning designation.
8    A    Must be somewhere around here.
9    Q    So you're indicating with a circle the
10 approximate area of land sale No. 3?
11   A    Yes.  L3.
12   Q    And you're labeling it L3 over that, is that
13 correct?
14   A    Yes.
15   Q    Thank you.  Looking back at the aerial
16 photograph which is Exhibit 19, Defendant's Exhibit 19,
17 are there any other residential developments indicated
18 on this photograph that are residential developments
19 located in a B2 zone?
20   A    This reference here is to this variance No. 1.
21   Q    I'm sorry.  You're referring to?
22   A    I'm referring to Defendant's Exhibit 22,
23 Defendant's Exhibit 22.
24   Q    Okay.  And that's the zoning map from the year

BONAFIDE & CERTIFIED REPORTING SERVICE (787) 250-8507)

SHEET 17  PAGE 293

1 flora and the fauna?
2    A    Defendant's Exhibit 41.
3    Q    Okay.  Thank you.
4    A    You're welcome.  I also make reference that
5 fuels the, the belief that all of this is, must be
6 subject, study the, the study about the elevations in
7 the area of the Guarico, the inner area of the Guarico
8 and the flow of the water away from the, from the
9 lagoon.
10   Q    Did you reference the exhibit number of that
11 study?  I know we discussed it yesterday.
12   A    Yes, this is Defendant's Exhibit 20.
13   Q    Exhibit 20, okay.  Very good.
14   A    Now, another one, this is Defendant's Exhibit
15 39.  This is the one that has to do with the problem
16 created by the non-maintenance of the drainage channels
17 which has flooded several communities in the Vega Baja
18 and now they're finally getting underway of a very
19 ambitious project to, to reconstruct or clean those
20 channels that will drain and, and dry many areas of Vega
21 Baja including some areas of Mr. Piza's property.
22   Q    And what exhibit number is that?
23   A    Thirty nine.
24   Q    Thirty nine.

PAGE 294

1    A    I think we already spoke about Defendant's
2 Exhibit 29, changing flood rating.
3    Q    That's correct.
4    A    By area so everything points to the fact that
5 all of this has to, all of this is customarily before
6 and after and during the taking on a case by case basis
7 because all the agencies recognize that these zoning
8 maps are just a guide, are not and this is a big issue
9 today in Puerto Rico because the government is trying to
10 zone the entire island without walking on the terrain
11 and that can't be done.
12   Q    And these documents are the basis of your
13 conclusions about the reasonable probability, when I say
14 these documents I mean documents we've discussed this
15 morning, the documents you just identified and the
16 documents we discussed yesterday?
17   A    We must add to that my experience working
18 throughout the island during 35 years analyzing project
19 after project after project, approved, approved both in
20 the urban areas and in the rural areas, approved against
21 the existing zone.
22   Q    And again, you did not speak to anybody from
23 any state agency or the Planning Board --
24   A    For this particular --

PAGE 295

1    Q    -- regarding this particular project --
2    A    No.
3    Q    -- for this assignment, is that correct?
4    A    That's correct.
5    Q    And my last question is, do you have any
6 documents in your work file that indicate that sand has
7 been extracted or that permits have been granted for the
8 extraction of sand on B2 zone land owned by Mr. Piza?
9    A    Yes, I have documents to that effect.  I have
10 permits, I have permits and I have evidence of logs of
11 trucks moving out from the farm.
12   Q    And that is on B2 zoned land, is that correct?
13   A    Well, the information I have is that the sand
14 was extracted from all the area in the farm that had
15 sand deposits and based on that critical line that we
16 discussed before, sand was extracted from both sides of
17 that land, apparently.
18   Q    So sand was extracted --
19   A    I was, unfortunately, I wasn't there in 1998
20 so the information I have is sand was extracted
21 throughout the, throughout the farm.
22   Q    Is the information you have that sand was
23 extracted from the parts of the farm that were sold or
24 that had been approved for residential development, the

PAGE 296

1 Haciendas de Tortuguero --
2    A    No.  I don't have that specific, the
3 information I have is that sand was extracted throughout
4 the property.  The specifics, you know, if it was land
5 sold or prior to be sold or whatever, I don't have that
6 specific data.
7    Q    So you don't know if sand was extracted from
8 Haciendas de Tortuguero site?
9    A    I know that sand was extracted throughout the
10 farm but if you ask me about a specific site, no, I
11 haven't walked the area to inspect where sand was
12 extracted.
13       I think that may be done, you know, it's not
14 impossible to walk on the farm and figure out where sand
15 was extracted.
16   Q    Do you have any documents that shows,
17 indicates in writing that sand was extracted from land
18 designated B2?
19   A    No.
20   Q    So the information you're basing it on is
21 information that was told to you orally by Mr. Piza?
22   A    That's correct.  That's correct.
23   Q    Was told to you by anyone else?
24   A    No, no, because I only checked with him.  He's