UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL NO. 98-1664 (GAG) |
| PLAINTIFF | Consolidated Cases |
| vs. | |
| 33.92536 ACRES OF LAND, MORE OR LESS SITUATED IN VEGA BAJA, COMMONWEALTH OF PUERTO RICO, AND JUAN PIZA BLONDET, AND OTHER UNKNOWN OWNERS | |
| DEFENDANTS | |

Defendant's Opposition to United State's Motion
to Exclude Highest and Best Use Evidence

---

**MAY IT PLEASE THE COURT:**

The United States seeks to exclude All Evidence Relating to Defendant's Appraisal of Highest and Best Use. The arguments raised by the United States lack merit and must be rejected by this Honorable Court.

**Argument**

The United States argues that the appraisals by the Defendant should not be considered. For the following reasons these arguments must be rejected:

In many cases where the property being condemned was, at the time of taking, subject to zoning restrictions which would affect its market value, evidence is admissible to show that such restrictions could or would be changed on proper application to the zoning authorities. Courts usually take the view that a prospective purchaser on the open market, on a proper showing that such a change was reasonably probable in the

1

reasonably near future, should consider the probability of such a change in zoning in valuing the property, and the courts should receive such evidence. See, 9 A.L.R.3d 291. Where there is evidence in eminent domain proceedings of a reasonable probability of a zone change with regard to the property being taken, this evidence may be considered in determining the fair market value of the property in cases where the probability of re-zoning the subject property to a more valuable zoning status existed, courts may properly take evidence, under comparable sales method of valuation, of sales of other property which had been benefitted by more advantageous zoning status. *Aurora v. Webb* (1978, Colo App) 585 P2d 288.

Defendant's expert, Mr. Gaztambide explained that the zoning restrictions on the Piza Blondet property were inaccurate and would be changed upon request. Mr. Gaztambide also explained that Mr. Piza Blondet had actually accomplished development on property zoned as B-2:

BY MR. TAPICK:

Q    We're back on the record, Mr. Gaztambide and you were telling me where the residential development that is referenced in Defendant's Exhibit 17 is located in relation to the rest of Mr. Piza's property and we've been looking at preliminary plans for Haciendas Blondet which is marked as Defendant's Exhibit 43A and which we've asked to be marked as Exhibit 4 to this deposition and -- Is that correct?

A    That's correct.

Q    And you were explaining to me that four projects had been approved in a B2 zone and you were pointing out the location of those projects on this map and I would ask that you label with a blue pen on this map where those four projects you were just describing to me are located and label them with a 1, 2, 3, 4.

A    Okay. Let me mention again that the importance about this particular plan is that we have the existing community as a landmark and that these four projects, including the existing community have been approved within what I interpret to be the B2 because as it looks fairly clear, the line that divides the CR and the B2 runs through the west boundary

of the community or the existing "barriada", the existing community and then I think it moves a little bit further west down here as it moves to the south. If we use this line as the division between the two zoning districts and even if later we determine that the line might be not on this side of the community but on this side of the community or ten meters past the community, whatever we end up after we do the, the due diligence, we would still have a clear understanding of which projects are definitely between within the B2 or at least partially within the B2 so at least for the time being we will call the north/southwest boundary of the existing community as our critical line, let's call it.

This dialog shows that Mr. Gaztambide, an expert of renown, was correct in his conclusion about the Piza Blondet property which was taken by the Government  The reasonable probability of re-zoning is a proper factor to be considered in determining the value of property taken in a condemnation proceeding, and where there is sufficient evidence for a court to make a finding that the reasonable probability exists, then a witness may testify as to the value of the land based upon such probability. *Board of Trustees of University of Illinois v. Shapiro*, 278 Ill. Dec. 665, 799 N.E.2d 383 (App. Ct. 1st Dist. 2003). See *Department of Public Works & Bldgs. v Association of Franciscan Fathers* (1977) 69 Ill 2d 308, 13 Ill Dec 681, 371 NE2d 616. The reasonable probability of re-zoning is a proper factor to be considered in determining value of property taken in condemnation proceeding, and where there is sufficient evidence for court to make finding that reasonable probability exists, then witnesses may testify as to value of land based upon such probability. *Department of Transp. v First Bank* (1992, 1st Dist) 260 Ill App 3d 490, 197 Ill Dec 686, 631 NE2d 1145.  The Government's Motion must, therefore, be denied. The defendant has presented all of the evidence required to proceed in this case.

Even though the Piza Blondet property is improperly zoned, it is clear that Mr. Gaztambide correctly values the land for its highest and best use. Mr. Gaztambide testified that the Puerto Rican authorities know that the zoning designations are not correct and that

variances are routinely granted. This Court must, therefore, consider all evidence which relates to the comparable sales appraisal offered by the Defendant:

> A landowner whose property is condemned is entitled to compensation for the possibility of re-zoning if a reasonable possibility exists, absent the threat of condemnation, that the zoning classification of the condemned property would have been changed; in other words, because the reasonable possibility of rezoning would have affected the price that a willing buyer would have offered for the property before the taking, it is compensable if proved. M.C.L.A. Const. Art. 10, § 2. *Carrier Creek Drain Drainage Dist. v. Land One, L.L.C.*, 269 Mich. App. 324, 712 N.W.2d 168 (2005).

It is clear that Mr. Gaztambide's testimony is admissible in this case:

> A landowner's expert was properly allowed to testify, as basis for his opinion of market value, that there was 60% probability that property zoned for single-family residences would be rezoned for garden apartments, where expert's opinion of probability of rezoning was based in expressed policies of zoning authority, availability of open land, presence of compatible or incompatible developments, density of use, and past actions of zoning authorities. *State ex rel. State Highway Com. v Carlson* (Mo App) 463 SW2d 74.

The evidence shows that Mr. Piza Blondet's property which was taken by the Government could and would have been developed into residential housing. Mr. Piza Blondet actually developed his surrounding property into light commercial/residential use. Mr. Gaztambide's appraisal, which considers comparable sales for IDENTICAL PROPERTIES must be considered by the trier of facts in this case. The Defendant's evidence is replete with substantial and non-hypothetical proof of the development value of the Defendant's property under the "highest and best use" standard which applies in this case.

This Court will be presented with substantial evidence that the zoning restrictions which exist in Puerto Rico are subject to generous amendment and given the Defendant's burden of establishing "reasonable probability" that variances will be granted, the evidence is unequivocal. The Government's own questioning of Mr. Gaztambide shows this truth:

Tapick

Q   What is your understanding of the term reasonable probability?

A   Basically by observing the activity in a certain market place of what people have, developers have attained by way of permits, for example, let's talk specifically about permits. If you're in an area where no permits have been obtained, in the Tortuguero, the hydrographical basin would be devoid of development, it would be far fetched to say we can obtain them around here but when you see so many developments springing around you and different people getting permits under different circumstances, you say there's a reasonable probability that we may obtain permits for, for the subject so it's a matter of the weight of the evidence more than anything else.

It is clear that the Piza Blondet property was properly appraised by Mr. Gaztambide. It is also without debate that the minerals on the property are very valuable and exploitable. The mineral (sand) value must be considered by this Court. The best evidence of property's value is said to be established by activity immediately prior to a taking. See, e.g. 9 A.L.R.3d 291. The evidence before this Court shows that Mr. Piza Blondet's property contains valuable minerals, ie. sand which was extractable and available for sale immediately prior to the Government's taking of his property. The argument that the silica sand is not extractable is nonsense:

BY MR. TAPICK:

    Q   Now, you're aware that Dr. James Joyce has offered an expert opinion and an expert report identifying sand deposits on your property, correct?

    A   Yes.

    Q   And you're aware of sand deposits in your property by virtue of your familiarity with your property, correct?

    A   Yes.

    Q   Is there sand on other portions of your property besides the 34 acres acquired by the FAA?

    A   Yes.

Q   Is there sand on property that you have developed on your farm?

MR. MUNPHREY:  Just ask you to qualify develop.

BY MR. TAPICK:

Q   Okay.  I'll rephrase the question. Is there sand on the portion of your farm that you developed into the Haciendas de Tortuguero subdivision?
A   There might be some.

Q   And by sand, I'm referring to silica sand.  Does that change your answer?

Q   Did you extract sand before you developed Haciendas de Tortuguero on that particular site?

A   Well, let's say we extracted sand from the limit of the tower to the west.  That would take maybe 180 acres or something acres.

Q   Is that where the Haciendas de Tortuguero Development is located?

A   Yes, it's there.  Part of that.

Q   So your testimony is that you extracted sand from the boundary of the tower property, is that what I heard you say?

A   Well, we wanted to extract sand from the tower but did not think it appropriate since it was rented to the government.  If it had not been rented to the government, we would have extracted, there's a hell of alot of sand there.

Q   But you extracted sand from the edge of the tower property all the way to the west, west meaning to the edge of your property on the west, is that –

A   On the Road 687, 687.

Q   How much sand did you extract from that area?

A   That was years ago.  The thing is the people from Owens, I talked to them because of you people and now they're going to come back to the farm because they need sand.  They said they could get the permission so I get the, the, I fill in from the mountain, I've got two, what do you call them, "canteras".  "Canteras" is where you get fill, land fill from the mountain, I got on the farm or "cerro" and you put it into the, where you take the sand out so we're going to examine, the only thing they're paying much more now than they used to pay.

Q   So it's your testimony that you're in the process of speaking to Owens Illinois currently about extracting sand from --

A   Yes.

The evidence before this Court is overwhelmingly in favor of Mr. Piza Blondet. The minerals which are available for extraction are located on in the uplands portion of the taken property which is not designated as "wetland". The Government's attempt to mischaracterize the Joyce report is understandable. The Government does not want to compensate Mr. Piza Blondet for the millions of dollars of silica sand which is present on the property taken by the Government. The United States Constitution requires this Court to evaluate all evidence of value for the property taken from the Defendant by the Government. The Government's Motion(s) is without merit and must be denied.

                                          RESPECTFULLY SUBMITTED,

S\Francisco Diez,
Bar Roll No. 215412
Attorney for JUAN PIZA BLONDET
652 Munoz Rivera
Suite 3125
San Juan, Puerto Rico 00918-4281
Telephone: (787) 250-0220
Telecopier: (787) 250-0295

        —and—

J. Wayne Mumphrey
David C. Vidrine
Mumphrey Law Firm, L.L.C.
2000 Old Spanish Trail, Suite 103
Slidell, LA 70458
Telephone: (985) 649-0709
Telecopier: (985) 649-5706

Copies to:

JOSE M. PIZARRO ZAYAS
Assistant U.S. Attorney
Room 452 Federal Building
Hato Rey, Puerto Rico 00918
Tel. 766-5656

PAUL HARRISON
JEFFREY M. TAPICK
Attorneys, U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 561 - Ben Franklin Station
Washington, D.C. 20044
Telephone:   202-305-0299
Fax:              202-305-0398

**Certificate of Service**

    I HEREBY CERTIFY that I have on this 26th day of September, 2006, served all counsel with a copy of the above and foregoing by email and electronic notification.

_____