IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

33.92536 ACRES OF LAND, MORE OR
LESS, SITUATED IN VEGA BAJA,
COMMONWEALTH OF PUERTO RICO,
and JUAN PIZA-BLONDET, et al.,

Defendants.

CIVIL NO. 98-1664 (FAB- BJM)
CIVIL NO. 98-2344 (FAB-BJM)

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.    INTRODUCTION**

This case involves a dispute over the amount of compensation due to the owner of

approximately 33.92 acres of land acquired by the United States in 1998 through eminent domain.

Before the court is the United States's motion under Fed. R. Civ. P. 71A(h) ("Rule 71A(h)") to

preclude as overly speculative defendant Juan Piza-Blondet's evidence that the highest and best use

of the acquired property, for valuation purposes, is residential development and/or sand extraction.

(Docket No. 132).  Also pending is a related motion by the United States to exclude all evidence of

defendant's appraisal of sand deposits.  (Docket No. 133).  Piza-Blondet has opposed both motions

(Docket No. 151, 152), which were referred to me for a report and recommendation pursuant to 28

U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).

For the reasons that follow, I recommend that court grant the United States's motions at

Docket No. 132 and 133 and enter an order excluding defendant's proffered evidence that the

acquired property could be used for residential development or sand extraction, and excluding all evidence related to the value of sand extraction.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural backdrop grew over eight years of litigation, which I will summarize it in pertinent part.

On December 2, 1998, the United States acquired approximately 33.92 acres of land (the "Subject Property") in Vega Baja, Puerto Rico for the operation of a Federal Aviation Administration radio beacon facility. The Subject Property was owned by defendant landowner Piza-Blondet, who also owned roughly 400 acres of surrounding land ("Main Tract"), from which the Subject Property had been segregated in 1997. (See Map, Docket No. 132, Exh. A).   The United States filed a Complaint in Condemnation naming Piza-Blondet and other potentially interested parties as defendants. (Docket No. 1, 24).   Piza-Blondet answered the complaint and accepted the government's eminent domain authority, but requested a jury trial on the issue of just compensation. (Docket No. 5). See Fed. R. Civ. P. 71A(h).

In October 1999, after conducting some discovery, both parties filed motions asking the court to decide between two competing methods of valuation for purposes of determining just compensation. (Docket No. 57, 60, 61).  The method favored by the government, known as the "before and after" rule, assumes that the government's acquisition of the Subject Property was actually a partial taking from the Main Tract, and thus would measure just compensation by the difference between the fair market value of Main Tract before the taking, and the fair market

**USA v. 33.92536 Acres of Land, et al**                                    Page 3
**Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)**
**April 24, 2007**

value of the Main Tract (minus the Subject Property) immediately after the taking. (Docket No.

60). Piza-Blondet, for his part, argued that because the Subject Property had been segregated from

the Main Tract in 1997, the "before and after" rule should not apply, and that just compensation for

the Subject Property should be measured by a direct appraisal based on sales of nearby tracts of land

of similar size and composition. (Docket No. 57).

On October 26, 1999, then-Senior District Judge Gierbolini held an evidentiary hearing to

determine which valuation method should be used, and took the matter under advisement. (Docket

No. 65, 75). The matter was still pending decision upon Judge Gierbolini's retirement, and in April

2004 the case was assigned to District Judge Cerezo. (Docket No. 73). Judge Cerezo, having

reviewed the transcript, summarized the testimony of the evidentiary hearing as follows:

> Most of the hearing was dedicated to establishing the highest and best
> use of the property, that is, the use which would give the land the
> highest value. Plaintiff's witness testified that, given the nature of the
> parcel, ecological and conservation consideration, the existing zoning
> and other regulations, the highest and best use of the land would be
> for passive recreation. Defendant Piza-Blondet, who presented no
> witnesses, presented documentary evidence and cross examined
> plaintiff's witness on defendant's theory that, notwithstanding the
> conservation and ecological considerations, smaller, similar areas had
> been re-zoned and permits issued for development. He presented
> evidence that one project within the remnant portion was already
> under construction, that he had plans for other projects and that he
> had applied for permits.

(Docket No. 82, p. 2) (footnote omitted). Judge Cerezo determined that because the Subject Property

had been segregated from the Main Tract, the government would be required to demonstrate unity

**USA v. 33.92536 Acres of Land, et al**                                                          Page 4
**Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)**
**April 24, 2007**

of use between the two parcels in order for the "before and after" valuation method to apply.[1]  The

defendant, for his part, would be required to prove that his proposed best use for the condemned

property (for valuation purposes) was not invalid as a matter of law and was feasible for the

reasonably near future.  Id., citing United States v. 7.92 Acres of Land, 769 F.2d 4, 10 (1st Cir. 1985);

United States v. 341.45 Acres of Land, 633 F.2d 108, 111 (8th Cir. 1980).  To this end, the court

ordered defendant Piza-Blondet to produce for the court's review copies of all permits and zoning

variances, and any other documentation, that would support his contention that the highest and best

use for the parcel would be medium density housing. (Docket No. 82).

Piza-Blondet failed to timely file any of the requested documentation.  Accordingly, the

court entered an order adopting the "before and after" method and prohibiting the defendant from

presenting to the jury a theory of a higher or better use of the land. (Docket No. 89).  Piza-Blondet

then filed, without opposition from the government, a motion requesting relief from the court's order

and submitting the documentation solicited by the court in its order at Docket No. 82.  (Docket No.

101).  The court then vacated its order at Docket No. 89 and stated that the defendant's exhibits

would be considered in deciding the method of valuation. (Docket No. 103).  Not to be outdone, the

government promptly requested, and was granted, a motion to stay the court's order pending briefing

on the relevance, if any, of defendant's newly filed exhibits.  (Docket No. 104, 105).  Following

briefing by the parties, the court determined that the proper method of valuation was a question best

decided by the jury, and that if the jury found a unity of use between the Subject Property and the

_____

[1] Judge Cerezo noted that two other requisites of the "before and after" rule  - contiguity
of the parcels and unity of ownership - were not in dispute.

USA v. 33.92536 Acres of Land, et al                                              Page 5
Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)
April 24, 2007

Main Tract, then the "before and after" method should be used; however, if the jury found that the highest and best uses for the parcels were not the same, then the Subject Property should be evaluated as an independent parcel.  (Docket No. 113).

In seeking to prove his theory regarding the highest and best use of the Subject Property, defendant Piza-Blondet has proffered the testimony of an expert appraiser, Carlos Gaztambide, MAI, who opines that the highest and best use is medium density residential housing and/or silica sand extraction. (Docket No. 132, Exh. B, F).  Defendant has also submitted expert reports as to the appraisal valuation of the sand that could be extracted from the Subject Property. (Docket Doc. 133, Exh. A, D, F).

Importantly, neither defendant nor Mr. Gaztambide disputes that certain legal restrictions affect the Subject Property. (See Docket No. 145, p. 3-4).  In particular, the Subject Property is located in the environmentally sensitive Tortuguero Lagoon Hydrographic Basin, which is governed by special zoning and land use regulations. (See Docket No. 132, Exh. B, p. 27-28; Exh. C (P.R. Planning Bd. Reg. 2498 (1978)).  The Subject Property is zoned B-2, a zone "established to identify and protect irreversible damage to wetlands and associated systems like mangrove forests and salty ponds." (Docket No. 132, Exh. B, p. 28).  The permitted uses in a B-2 zone include fishing, scientific studies, and passive recreational activities.  (Id.; see also, Docket No. 132, Exh. C, § 8:02). Residential development and lot division are not permitted in a B-2 zone. (Docket No. 132, Exh. C (Deposition of Carlos Gaztambide), p. 78; Exh. C, §§ 8:02, 8:04).  Moreover, the Subject Property is located in a low-lying, flood-prone zone.  Roughly 19 acres of the Subject Property are designated

as Flood Zone 2, while the remaining 15 acres are in Flood Zone 1. (Docket No. 132, Exh. B, p. 27-28).  In a Flood Zone 2, residential development is permitted only "if adequate precautions are taken to fill the land to elevations that protect the property from rising waters and/or floods." Id., at p. 28.  In a Flood Zone 1, residential development is not permitted at all. Id.  In addition, on the date of the taking, the Subject Property was interlaced with roughly 15 acres of wetlands. Id.  Regulations of the Department of Natural Resources ("DNR") prohibit sand extraction on wetlands. (Docket No. 132, Exh. F).  DNR regulations also require a buffer zone between extraction areas and any wetlands as delineated in a jurisdictional determination. Id.

In response to defendant's proffered expert testimony, the government filed the two motions that are presently before the court: 1) a motion to exclude defendant's evidence of highest and best use of the Subject Property; and 2) a motion in limine to exclude all evidence based on defendant's appraisal of sand deposits.  Both motions argue that defendant's proffered evidence is too speculative to be presented to the jury and should be excluded pursuant to the court's authority under Rule 71A(h).

## III.    DISCUSSION

### A.    Defendant's Opinion Evidence that the Highest and Best Use of the Subject Property is Residential Development and/or Sand Extraction is Overly Speculative and Should not be Allowed.

In a federal eminent domain case, the landowner bears the burden of proof to establish just compensation for the condemned property.  See Nat'l R.R. Passenger Corp. v. Certain Temp. Easments, 357 F.3d 36, 39 (1st Cir. 2004).  The value of a property for the purpose of determining

just compensation "may reflect not only the use to which the property is presently devoted but also that to which it may be readily converted." U.S. ex rel. use of T.V.A. v. Powelson, 319 U.S. 266, 275 (1943). However, the Supreme Court has held that just compensation cannot be predicated upon speculative uses. Olson v. United States, 292 U.S. 246, 257 (1934) ("Elements affecting value that ... are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value"). In order for a landowner to argue the value of just compensation based on a proposed use, he must show that the use is reasonably probable within the reasonably near future. Id., at 255-57; United States v. 320.0 Acres of Land, 605 F.2d 762, 814-15 (5th Cir. 1979). Only by meeting this standard is the landowner entitled to present the proposed use to the jury. Id; 7.92 Acres of Land, 769 F.2d at 10; 341.45 Acres of Land, 633 F.2d at 111.

Rule 71A of the Federal Rules of Civil Procedure governs proceedings in federal eminent domain cases. Rule 71A(h) provides that "any party may have a trial by jury on the issue of just compensation," but that "[t]rial of all issues shall otherwise be by the court." The Supreme Court has held that the trial judge shall decide "all issues" other than the precise issue of just compensation. United States v. Reynolds, 397 U.S. 14, 19-20 (1970). Accordingly, courts have held that Rule 71A(h) requires the trial court to screen evidence before it gets to the jury and to exclude any valuation evidence that is predicated on an overly speculative use of the property. United States v. Certain Land Situated in the City of Detroit, 450 F.3d 205, 211 (6th Cir. 2006); 320.0 Acres of Land, 605 F.2d at 814-15. As the Fifth Circuit explained:

**USA v. 33.92536 Acres of Land, et al**                                          Page 8
**Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)**
**April 24, 2007**

> If ... a proffered potential use is not reasonably practicable or probable, so that no reasonably minded trier of fact faithfully applying the law could find that it represents an element of fair market value, then of course the landowner is not entitled to have evidence concerning that use considered by the trier of fact. Indeed... under Rule 71A(h) the trial judge Must [*sic*] exclude evidence of any such speculative uses.

Id., at 818.

In several cases, courts have applied Rule 71A(h) to situations where a landowner's proposed use was prohibited under zoning or land use regulations. In such cases, courts have held that the judge must exclude all evidence of the proposed use unless the landowner can show that it was reasonably probable that the zoning regulations would be changed or a variance granted to allow the use. Id., at 818-19; United States v. 27.93 Acres of Land, 924 F.2d 506, 512 (3rd Cir. 1991). Similarly, evidence of a proposed use must be excluded if the landowner fails to demonstrate reasonable probability that a permit would be issued for the proposed use. Id., at 513-14; 320.0 Acres of Land, 605 F.2d at 818.

## 1.    *Residential Development*

Defendant Piza-Blondet seeks to meet his burden of establishing just compensation for the property through the expert testimony of his retained appraiser, Carlos E. Gaztambide, MAI. Mr. Gaztambide's opinions are proffered in written appraisal reports. The first appraisal report ("Residential Appraisal Report") argues that Subject Property contains at least 19 acres of non-wetland area that could be best used as medium density residential housing. (See Docket No. 132, Exh. B).

**USA v. 33.92536 Acres of Land, et al**                                      Page 9
**Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)**
**April 24, 2007**

Given the legal restrictions on the use of the Subject Property described in Part II above, defendant is burdened with proving a reasonable probability that the zoning regulations would change, and/or that the necessary variances and permits would be granted in the reasonably near future to allow for medium density residential housing. See 320.0 Acres of Land, 605 F.2d at 818-19; 27.93 Acres of Land, 924 F.2d at 512.  Although Mr. Gaztambide offers his expert opinion that these obstacles can be overcome, that opinion is seriously undermined by admissions he made during his deposition that demonstrate that many of his assumptions are either unsupported or contrary to existing facts.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993) (court must perform a gatekeeping role under Fed. R. Evid. 702 to screen expert witness testimony for reliability and relevance); Ortiz-Semprit v. Coleman Co., Inc., 301 F.Supp.2d 116, 120-121 (D.P.R. 2004) (expert opinion testimony precluded as unreliable when not predicated on a foundation of available facts and studies).

Initially, Mr. Gaztambide opines that although B-2 zoning (applicable to the Subject Property) prohibits residential development, it is not an absolute bar because "R-1 and R-3 equivalent subdivisions have been approved not only on the main tract owned by Mr. Piza Blondet but in numerous properties that have this zoning and subsequently were approved for development." (Docket No. 132, Exh. B, p. 36).  However, his Residential Appraisal Report fails to cite any specific cases where a residential development was approved in a B-2 zone.  To the contrary, the residential developments that he cites on the Main Tract are located in a CR zone, not in a B-2 zone. Id., p. 48-49.  Similarly, all of the nearby residential developments that he cites are located on land zoned CR

USA v. 33.92536 Acres of Land, et al                                    Page 10
Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)
April 24, 2007

or AD, rather than B-2.[2] Id., p. 36, 48-50. During his deposition, Mr. Gaztambide claimed to have studied permits showing residential developments that were approved in land zoned B-2, but upon review of these permits he acknowledged that none stated that the development was in B-2 while some on their face specifically stated the land was zoned CR or AD, not B-2. (Docket No. 132, Exh. D, p. 250-251, 255-256, 259, 263, 267, 269). In short, defendant has failed to document a single instance that supports Mr. Gaztambide's assertion that the Puerto Rico Planning Board has ever, or is likely to, approve residential housing developments on land zoned B-2, either on the Main Tract or nearby the Subject Property.

Mr. Gaztambide also opines that all permits for residential development could be obtained within two years, but his opinion is seriously, if not fatally, undermined by defendant's own experience. In particular, defendant Piza-Blondet has attempted to obtain approval to build 72 walk-up apartment units on part of the Main Tract zoned B-2 and located immediately adjacent to the Subject Property. That application was submitted to the Planning Board 1999 and had not been approved on the date of Mr. Gaztambide's deposition, a full seven years after it was submitted. (Docket No. 132, Exh. D, p. 271-72). The fact that this development has not been approved in more than seven years refutes Mr. Gaztambide's opinion that the Planning Board is likely to approve

---

[2] CR zoning designates resource conservation, while AD zoning designates developed areas. (See Docket No. 132, Exh. C, § 3:01). The uses permitted in a CR zone include golf courses, parking lots, scientific research institutions, museums, forest ranger stations, police stations, first aid units, public parks and walkways. Id., § 10.02. In an AD zone, existing uses and new lots are permitted. Id., § 11.02.

USA v. 33.92536 Acres of Land, et al                                           Page 11
Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)
April 24, 2007

residential use of the Subject Property in the "reasonably near future."[3] See Olson, 292 U.S. at 255-57 (landowner has burden of proving that proposed use is reasonably probable in the reasonably near future).

Notwithstanding the above, Piza-Blondet argues that the Subject Property was erroneously zoned B-2 and that the Planning Board would re-zone it upon request. Again, defendant relies on the opinion testimony of Mr. Gaztambide. (Docket 145, p. 2). And again, defendant has not bolstered Mr. Gaztambide's opinion with the requisite foundational facts and examples. As the government points out, Mr. Gaztambide's assertion that the parcel was incorrectly zoned B-2 appears to be based on his reading of a map and his belief that B-2 zoning is only appropriate for wetlands. However, and as Mr. Gaztambide acknowledges in his Residential Appraisal Report, B-2 zoning is also appropriate to protect systems associated with wetlands like mangrove forests and salty ponds. (Docket No. 132, Exh. B, p. 28). Moreover, it is undisputed that the entire Subject Property is interlaced with wetlands and is located in a low-lying flood prone zone. Furthermore, Mr. Gaztambide admitted that he did not speak to anyone at the Planning Board to confirm his suspicion that the Subject Property was improperly zoned B-2 or about any procedure for changing the B-2

---

[3] As Judge Cerezo noted in her November 22, 2004 order, "Over six years have passed since the government condemned the portion of the parcel, which is a reasonable length of time for the near future in which [defendant] could demonstrate that his proposed use is probable." (Docket No. 82, p. 2). More than two years have passed since that pronouncement, and defendant's continued failure to obtain a permit for his own project, and his continued failure to produce permits for residential developments on nearby B-2 parcels, takes on increasing significance with the passage of time, since it is now no longer a matter of conjecture but rather an established fact that no such approvals were granted within a reasonable length of time after the taking.

zoning.   Given these circumstances, Mr. Gaztambide's opinion, by itself, fails to establish a reasonable probability that the Planning Board would either change the zoning or grant a variance at any time in the near future.   See 27.93 Acres of Land, 924 F.2d at 513-14 (excluding evidence of possible commercial use when landowner failed to meet burden of demonstrating its reasonable probability because zoning board member could not say whether new zoning regulation would be adopted and concern of preservation of agricultural land could cause new zoning regulation to be rejected).

In the end, the defendant has not met his burden to produce hard foundational evidence that residential development on the Subject Property would be legally permitted; thus, the opinion testimony of defendant's expert should not be allowed at trial.

## 2.     *Sand Extraction.*

The government similarly seeks to exclude the defendant's proffered evidence that the highest and best use of the Subject Property is sand extraction.   The defendant again relies on the opinion testimony of Mr. Gatzambide. (Docket No. 132, Exh. F).  The government at this stage does not dispute the defendant's contention that the Subject Property contains sand and that there is a market for such sand.  However, the government maintains that the defendant has not provided sufficient proof that it would be legally permissible to exploit that resource.

As noted by another of defendant's experts,  Dr. James Joyce, Ph.D., DNR regulations prohibit sand extraction from wetlands, and a buffer zone is required between extraction areas and wetlands. (Docket No. 132, Exh. F).  Defendant, therefore, must prove that it is reasonably probable that DNR would eschew these restrictions and issue a sand extraction permit in the reasonably near

USA v. 33.92536 Acres of Land, et al                                                   Page 13
Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)
April 24, 2007

future. See 320.0 Acres of Land, 605 F.2d at 818-19; 27.93 Acres of Land, 924 F.2d at 512.

Defendant's proof to this end is deficient. Mr. Gaztambide admitted in deposition that he did not analyze the reasonable probability of obtaining a sand extraction permit, and that he did not consult with anyone at the DNR regarding the matter. Nevertheless, he said he was 100% certain that the DNR would allow sand extraction based on his understanding that it had allowed sand extraction in the past on the Main Tract. (Docket No. 132, Exh. D, p. 197-99). However, during deposition he conceded that he had reviewed no documents showing that sand was extracted from land that is zoned B-2. Id., 296. In short, defendant has not come forward with any foundational evidence in support of Mr. Gaztambide's opinion that sand extraction would be allowed on land fitted with similar restrictions as the Subject Property, which is zoned B-2, located within a Flood Zone 2, and interlaced with wetlands in the Tortuguero Basin.[4] The government, on the other hand, has countered Mr. Gaztambide's opinion testimony with the testimony of Mr. Julio Toro, the Director of DNR Earth's Crust Division, which is responsible for issuing sand extraction permits. Mr. Toro explained that it was "extremely difficult" to obtain a sand extraction permit at the time of the taking even when all the papers were correct. (Docket No. 132, Exh. G, p. 8).

On balance, defendant fails to meet his burden of proving reasonable probability that a sand

---

[4] Defendant's opposition quotes testimony from Piza-Blondet's deposition regarding extraction of sand from the Main Tract but fails to attach the corresponding deposition transcript. (Docket No. 145, p. 5-6). In the quoted passage, Piza-Blondet states that he did not extract sand from the Subject Property (since it was leased to the government) but did extract sand from nearby areas. The defendant's testimony did not say, however: 1) whether the sand was extracted from areas zoned B-2; and 2) whether defendant had a permit to extract the sand. Since the government has provided evidence that defendant was cited for illegal extraction of sand without a permit (Docket No. 151), the court cannot assume that the extraction was compliant with law.

extraction permit would be forthcoming.  The case of <u>United States v. 62.50 Acres of Land</u>, 953 F.2d 886 (5th Cir. 1992) is instructive.   In that case, the landowner presented evidence supporting his theory that clam shell extraction was the highest and best use for a condemned wetland property, namely that the property contained clam shells and that there was a strong demand for them in the local market.  The landowner's expert, moreover, opined that any required permits could be obtained, but had not consulted any of the agencies responsible for granting permits.  The government countered by presenting the testimony of agency officials who expressed "considerable doubt" about whether the permits would be granted, owing to the policy of protecting coastal wetlands.  The trial court ruled, and the Fifth Circuit affirmed, that the evidence supporting a landowner's proposed highest and best use was too speculative to be admitted at trial. <u>Id</u>. at 888-91. In the present case, defendant similarly relies on the unsupported opinion testimony of an expert who failed to consult with the permitting agency or to analyze the reasonable probability of obtaining a permit, and the government has similarly countered with the testimony of an agency official who expressed serious concerns regarding the difficulty of obtaining a permit in an environmentally protected area.  Given these circumstances, Mr. Gaztambide's opinion as to possible sand extraction is overly speculative and should be excluded.

**B.**       **Defendant's Evidence of the Valuation of Sand Deposits on the Subject Property Should Be Excluded.**

The government also filed a motion *in limine* to exclude Mr. Gatzambide's appraisal of the

**USA v. 33.92536 Acres of Land, et al**                                   Page 15
**Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)**
**April 24, 2007**

value of the sand deposits underlying the Subject Property. (Docket No. 133).[5] The government

objects to Mr. Gatzambide's methodology as violating the "unit rule" (which prohibits valuing the

mineral estate separately from the fee simple interest), and as impermissibly valuing lost business

income not compensable under the Fifth Amendment.  The government further contends that the

sand appraisal is not based upon sufficient facts or data.  Essentially, the government seeks exclusion

of all data and opinions regarding appraisal of the value of sand extraction.

The appraisal at issue is contained in two related reports dated June 13, 2005.  The stated

purpose of the first report was to estimate "the Market Value of the Fee Simple Estate" on the

Subject Property as of the date of the taking.  (Docket No. 133, Exh. A) ("Fee Simple Appraisal").

In the Fee Simple Appraisal, Mr. Gatzambide concluded that the market fee simple value for the

upland section of Subject Property (approximately 19.506 *cuerdas*) was $980,000, or roughly

$50,000 per *cuerda*.  That estimate was based on the sales of three comparable tracts located near

the Subject Property, two of which were owned and sold by Piza-Blondet about a year before the

taking.  (Docket No. 333, Exh. H)  Mr. Gatzambide also concluded, based on his review of six

comparable sales,  that the market fee simple value for the wetland section of the Subject Property

(approximately 15.396 *cuerdas*) was $140,000, or roughly $9,000 per *cuerda*.   He found the total

market value of the fee simple estate for the Subject Property to be $1,120,000.  (Docket No. 33,

Exh. A).

---

[5] I will address this issue notwithstanding the fact that it would be rendered moot by the
finding, recommended in Part III.A.2 above,  that the defendant has produced no reliable
evidence that sand extraction would be permitted in the reasonably near future and that
consequently  any evidence related to this proposed use should be barred.

The second appraisal report is an addendum in which Mr. Gatzambide estimates the market value of the "Fee Simple Estate of the Sand Deposits in the Subject Property." (Docket No. 133, Exh. D) ("Sand Appraisal").   Relying on the conclusion of Dr. Joyce, a geologist, that the Subject Property contains between 100 and 200 cubic meters of extractable silica sand, Mr. Gatzambide concludes that the market value of the fee simple estate of the sand deposits in the Subject Property has a lower limit value of $3 million and a upper limit value of $6 million.  (Docket No. 133, Exh. D).  In reaching his conclusion, Mr. Gatzambide capitalized a hypothetical income stream for sand extraction utilizing a variety of factors, including a 15% discount rate to determine present value and an estimated cost of extraction of 20% of the anticipated gross income. Id.  The government seeks to exlcude the opinions and data found in the Sand Appraisal as violating permitted norms of valuation.

In United States v. Miller, 317 U.S. 369, 373-74 (1943), the Supreme Court noted that while it is "conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used," courts nevertheless, based on practical considerations, have adopted the concept of "market value" to measure what compensation is required by the Fifth Amendment.  As the First Circuit explained, the "test of market value is objective.  It is what a hypothetical seller would part with the land for and what an equally hypothetical buyer would give for it." Baetjer v. United States, 143 F.2d 391, 396 (1st Cir. 1944); see also, United States v. 91.90 Acres of Land, 586 F.2d 79, 88 (8th Cir. 1978) ("[t]he fair and reasonable market value of a tract of land is that price which a reasonable seller who desires to sell but is not required to sell would demand for the property and the price which a reasonable buyer who

desired to buy but was not required to buy would pay for the same, assuming a reasonable time for negotiations and explorations of alternatives").

In determining fair market value, the landowner is entitled to have all factors of value - such as location or mineral deposits - taken into consideration[6].  However, federal courts consistently have held in cases involving the condemnation of mineral-laden properties that "the landowner is not entitled to have the surface value of the land and the value of the underlying minerals aggregated to determine market value." Id., at 87.  Instead, the "value of the mineral deposit is to be considered only to the extent to which it goes into and affects the over-all market value of the property."  Id. See also, Georgia Kaolin Co. v. United States, 214 F.2d 284, 286 (5th Cir. 1954) ("[i]n eminent domain proceedings, the existence of valuable mineral deposits in the condemned land constitutes an element which may be taken into consideration if and in so far as it influences the market value of the land"); cf., Baetjier, 143 F.2d at 396 ("Value due to the strategic location of land is important, but important only in so far as that factor would influence the hypothetical bargainers whose behavior provides the test of value").  The concept that there can be no separate valuation of improvements or natural attributes of the land, apart from the tract's overall fair market value, has come to be known as the "unit rule." 4 J. Sackman, *Nichols on Eminent Domain*, § 13.01[16][a] (3d Ed.).

In light of the above, courts have found that it is  not permissible to calculate the value of the

---

[6] This is assuming, of course, evidence exists that the proposed use is reasonably probable.  As the court concluded in the previous section, the defendant has not provided sufficient evidence that sand extraction would be permitted in the reasonably near future.

**USA v. 33.92536 Acres of Land, et al**                                          Page 18
**Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)**
**April 24, 2007**

mineral deposits apart from the value of the surface land and to add the two values to determine the amount of just compensation. 91.90 Acres of Land, 586 F.2d at 89. In Georgia Kaolin, the Fifth Circuit similarly acknowledged that while the fair market value may take into consideration mineral deposits, "there can be no recovery for both the value of the land and its mineral deposits as two separate items." 214 F.2d at 286. See also, 4 J. Sackman, *Nichols on Eminent Domain*, § 13.14[2] (3d Ed.) ("It is impermissible to aggregate the value of the land and the value of the deposit in a summation approach.").

Moreover, while an owner of condemned property is entitled to just compensation for the taken land, no compensation is owed for loss of profits derived from a business operating on the property. United States ex rel. T.V.A. v. Powelson, 319 U.S. 266, 281-86 (1943); A.G. Davis Ice Company, Inc. v. United States, 362 F.2d 934 (1st Cir. 1966) ("[s]uch profits [of business operating on condemned property] are not generally considered property within the meaning of the constitutional provision forbidding the taking of property by eminent domain except upon payment of just compensation").

Federal courts have also addressed the related issue of what is the correct appraisal method to be used in cases involving condemnation of mineral-laden property. Most such cases address whether the appraisal must be based on the sales of comparable property, or, whether the present value capitalization of anticipated net income from the minerals may be considered in determining fair market value. These cases have held uniformly that "[t]he best evidence of market value of real property in condemnation is... found in sales of comparable land within a reasonable time before the taking." United States v. 179.26 Acres of Land, 644 F.2d 367, 371 (10th Cir. 1981); see also, United

States v. 494.10 Acres of Land, 592 F.2d 1130, 1132 (10th Cir. 1979) ("The willing buyer and seller standard is represented by comparable transactions as a method of proof. The parties to such transactions are presumed to have taken into consideration all the elements of value to be attributed to the land."); United States v. 103.38 Acres of Land, 660 F.2d 208, (6th Cir. 1981) (a "'comparable sales' analysis has long been and remains the preferred method of establishing a property's 'fair market value.'"); 4 J. Sackman, *Nichols on Eminent Domain*, § 13.01[11] (3rd Ed.) (the "consensus is that this [the comparable sales approach] is the most reliable method of arriving at market value.").

Notwithstanding the above, some courts have permitted evidence of potential royalties or income stream for extracting minerals in determining the fair market value of a property. These courts, however, uniformly have allowed evidence of the land's potential income stream only after determining that there was no available evidence of comparable sales. See, e.g., United States v. 2,500 Acres of Land, 836 F.2d 498, 504 (10th Cir. 1988) ("in the absence of comparable land or mineral interest sales, it is appropriate to use the net income approach... to estimate the profit a mineral interest could yield over a period of time") (internal quotation omitted); 103.38 Acres of Land, 660 F.2d at 211 ("[i]n the absence of true 'comparables', however, the trier of fact may indeed must resort to other means of determining fair market value"); Cloverport Sand & Gravel Co., Inc. v. United States, 6 Cl.Ct. 178, 189 (1984) ("where no comparable sales evidence is available, the income capitalization approach is... considered the next best approach to valuation"). Where evidence of comparable sales exists, courts have refused to consider evidence of capitalization of income from the property. See, e.g. United States v. 494.10 Acres of Land, 592 F.2d 1130 (10th Cir. 1979); United States v. 13.98 Acres, 702 F.Supp. 1113, 1122-24 (D.Del. 1988).

In the present case, defendant's proffered Sand Appraisal runs afoul of the valuation principles cited above and should be excluded for two reasons. First, defendant seeks to introduce evidence of the value of the mineral deposits (the Sand Appraisal) separate from and in addition to the value of the surface area of the Subject Property (the Fee Simple Appraisal). Courts have rejected similar attempts to aggregate the surface value and the mineral value as a violation of the unit rule. See, 91.90 Acres of Land, 586 F.2d at 89; Georgia Kaolin, 214 F.2d at 286.

Second, defendant's proffered evidence of the Subject Property's potential income stream for sand extraction should not be considered because there is available in this case evidence of sale of three comparable properties located nearby the Subject Property. In fact, the evidence of the three comparable sales was provided by the defendant himself as part of the Fee Simple Appraisal, and two of these sales involved property owned by the defendant who sold them less than two years prior to the taking. Moreover, and contrary to what defendant avers in his opposition motion, all three of the comparable sales contained silica sand deposits. (See Docket 133, Exh. H). Given the fact that the defendant himself sold comparable sand-laden properties, the court "must conclude that the parties to the arms-length comparable sales transactions implicitly if not explicitly took into consideration any value inherent in the land as a source of [sand]." 13.98 Acres, 702 F.Supp. at 1123. Under these circumstances, the admission of additional evidence of the land's potential income stream for sand extraction "would be to improperly sanction double counting." Id.

Given the foregoing, defendant's evidence related to the valuation of the sand deposits should be excluded.

**USA v. 33.92536 Acres of Land, et al**                                                    Page 21
**Civil Nos. 98-1664 (FAB-BJM); 98-2344 (FAB-BJM)**
**April 24, 2007**

**III.**    **CONCLUSION**

For the reasons set forth above, I recommend that the government's motion at Docket No.

132 be **GRANTED** and that the court enter an order excluding defendant's proffered expert

testimony that the highest and best use of the Subject Property is residential development or sand

extraction.  I further recommend that the government's motion at Docket No. 133 be **GRANTED**

and that the court issue an order excluding all defendant's evidence related to the valuation of sand

deposits in the Subject Property.

The parties have ten (10) business days to file any objections to this report and

recommendation.  See Local Rule 72(d); 28 U.S.C. § 636(b)(1).  Failure to file same within the

specified time waives the right to appeal this order.  Henley Drilling Co. v. McGee, 36 F.3d 143,

150-151 (1st Cir. 1994); see also Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840

F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role

reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial

hearing, and save its knockout punch for the second round").

**IT IS SO RECOMMENDED.**

San Juan, Puerto Rico, this 24th day of April, 2007.


                                        s/Bruce J. McGiverin
                                        BRUCE J. McGIVERIN
                                        United States Magistrate Judge