IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,                    *
                                             *
Plaintiff,                                   *
                                             *
            v.                               *
                                             *
33.92536 ACRES OF LAND, MORE OR              * CIVIL ACTION NO. 98-1664 (FAB-BJM)
LESS, SITUATED IN VEGA BAJA,                 * CIVIL ACTION NO. 98-2344 (FAB-BJM)
COMMONWEALTH OF PUERTO RICO,                 *
and JUAN PIZA-BLONDET, et al.,               *
                                             *
Defendants.                                  *
                                             *
*    *    *    *    *    *    *  *  *    *    *    *    *    *    *

OBJECTIONS TO THE MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

NOW INTO COURT, through undersigned counsel, comes defendant, Juan Piza-Blondet

("Piza-Blondet"), and files the following Objections to the Magistrate Judge's Report and

Recommendation dated April 24, 2007.  Consistent with 28 U.S.C. § 636(b) and Local Rule

72(d), Piza-Blondet respectfully requests that the District Court Judge conduct a *de novo* review

of the Magistrate Judge's Report and Recommendation and that the same be reversed by this

Honorable Court.

PROCEDURAL BACKGROUND

Under Rule 71A (h) of the Federal Rules of Civil Procedure, the United States moved to

exclude the defendant/landowner's evidence (as contained in the testimony and report of Carlos

Gaztambide, MIA) that the highest and best use of the subject property is for residential

development and/or sand extraction. (Docket No. 132).  Additionally, the United States filed a

Motion in Limine to Exclude All Evidence (as contained in the testimony and reports of Mr.

Gaztambide and Dr. James Joyce) Relating to Defendant's Appraisal of Sand Deposits. (Docket

No. 133). Piza-Blondet opposed both motions in limine (Docket Nos. 145,146 ). Consistent with Federal Rule of Civil Procedure 72(b), Magistrate Judge Bruce McGiverin rendered a Report and Recommendation granting the United States' motions in limine and excluding the defendant's expert testimony that the highest and best use of the subject property is residential development and/or sand extraction. (Docket No. 155) The Magistrate Judge also excluded all of the defendant's evidence relating to the valuation of sand deposits on the subject property. Id.

## FACTUAL BACKGROUND

It is undisputed in this case that on December 22, 1998 the United States acquired approximately 33.92 acres of land ("the subject property") in the Vega Baja, Puerto Rico for the operation of a Federal Aviation Administration ("FAA") radio tower. (Docket No. 155, page 2) At the time of the taking, the property was owned by defendant landowner, Piza-Blondet, who also owned 400 acres of surrounding land ("the main tract"). Id. The subject property was segregated from the main tract in 1997.[1] The subject property is located in the Laguna Tortuguero Hydrographic Basin with access to state highway PR687. Id.

It is also undisputed that the subject property has vast deposits of silica (quartz) sand. (See the report of Dr. James Joyce, and pictures of the property, Exhibit "A.") The silica sand deposits cover nearly half of the property and are limited to areas between one and three meters in elevation. Id. As this Honorable Court is aware, silica sand is a valuable industrial resource that is used extensively in the glass making industry. In Puerto Rico, the primary purchaser of silica sand is Owens-Illinois Company. The defendant, Piza-Blondet, maintains that there is absolutely nothing speculative about the silica sand deposits on the subject property or the value

---

[1] See the Magistrate Judge's Report and Recommendation (docket No. 155, page 2). The defendant notes that this finding will necessarily cause the United State's appraisal of the subject property to be excluded. The United State's expert appraiser improperly used the "before and after" method of valuating the subject tract. If the subject tract was segregated in 1997, then there was a total taking of the property and the "before and after" method does not apply.

of the same.  Unlike other mineral deposits, silica sand is extracted by using industrial equipment such as bulldozers and dump trucks.  The sand deposits in Puerto Rico are not mined (like coal or clay) or extracted from the ground using drilling equipment (like natural gas or oil).

The characteristics of the subject property are not in dispute.  The parties jointly retained an expert to delineate the property's uplands and lowlands.  Greg Morris Engineers of San Juan Puerto Rico prepared "an environmental and wetland jurisdictional determination" for the property.[2]  As outlined in this extensive report and in the pictures attached to the report, there is a clear upland portion of the property that generally does not contain wetland fauna.  Additionally, there are no mangroves on the subject tract, and "sandy soils dominate the uplands." Id.

Consistent with the report of Greg Morris Engineers, the defendant's expert appraiser, Carlos E. Gaztambide, MIA, has opined that the highest and best use of the subject tract is for residential development and/or sand extraction in the upland section of the property.  (See excerpts from Mr. Gaztambide's report, Exhibit "C.")  Mr. Gaztambide reached his conclusion after studying the characteristics of this particular property.  He recognized but did not merely analyze zoning regulations. Id.

Prior to the taking, the subject property was developed with an access road, a building (with a concrete slab), a parking lot, and a tower (with a metal grid imbedded underground in silica sand).  (See the "Photos of the Subject Property," Exhibit "C.")  The FAA site was developed on the upland portion of the subject property. Id. This site was not developed in what the Magistrate Judge describes as wetlands.  Prior to the taking, the subject property was clearly impacted by the federal government. The government's development of the property, prior to the taking, greatly increased the landowner's chances of obtaining a variance, or a rezoning of the subject property, for residential development or sand extraction.  The United States' own

---
[2] Exhibit "B."

witness, Julio Toro McCowen, of the Puerto Rico Department of Natural Resources, concedes

this fact in this deposition:

Q      I'm going to give you an example here, and we're talking about the same place [two identical pieces of property in the same geographic area]. We have two squares here. It's the same property and this is based on your experience as the Director of Earth Crust.

A      You mean as a technician of the department?

Q      Yes, correct.

A      Not exclusively as - -

Q      Your experience in general, your capacity based on what you work on.

A      You mean further than my responsibilities as director of a division?

Q      What you have knowledge of.

A      Okay.

Q      In this case, this represents a tower, and there is a small, little house and this is a slab of cement or a parking, a cement slab, something similar to that, there is something here, the cables, the anchorage to hold it in place, the tower, and this [another property in the same area with no development] is the same place but with nothing on it, obviously we've already established that there has been an impact on the one that has the tower.

A      Yes.

Q      An environmental impact, obviously.

A      Yes.

Q      Okay. I apply in this case, the one that has the things on it [the property that has been impacted], for a sand extraction permit and we're talking about 1998 or before that and I also apply for a permit in the one that doesn't have anything [the property with no environmental impact], for a sand extraction, which of the two would be easier to obtain?

A      The place that is already impacted.[3]

In rendering his Report and Recommendation, the Magistrate Judge also failed to

consider that variances in 1998 were commonplace and much less difficult than they are today.

Mr. McCowen again conceded this point in his deposition:

Q      Meaning a variant, is that what they call it here?

A      A rezoning.

Q      In your experience, what it's called, the zoning office?

A      It's called the Bureau of Land Use.

Q      And they are the ones that award variances?

A      They meet two or three times a year to consider these cases.

---

[3] See the deposition of Julio Toro McCowen, Exhibit "D," page 56, line 24 through page 58, line 5.

Q    Are they common, are they very common in Puerto Rico, variances?
A    In these coastal area, each time it's getting harder to get them.
Q    In '98 going back, towards the past, were variances common?
A    It wasn't as difficult as it is now. As all these issues have come up, all these conflicts between development and the coastal zone, the state has realized that if we continued with that practice, we were going to seriously impact our estuary system, our coastal estuaries and our marine eco systems.[4]

The FAA did not select this site randomly; in fact, this agency primarily chose the subject property because of the silica sand. The sand helps conduct radio frequencies, and for this reason, the FAA tower and its underground metal grid are embedded in quartz sand. Accordingly, and contrary to the Magistrate Judge's Report and Recommendations, this property cannot be analogized to a B-2 mangrove forest or salt pond that can only be used for passive recreational activity under Puerto Rico's zoning regulations for the Tortuguero Laguna Hydrographic Basin.

Piza-Blondet is not suggesting to this Honorable Court, and will not present evidence to the Jury, that all of the subject tract can be developed for residential purposes. On the contrary, Mr. Gaztambide concluded that approximately 15 acres of lowlands (wetlands) should be used as a mitigation bank.[5] Especially in 1998, the mitigation bank would greatly increase the landowner's chance of extracting sand and/or developing the upland portion of the subject property. In simple terms, the wetlands would be preserved in perpetuity, in exchange, for the development of the uplands. Again, the uplands at the time of the taking were already developed and impacted by the FAA site. Nonetheless, the Magistrate Judge did not consider these issues in granting the plaintiff's motions in limine and excluding the defendant's evidence. For the

---

[4] See the deposition of Julio Toro McCowen, Exhibit "D," page 31, lines 4 through 24.

[5] This significant fact was overlooked by the Magistrate Judge in rendering his Report and Recommendations.

reasons set forth below, Piza-Blondet respectfully requests that the Magistrate Judge's ruling be reversed.

## OBJECTIONS TO THE MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

1.      The Magistrate Judge's Report and Recommendation fails to consider the actual use of the property (commercial development by the FAA) at the time of the taking (1998) in excluding the defendant's evidence that the highest and best use for the uplands section of the property is for residential development and/or commercial sand extraction.

2.      The Magistrate Judge's Report and Recommendation does not consider the mitigation bank proposed by the defendant's expert appraiser in analyzing whether sand extraction permits would be "reasonably probable" for the uplands portion of the subject tract.

3.      The Magistrate Judge's Report and Recommendation does not consider the environmental impact of the FAA site in ruling that permits for residential development or commercial sand extraction would not be "reasonably probable" for the particular B-2 tract.

4.      The Magistrate Judge's Report and Recommendation incorrectly focuses on the zoning classification of the subject tract (B-2) and not on the actual characteristics of the land at the time of the taking.

5.      The Magistrate Judge's Report and Recommendation does not consider the fact that variances were routinely granted in 1998 for residential development and/or sand extraction.

6.    The Magistrate Judge's ruling conflicts with the prior ruling of this Court (Docket no. 113) wherein it was determined that the proper method of valuation was a question best decided by the jury.

7.    The Magistrate Judge's ruling improperly compared the subject tract to the main tract, zoned B-2, as the subject tract was developed at the time of the taking and segregated from the main tract.

8.    The Magistrate Judge's ruling over-emphasized the length of time a 1999 permit application for sand extrication in the main tract has taken, as the main tract was not impacted with development the way the subject tract was in 1998 prior to the taking.

<u>ARGUMENT AND ANALYSIS OF CASE LAW</u>

**A. Just Compensation**

"Just compensation rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken." Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 304 (1923); United States v. Miller, 317 U.S. 369, 373-74, 63 C.Ct. 276, 280 (1943). Just compensation for condemned property is often measured by the fair and reasonable market value of the property or interest taken. Miller, 317 U.S. at 373, 63 S.Ct. at 280. However, fair market value cannot be an obstacle to just compensation; it cannot be the standard of valuation when it produces less than the constitutional guarantee or when market value cannot be ascertained. United States v. Commodities Trading Corp., 339 U.S. 121, 123 (1950); Kirby Forest Indus., Inc. v. United States, 467 U.S. 1 (1984).

In land condemnation proceedings, the comparable sales method of evaluation is the preferred approach in establishing the fair market value of property. However, when comparable

7

sales do not exist "[t]he law of evidence . . . favors a broad rule of admissibility and is designed to permit the admission of all evidence which is relevant and material to the issues in controversy, unless there is a sound and practical reason for excluding it." United States v. 2,847.58 Acres of land, 529 F.2d 682, 687 (6th Cir. 1976). The landowner's compensation depends upon the circumstances of each case; there are no general formulas to be used and some speculation is inherent in any valuation of a property. Miller, 317 U.S. at 373-74, 63 C.Ct. at 280.

In this case, even the plaintiff concedes that mineral deposits can be considered by courts in determining just compensation.[6] However, the United States has analogized this case to an oil or coal case wherein landowners are required to value mineral deposits based on rental or royalty income that can be generated from the property itself, as opposed to the sale of the minerals separate from the property. The government's argument lacks any merit considering the nature and method of extracting the sand deposits on the subject tract.

Again, the mineral deposits (silica sand) on the subject tract would not be extracted by an oil or mining company. Rather, the silica sand could be simply loaded into dump trucks and brought to a buyer such as Owens-Illinois. The landowner would receive compensation from the buyer based on the amount of sand. There would be no rental or royalty income generated by the sale of silica sand. Accordingly, this case is distinguishable from all the cases cited by the government on pages 8 and 9 of its First Motion in Limine to Exclude all Evidence Relating to Defendant's Appraisal of Sand Deposits. Like in the United States v. 100.80 Acres of land, 657 F.Supp. 269 (M.D.NC 1987), the Court in this matter should allow the discounted income approach in valuating the minerals (silica sand). The reasonably probable income from the silica sand deposits is attributable to the value of the land. Id.

---

[6] Docket No. 133.

Consistent with relevant case law, the defendant, Piza-Blondet, has established that the extraction of sand from the subject tract is consistent with the highest and best use of the property. United States v. 13.98 Acres, 702 F.Supp. 1113 (Del. 1988); United States v. Land in Dry Bed of Rosamond Lake, Cal., 143 F.Supp 314 (S.D. Cal 1956). There is clearly a market for the silica sand, and the silica sand is of such a quality and character that it could be sold for profit. Id. Accordingly, the silica sand contributes to the value of the subject land and should be considered by the jury in determining just compensation in this case. Id.

The defendant has also established that as of 1998, a permit was reasonably probable for the subject property – considering the environmental impact of the FAA tower, the access road installed by the United States Government, and the fact that the property had no wetland fauna or mangrove forest on the upland portion of the subject tract. Therefore, the defendant should be allowed to present evidence to the jury on the residential development of the subject tract and sand extraction on the upland portion of the condemned land. The testimony and report of Carlos Gaztambide and the testimony and report of Dr. James Joyce are admissible under the Federal Rules of Evidence. The defendant maintains that the district court should reverse the Magistrate Judge's Report and Recommendation dated April 24, 2007.

**B. The reasonable probability of permits**

In rendering his Report and Recommendation, the Magistrate overemphasized the need to obtain a permit for sand extraction on the subject property. Such overemphasis on an actual permit is inconsistent with the case law. In fact, even when no active development of the minerals has occurred as of the date of taking, landowners are generally not precluded from valuation of known mineral deposits. United States v. 1,955.00 Acres of land, 447 F.2d 673 (10th Cir. 1971); United States v. 26.81 Acres of land, 226 F.Supp. 829 (W.D. Ark. 1964); United

States v. 620.00 Acres of land, 101 F.Supp. 686 (W.D. Ark. 1952).  As one Colorado court has

stated:

> It is true that at the time the department took possession, there was no
> commercially established gravel operation on the land, nor had the landowners
> taken any preliminary steps toward gravel production such as obtaining permits.
> However, in condemnation cases, **evidence of reasonable future use is
> admissible to determine the present fair market value of property**, [citations
> omitted], and compensation is not limited to the value of property for the uses to
> which it is devoted at the time of taking.  State Dept. of Highways v. Mahaffey,
> 697 P.2d 773 (Colo. App. 1984). (Emphasis added.)

In this case, the methodology used by Mr. Gaztambide is appropriate for purposes of

placing a value on the subject land.  His testimony should be admitted and considered by the jury

in determining just compensation.  In 1998, there was a reasonable probability that a permit

would be issued for sand extraction on the subject property.  The uplands portion of the property

was developed by the FAA.  The uplands portion of the subject tract did not contain mangrove

forest or a salty pond at the time of the taking.[7]  The property was improperly classified as B-2

and rather should have been classified as CR.   Nonetheless, the Magistrate Judge simply

dismissed these facts in excluding the testimony of Mr. Gaztambide and Dr. Joyce.

The defendant, Piza-Blondet, respectfully maintains that the District Court Judge should

reverse the Magistrate Judge's Report and Recommendation dated April 24, 2007.   The

defendant should be allowed to introduce his evidence of sand extraction and residential

development of portions of the subject land to the jury.  For any portions of the land that were

clearly wetlands, Mr. Gaztambide concluded that those lands should be mitigation banks.  In

other words, Mr. Gaztambide concluded that there should be no development or sand extraction

---

[7] The Magistrate Judge recognizes that B-2 properties are "established to identify and protect irreversible damage to wetlands and associated systems like mangrove forests and salty ponds." (Docket No. 155, page 5).  However, the FAA site is not on such a location.  Rather, the FAA site is on sandy uplands on the subject tract.

on low land portions of the subject property.[8]    Again, the Court did not even consider this

conclusion of Mr. Gaztambide in excluding his opinions.

### C. Some speculation is allowed especially with regards to minerals

In determining fair market value, Courts are not bound by "an absolute standard nor an

exclusive method of valuation. <u>United States v. Virginia Electric & Power Co.</u>, 365 U.S. 624,

633, 81 S.Ct. 784, 790, 5 L.Ed.2d 838 (1961).  However, in this case, the Magistrate Judge has

focused on the technical concepts of property law (zoning restrictions) as opposed to the

character of the subject property.  There is absolutely no speculation as to the future value of the

silica sand deposits on the subject property.  The value of the sand must be considered by the

jury in estimating just·compensation in this case.  Additionally, the jury must consider the fact

that the subject property was environmentally impacted at the time of taking.  Again, the FAA

constructed a building, an access road, a surrounding fence, and a tower prior to the taking.  The

government's impact on the subject tract was permanent.  It is unjust and inequitable not to

consider these critical facts in determining the compensation owed to the landowner.  With the

report of his appraiser, the defendant, Piza-Blondet, has established that residential development

of the property was "reasonably probable" within a reasonable time from the time of the taking

(1998).

The undisputed facts of this case, including pictures of the subject property attached to

the reports of Mr. Morris, Mr. Gaztambide, and Dr. Joyce, establish that the subject property was

improperly classified as B-2.  Puerto Rico's plan and regulations for the Laguna Tortuguero

Hydrographic Basin establish that B-2 properties are districts "established to classify coastal

lands in the Laguna Tortuguero Hydrographic Basin, <u>generally covered with mangroves</u>."

---

[8] The United States conceded this point in their Motion in Limine to exclude all evidence relating to defendant's appraisal of sand deposits, Docket No. 133 on page 3.

(Emphasis added.) It is absolutely undeniable in this case that the FAA site was not located on mangroves. The defendant, Piza-Blondet, has maintained throughout these proceedings that the subject property (and not all B-2 properties) could be properly reclassified, rezoned, and/or developed for commercial/residential purposes. It is the unique characteristics of the subject land that makes it reasonably probable that permits would be issued for sand extraction and/or for residential development. As the Magistrate Judge points out in his Report and Recommendation, sand permits and development have been allowed in the main tract in areas that are zoned CR. Accordingly, the jury should be allowed to consider the defendant's evidence of residential development and sand extraction for the subject tract. The Magistrate Judge ultimately excluded evidence of residential development and sand extraction because such evidence was too speculative.[9] However, courts across the country have recognized that due to the nature of minerals, there are necessary elements of speculation and uncertainty in calculating their values. See e.g., United States v. 2,847.58 Acres of land, 529 F.2d 682 (6th Cir. 1976); United States v. 79.95 Acres of land, 459 F.2d 185, 188 (10th Cir. 1972) ("We appreciate the fact that there can be no absolutes in the speculative area of oil reserves. Reliance must necessarily be placed on expert testimony.") Furthermore, despite a certain degree of inherent speculation and conjecture with regard to mineral rights, if the evidence of the mineral's value is the best available and follows the custom of the industry, courts have held that such evidence is generally admissible. United States v. 179.26 Acres of land, 644 F.2d 367 (10th Cir. 1981); United States v. Silver Queen Mining Co., 285 F.2d 506 (10th Cir. 1960).

In this case, it is undisputed that there are mineral deposits (silica sand) on the subject property. The extraction of the sand is clearly feasible. There is some speculation with regard to the amount of mineral deposits on the subject property. However, the evidence submitted by the

_____

[9] See the Magistrate Judge's Report and Recommendation, Docket No. 155, page 7-8.

defendant is consistent with industry practices, and even the government does not dispute the amount of silica sand on the subject tract. The extraction of sand off of the subject tract is different in kind than drilling for oil or mining for minerals in the cases cited by the U.S. Government. The defendant should at least be allow to introduce his evidence on the highest and best use of the land to the jury.

## CONCLUSION

The subject property was used commercially by the FAA at the time of taking. The defendant's expert appraiser, Carlos Gaztambide, MAI, concluded that the highest and best use of the land would be residential development and/or commercial sand extraction. This conclusion is not speculative. Rather, Mr. Gaztambide's conclusions are consistent with the actual use of the property at the time of the taking. The Magistrate Judge's ruling is far more speculative as it focuses on the zoning (B-2) of the property and the theoretical uses for the subject tract (fishing, scientific studies, and passive recreational activities). The Magistrate Judge's ruling fails to consider the fact that variances were routinely granted for development or sand extraction in 1998, and the Magistrate Judge's ruling emphasizes the zoning regulations as they presently exist.

The Report and Recommendation of Magistrate Judge Bruce McGiverin fails to consider the Federal Aviation Administration's development of the property prior to the taking in 1998. The Magistrate Judge's Report and Recommendation fails to consider the undisputed evidence that the subject property had an access road, a building, a parking lot, and a communications tower on it in 1998. The Magistrate Judge failed to consider the fact that the FAA site forever changed the most likely highest and best use of the land. The environmental impact of the FAA site made it much more likely for permits to be issued for residential development and/or sand

13

extraction. The uplands portion of the subject tract is not wetland, and it does not have mangroves or salty ponds on it. Stated simply, the subject tract is different in kind from other properties (including but not limited to the main tract) that are zoned B-2 in the area. The Magistrate Judge improperly excluded the defendant's evidence. In this case, the jury must decide the proper amount for just compensation, not the Magistrate Judge. Piza-Blondet, maintains that the expert testimony, and reports, of Carlos E. Gaztambide, MAI, and Dr. James Joyce are admissible under the Federal Rules of Evidence. The defendant, Piza-Blondet, should be allowed to introduce evidence of residential development and the sand deposits on the subject tract. Mr. Gaztambide's method of evaluating the highest and best use of the subject property should be introduced at trial of this matter. The defendant maintains that the Magistrate Judge's Report and Recommendation should be reversed.

Respectfully submitted,


_____/s/ Francisco Diez_____ .
Francisco Diez
Bar Roll No. 215412
Attorney for JUAN PIZA BLONDET
B-5 Pabonuco Street
Suite 216 PMB 255
Guaynabo, Puerto Rico 00968
Telephone: (787) 721-1100
Telecopier: (787) 725-8195


- and -

J. Wayne Mumphrey
David C. Vidrine
Mumphrey Law Firm, L.L.C.
2000 Old Spanish Trail, Suite 103
Slidell, LA  70458
Telephone: (985) 649-0709
Telecopier: (985) 649-5706

15

Copies to:

JOSE M. PIZARRO ZAYAS
Assistant U.S. Attorney
Room 452 Federal Building
Hato Rey, Puerto Rico 00918
Tel. 766-5656

PAUL HARRISON
JEFFREY M. TAPICK
Attorneys, U.S. Department of Justice
Environment and Natural Resources Division
P. O. Box 561 – Ben Franklin Station
Washington, D.C.  20044
Telephone: 202-305-0299
Fax:          202-305-0398

## Certificate of Service

I HEREBY CERTIFY that I have on this 7th day of May, 2007, served all counsel with a copy of the above and foregoing by email and electronic notification.

_____/s/ Francisco Diez_____.
Francisco Diez