APPRAISAL REPORT OF
A VACANT PARCEL OF LAND COMPRISING 34.930 CUERDAS (33.92356 ACRES)
LOCATED AT KM. 3.8, INTERIOR PUERTO RICO ROAD 687
YEGUADA WARD, VEGA BAJA, PUERTO RICO

PREPARED FOR:

MR. JUAN PIZA-BLONDET
MR. MAURICE PIZA, ESQUIRE
ASHFORD AVENUE CORNER AGUADILLA STREET
CONDADO, PUERTO RICO  00907

PREPARED BY:

CARLOS E. GAZTAMBIDE AND ASSOCIATES, INC.
REAL ESTATE APPRAISERS AND CONSULTANTS
SUITE 1515, BANCO POPULAR CENTER
HATO REY, SAN JUAN, PUERTO RICO 00918

EXHIBIT
"C"

27

## DESCRIPTION OF THE SUBJECT PROPERTY

The subject property is a suburban vacant parcel of land located at Km. 3.8, Interior, Puerto Rico Road 687, Yeguada Ward, Vega Baja, Puerto Rico. The subject is at a convenient distance (about four kilometers) from Puerto Rico Road 2 through Road 687. It is also at a convenient location from the José de Diego Expressway (which leads into San Juan) and from the center of the city of Vega Baja.

The subject property is a vacant parcel of land comprising 34.93 cuerdas (33.92356 acres) with a level topography and a local view. It is very important to mention that the subject property has its access through a right of way of 0.892 cuerdas (0.86522 acres) that connects to an interior municipal road about 500 lineal meters from Road 687. For the purpose of this appraisal assignment the effective area is 34.930 cuerdas (34.038 cuerdas plus 0.892 cuerdas equal to 34.930 cuerdas or 33.92356 acres). Furthermore, for the highest and best use determination, it is pertinent to mention that a 13 meters wide access has been approved and segregated which lead into the immediate area of the subject property.

Based on its recording, configuration, topography and its access, the subject property constitute an independent parcel of 34.930 cuerdas (33.92356 acres).

The subject is located in a Zone AE (inside the 500 year flood plain) according to the Flood Insurance Rate Map #72-0000-0040-E, revised on June 2, 1999. According to an evaluation of the Sheet No. 7B of the Puerto Rico Planning Board Flood Rate Map, about half or the west section

(56%) of the subject property is located within Zone 2, with the remainder 44% or the east section the subject within Zone 1.

Within Zone 2, the Puerto Rico's Department of Natural and Environmental Resources (DNER) authorizes development if adequate precautions are taken to fill the land to elevations that protect the property from rising waters and/or floods. On Zone 1, the DNER does not condone development in areas with this classification.

Based on the Site Environmental Assessment Report conducted by Dames & Moore on May 29, 1999 for the Environment and Natural Resources Division of the U.S. Department of Justice the wetland and upland coverage of the subject property was estimated in 15 acres of wetlands (44%) and 19 acres of upland (56%). We assumed these figures as true and correct.

The subject is located inside the special zoning rated areas under LT-B2 District, as per Sheet No. 35 of the "Mapa de Zonificación Especial Cuenca Hidrográfica de la Laguna Tortuguero" of the Puerto Rico Planning Board, valid since October 28, 2000. The LT-B2 District ("Laguna Tortuguero-Bosque de Mangle") was established to identify and protect the irreversible damage to wetlands and associated systems like mangroves forests and salty ponds. The only presumable uses are: activities related to aesthetic values, refuge and species breeding places, the coastal protection, scientific investigation, passive recreation as long as they do not affect the natural ecosystem, plus the construction of fisherman's piers without affecting the mangroves.

The B-2 zoning is not an absolute negation to development because R-1 and R-3 equivalent subdivisions have been approved not only on the main tract owned by Mr. Pizá Blondet but in numerous properties that have this zoning and subsequently were approved for development presumably because these do not represent an adverse factor with respect to the protection of the lagoon. To that effect, we are presenting an aerial photograph showing numerous residential developments to the east and south of this lagoon. Furthermore, we have included as an exhibit of this appraisal the Declaration prepared by Carlos E. Gaztambide, Juris Doctor, MAI that includes numerous exhibits that prove development of the subject property is possible.

## SITE DESCRIPTION OUTLINE AND ANALYSIS

| | | |
|---|---|---|
| Location | : | Assumed Vacant Parcel of Land Comprising 34.930 Cuerdas (33.92356 acres), Km. 3.8, Interior, Puerto Rico Road 687, Yeguada Ward, Vega Baja, Puerto Rico |
| Zoning | : | LT-B2 District ("Laguna Tortuguero-Bosque de Mangle") under the "Mapa de Zonificación Especial Cuenca Hidrográfica de la Laguna Tortuguero" |
| Highest and Best Use** | : | Upland – Residential Development<br>Wetland - Mitigation |
| Infrastructure | : | The infrastructure is to the immediate west at the tip of the right of way that provides current and future the access to subject property. |
| Topography | : | Level |
| Access | : | The access is through a municipal road about 500 lineal meters from Road 687 that intersect the right of way of the subject property. Furthermore, a medium density residential grade access which leads into the immediate area of the subject has been approved and segregated. |
| Configuration | : | Square |
| Flood Plain Data | : | Zone "AE" (inside 500 year flood plain), FIRM #720000-0040-E, revised June 2, 1999. According to an evaluation of the Sheet No. 7B of the Puerto Rico Planning Board Flood Rate Map about the west half section (56%) of the subject property is located within Zone 2 and the east section (44%) of the subject is within Zone 1. |
| Lot Area | : | The subject property is a vacant parcel of land comprising 34.93 cuerdas (33.92356 acres) with a level topography and a local view. It is very important to mention that the subject property has its access through a right of way of 0.892 cuerdas (0.86522 acres) that connects to an interior municipal road about 500 lineal meters from Road 687. For the purpose of this appraisal assignment the effective area is 34.930 cuerdas (34.038 cuerdas plus 0.892 cuerdas equal to 34.930 cuerdas or 33.92356 acres). Furthermore, for the highest and best use determination it is pertinent to mention that a 13 meters wide access has been approved and segregated which leads into the immediate area of the subject property. Furthermore, a medium density residential grade access which leads into the immediate area of the subject has been aggregated and segregated. |

** See highest and best use section and exhibits of this report which are presented under a separate cover.

**<u>PHOTOS OF THE SUBJECT PROPERTY</u>**



AERIAL VIEW OF THE SUBJECT PROPERTY



AERIAL VIEW OF THE SUBJECT NEIGHBORHOOD





VIEW OF THE ENTRANCE OF THE SUBJECT PROPERTY



VIEW OF THE ENTRANCE OF THE SUBJECT PROPERTY AND ITS NEIGHBORHOOD



VIEW OF THE RIGHT OF WAY THAT GIVES ACCESS TO THE SUBJECT PROPERTY



VIEW OF THE RIGHT OF WAY THAT GIVES ACCESS TO THE SUBJECT PROPERTY



INTERIOR VIEW OF THE UPLAND SECTION OF THE SUBJECT PROPERTY



INTERIOR VIEW OF THE UPLAND SECTION OF THE SUBJECT PROPERTY



INTERIOR VIEW OF THE UPLAND SECTION OF THE SUBJECT PROPERTY



INTERIOR VIEW OF THE UPLAND SECTION OF THE SUBJECT PROPERTY



FRONT VIEW OF THE EQUIPMENT BUILDING IN THE SUBJECT PROPERY



REAR VIEW OF THE EQUIPMENT BUILDING IN THE SUBJECT PROPERTY



INTERIOR VIEW OF THE WETLAND SECTION OF THE SUBJECT PROPERTY



INTERIOR VIEW OF THE WET LAND SECTION OF THE SUBJECT PROPERTY



VIEW OF THE SILICA SAND SOIL IN THE SUBJECT PROPERTY



VIEW OF THE SILICA SAND SOIL IN THE SUBJECT PROPERTY

**MAPS PERTINENT TO THE SUBJECT PROPERTY**



LOCATION MAP



**ZONING MAP OF THE SUBJECT PROPERTY**

**FEMA FLOOD MAP OF THE SUBJECT PROPERTY**



PR PLANNING BOARD FLOOD MAP



Subject Property



**TOPOGRAPHIC MAP OF THE SUBJECT PROPERTY**



SUBJECT

33

**<u>SUBJECT AND COMPARABLE SALES LOCATION M AP</u>**



**LOCATION MAP OF THE SUBJECT PROPERTY AND THE COMPARABLE SALES**







LOCATION MAP OF THE SUBJECT PROPERTY AND THE COMPARABLE SALES

**PART FOUR - ANALYSIS OF DATA AND CONCLUSIONS**

## HIGHEST AND BEST USE

According to the Dictionary of Real Estate Appraisal (Appraisal Institute) highest and best use is defined as follows:

> **The reasonable probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.**

In this analysis the procedure is as follows: First, the highest and best use of the land as though vacant must be determined. If the highest and best use of the land is to be improved, then, the ideal improvements must be determined. Finally, the ideal improvements must be compared to the existing improvements (if any) and a determination made whether to maintain the property "as is" or modify the improvements.

### Highest and Best Use as Though Vacant

**Legal Permissibility Test:** The subject is located inside the special zoning rated areas under LT-B2 District as per Sheet No. 35 of the "Mapa de Zonificación Especial Cuenca Hidrográfica de la Laguna Tortuguero" of the Puerto Rico Planning Board.

The LT-B2 District ("Laguna Tortuguero-Bosque de Mangle") was established to identify and protect of irreversible damage to wetlands and associated systems like mangroves forests and salty ponds. The only presumably uses in wetlands, mangroves and salty ponds are: activities related to aesthetic values, refuge and species breeding places, the coastal protection, scientific investigation, passive recreation as long as they do not affect the natural ecosystem, plus the construction of fisherman's piers without affecting the mangroves.

The B-2 zoning is not an absolute negation to development because R-1 and R-3 equivalent subdivisions have been approved not only on the main tract owned by Mr. Pizá Blondet but in numerous properties that have this zoning and subsequently were approved for development presumably because these do not represent an adverse factor with respect to the protection of the lagoon. To that effect, we are presenting an aerial photograph showing numerous residential developments to the east and south of this lagoon. Furthermore, we have included as an exhibit of this appraisal the Declaration prepared by Carlos E. Gaztamnide, Juris Doctor, MAI that includes numerous exhibits that prove development of the subject property is possible.

Based on the above, there is a reasonable probability that the subject may be approved for medium density residential development if adequate protection to or mitigation of the wetland is provided.

There is evidence that as an incidental legal practice under a development scheme, the sand deposits on the subject may be substituted with stable borrow fill that exists in another portion of the main tract. The value of the sand deposits is estimated in an addendum of this report.

**Physical Possibility Test:** The subject property is a suburban vacant parcel of land located at Km. 3.8, Interior, Puerto Rico Road 687, Yeguada Ward, Vega Baja, Puerto Rico.

The subject is located in a Zone AE (inside the 500 year flood plain) according to the Flood Insurance Rate Map #72-0000-0040-E, revised on June 2, 1999. According to an evaluation of the Sheet No. 7B of the Puerto Rico Planning Board Flood Rate Map, about half or the west section (56%) of the subject property is located within Zone 2 with the remainder 44% east section of the subject within Zone 1.

Within Zone 2, the Puerto Rico's Department of Natural and Environmental Resources (DNER) authorizes development if adequate precautions are taken to fill the land to elevations that protect the property from rising waters and/or floods. On Zone 1, the DNER does not condone development in areas with this classification.

Based on the Site Environmental Assessment Report conducted by Dames & Moore on May 29, 1999 for the Environment and Natural Resources Division of the U.S. Department of Justice the wetland and upland coverage of the subject property was estimated in 15 acres of wetlands (44%) and 19 acres of upland (56%). We assumed these figures as true and correct.

To the southwest of the subject property, in a parcel of land segregated from the main farm from which the subject was segregated and property of Mr. Juan Pizá-Blondet, is Haciendas de Tortuguero. This is a residential subdivision of 44 units with several units that have been completed and with several units under construction. Haciendas de Tortuguero is being developed inside the Conservation Resources Zoning District of the Tortuguero Lagoon Special Zoning Regulation.

Based on the characteristics of the subject property and the trend in the neighboring parcels, the subject is suitable for residential development in the upland section.

**Financial Feasibility Test:** As previously mentioned, based on the Site Environmental Assessment Report conducted by Dames & Moore on May 29, 1999 the wetland and upland coverage of the subject property was estimated in 15 acres of wetlands (44%) and 19 acres of upland (56%). We assume these figures are true and correct.

For the wetland section of the subject property, the possible use is for conservation or mitigation while for the upland section is for medium density residential development.

For parcels of land with wetland sections, as the subject property, the possible use is for conservation or for mitigation. In the case of conservation, it is possible to establish a Conservation Easement for the donation of the subject property to the Puerto Rico's Government (ELA) or to a non-profit organization with its main purpose to protect or conserve areas with natural or cultural value. Based on this donation, it is possible to receive a tax benefit that consists of a deduction in gross revenue on the income tax return of the donor.

In the case of the of the mitigation process, when the developer has a project that impacts a sensitive property and as a consequence mitigation is necessary, he needs to go to the open market to obtain a parcel of land with the same zoning classification and similar physical characteristics in order to comply with the requirements of the governmental agencies.

For the upland section of the subject property it is possible to develop of a medium density residential project. As previously stated in the legally permissible section of this section, the B-2 zoning is not an absolute negation to development. R-1 and R-3 equivalent subdivisions have been approved in numerous properties that have this zoning and subsequently were approved for development presumably because they do not represent an adverse factor with respect to the protection of the lagoon. To that effect, we are presenting an aerial photograph showing numerous residential developments to the east and south of this lagoon.

According to a study prepared by Estudios Técnicos for the Puerto Rico Bankers Association for the period of 1999 to 2003, the demand for housing in the Vega Baja area is strong. There are a good number of residential projects that have sold successfully in the city of Vega Baja. One of the reasons why Vega Baja is so good for the residential market is because it is an alternative location to the San Juan Metropolitan Area due to its convenient commuting distance offering good housing at competitive prices.

**Maximal Productivity Test:** At present, no alternative use to residential development for the middle class market segment is forecasted to generate the return which such development would yield.

### Conclusion

Given the subject's location, and the trends of the neighborhood, the residential use of the subject for a residential development is forecasted to produce the highest net return to the site over a typical holding period.

40

## HIGHEST AND BEST USE AS IMPROVED

### Introduction

According to the fourth edition of The Dictionary of Real Estate Appraisal (Appraisal Institute, Chicago), Highest and Best Use of the property as improved is defined as follows:

> **The use that should be pursued of a property as it exists. An existing property should be renovated or retained as long as it continued to contribute to the total market value of the property, or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one.**

In this particular case, the subject property is assumed as a vacant parcel of land. For this reason, we do not present a Highest and Best Use analysis "As Improved" in this appraisal.

### Contingent and Limiting Condition

This Highest and Best Use analysis is not to be considered a Marketability or Feasibility study. The determinations made here are only within the Highest and Best Use framework for the purpose of an appraisal.

**<u>VALUATION</u>**

## DISCUSSION OF THE APPRAISAL PROCESS

To arrive at an estimate of market value for the given property, special attention must be given to the typical purchaser who would be interested in that particular type of property. Market Value is the most probable sales price which a property will bring, and this price depends upon the typical purchasers' reaction to the various supply and demand factors which affect the property being appraised. All of this information must be derived from the market.

Considering the above framework, the appraisal process is basically an economic analysis. It consists of an orderly approach by which the problem is defined, and then data are acquired, classified, analyzed and interpreted into an estimate of value. These approaches are the Cost Approach, the Income Approach and the Direct Sales Comparison Approach. Regardless of the approach being utilized, the data under consideration are taken from the market in one form or another. Whether or not all three approaches to value are used in the valuation of a particular property depends upon the individual situation. In the event that more than one approach is utilized, the value estimates arrived at from the different approaches is reconciled into a single value estimate considered to be the most appropriate for the subject property. The following is a brief discussion of each approach and its application.

### A. Income Approach

The Income Approach to value is predicated upon a definite relationship between the amount of income a property will earn and its value. Although all of the appraisal principles are involved in this approach, the principle of anticipation is particularly applicable. The Income Approach is a

technique in which the anticipated annual net income of the subject is processed in order to arrive at an indication of value. The process is called capitalization and it involves multiplying the annual net income by a factor or dividing it by a rate which weights such consideration as risk, time and return of investment. The appropriateness of this rate or factor is critical and there are a number of techniques by which it may be developed. The net income attributable to the subject property is estimated by subtracting expenses from the property's annual potential gross income. All of these figures are derived from the market comparison of properties similar to the subject. The reliability of the Income Approach is based upon a number of considerations. These considerations include the reliability of the estimate of income and expenses, the duration of the net annual income, the capitalization rate or factor used, and the method of capitalization used. The weakness of this approach lies in the estimation of income and expenses and the fact that not all properties are suitable for this type of analysis. The strength of this approach is that it reflects typical investor considerations as they analyze income-producing properties. This approach was not used to arrive at the conclusion of value for the subject property.

## B. Sales Comparison Approach

The Sales Comparison Approach to value relies heavily upon the principle of substitution. A comparative analysis between the subject and similar properties that have been sold can often provide an indication of market behavior and response to the subject. The sales are compared to the subject and adjustments for differences in location, time, terms of sale, or physical characteristics can be made using the subject as the standard of comparison. Most types of properties which are bought and sold can be analyzed using "common denominators" such as the sales price per unit of comparison. The reliability of the Sales Comparison Approach to value depends to a large extent

upon the degree of comparability between the sales and the subject. The major strength of this approach includes the reflection of actual market transactions and the fact that normal "common denominators" tend to be fairly easily determined. The potential weakness of this approach arises from the fact that the data are historical and the "ideal" comparables are usually very difficult to obtain. This approach was used to arrive at the conclusion of value for the subject property.

## C. Cost Approach

The Cost Approach to values is based upon the premise that a prudent buyer will pay no more for a property than it would cost to reproduce a substitute property with the same utility. The Cost Approach is a method in which the value of a property is developed by estimating the replacement cost, or reproduction cost new of the subject improvements, deducting there from the estimated depreciation from all sources and then adding this depreciated reproduction cost of the improvements to the site value. The site value is based upon a vacant site being utilized to its highest and best use. Generally speaking, the site value is estimated via the Sales Comparison Approach. Replacement Cost or Reproduction Cost New can be derived from reliable cost manuals and/or from interviews with reputable local contractors as well as actual cost data from comparable developments.

Depreciation can be from physical, functional or economic causes. Depreciation can be observed from rent loss or based upon a cost-to-cure analysis. In all cases, information concerning depreciation is developed from the market by observing comparable properties. This approach was not used to arrive at the conclusion of value for the subject property.

**Method(s) of Valuation**

To derive a market value estimate for the subject, we have used the Sales Comparison Approach to Value because the vacant land typically does not generate income, especially in the residential sector and there are no improvements on the property linked to its highest and best use. Due to this reasons, the Cost and Income Approach are not considered on this appraisal assignment

The market data obtained has been developed and analyzed to provide an indication of the Market Value of the Fee Simple Interest in the subject property. Our analysis and conclusion via the Sales Comparison Approach to value is presented in the following pages of this report.