UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL NO. 98-1664-FAB-BJM |
| | ) | CIVIL NO. 98-2344-FAB-BJM |
| vs. | ) | Consolidated Cases |
| | ) | |
| 33.92536 ACRES OF LAND, MORE | ) | |
| OR LESS, SITUATED IN VEGA BAJA, | ) | |
| COMMONWEALTH OF PUERTO RICO, | ) | |
| AND JUAN PIZA BLONDET, AND | ) | |
| UNKNOWN OWNERS | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MAY 8, 2007 OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff United States of America ("Plaintiff" or the "United States") hereby respectfully submits this response in opposition to the May 8, 2007 objections (Docket No. 156) filed by Defendant Juan Piza-Blondet ("Defendant") in this condemnation proceeding.  On April 24, 2007, Magistrate Judge Bruce J. McGiverin filed a Report and Recommendation (Docket No. 155) recommending that the Court grant both the United States' motion under Rule 71A(h) to exclude Defendant's proffered highest and best use evidence (Docket No. 132), and the United States' motion in limine to exclude all evidence relating to Defendant's appraisal of sand deposits (Docket No. 133).  Defendant's objections do not contain any evidence or arguments that refute Judge McGiverin's findings.  Accordingly, for the reasons set forth below and in the Report and Recommendation, this Court should overrule Defendant's objections and adopt Judge McGiverin's recommendation by granting: (1) the United States' motion to exclude Defendant's highest and best use evidence; and (2) the United States' motion to exclude all evidence relating to Defendant's appraisal of sand deposits.

**BACKGROUND**

On December 2, 1998, the United States acquired by eminent domain approximately 33.92 acres of land (the "Subject Property") in Vega Baja, Puerto Rico, for the continued operation of a Federal Aviation Administration ("FAA") radio beacon facility. See Docket No. 155 at 2. The Subject Property was owned by Defendant Juan Piza-Blondet, who also owned roughly 400 acres of adjacent land ("Main Tract"). Id. On the date of taking, the Subject Property was vacant except for the FAA facility.

The Subject Property is located in the environmentally sensitive Tortuguero Lagoon Hydrographic Basin. Id. It is undisputed that, on the date of taking, the Subject Property was governed by a number of environmental and land use regulations that restricted the legal uses of the property. See id. at 5. First, the Subject Property was zoned B-2, which means that residential development and lot division were not permitted. Id. Furthermore, the Subject Property, which is located in a low-lying, flood-prone area, was governed by flood zone regulations that imposed additional prohibitions on residential development. Id. at 5-6. In addition, because the Subject Property was interlaced with approximately fifteen acres of wetlands, applicable land use regulations prohibited sand extraction on the wetlands and required a buffer zone between the wetlands and any sand extraction areas.

Defendant's appraiser, Mr. Carlos Gaztambide, MAI, has asserted that the highest and best use for the approximately nineteen acres of non-wetlands is for residential development and sand extraction. Id. at 5, 15. Mr. Gaztambide expressed this opinion in two written appraisal reports, one of which valued the fee simple interest, and the other of which valued silica sand deposits on the Subject Property. Id. On August 14, 2006, the United States filed motions to

exclude portions of Mr. Gaztambide's expert opinion that are overly speculative and improper under federal case law. The first motion (Docket No. 132) argued that, in light of the extensive legal restrictions governing the Subject Property, Mr. Gaztambide failed to show that residential development and/or sand extraction were reasonably probable in the reasonably near future. The second motion (Docket No. 133) asserted that Mr. Gaztambide's appraisal of the sand deposits violated fundamental principles of valuation under federal law and lacked the necessary foundational support to be admissible.

On January 19, 2007, the Court referred the United States' motions to Magistrate Judge McGiverin for a report and recommendation under 28 U.S.C. § 636(b)(1). On April 24, 2007, Judge McGiverin issued his Report and Recommendation. Addressing the United States' first motion, Judge McGiverin ruled that in light of the regulations governing the Subject Property, Defendant was required to demonstrate the reasonable probability of obtaining: (1) a zoning change or variance to allow residential development; and (2) a permit to allow sand extraction. See Docket No. 155 at 8-14. Because Defendant failed to meet this burden, Judge McGiverin recommended that all evidence of the proposed uses of residential development and sand extraction should be excluded as overly speculative. Id. at 12-14. Turning to the United States' second motion, Judge McGiverin found that Mr. Gaztambide's appraisal of the sand deposits violated the unit rule and improperly "double counted" the value of the sand deposits on the Subject Property. Id. at 16-20. Accordingly, Judge McGiverin recommended that the Court also exclude all evidence based on Mr. Gaztambide's appraisal of the sand deposits. Id. at 20. On May 7, 2007, Defendant filed objections (Docket No. 156) to Judge McGiverin's Report and Recommendation.

## SUMMARY OF ARGUMENT

In the eight years since this action was filed, Defendant has been afforded numerous opportunities to present relevant and admissible evidence of the highest and best use and market value of the Subject Property.[1]  Despite having multiple "bites at the apple" to produce proper evidence, Defendant continues to claim that the Subject Property should be valued based on improper theories that lack evidentiary support, and which therefore are speculative and cannot be considered in the determination of just compensation.  Specifically, Defendant has failed to produce any competent evidence that the proposed uses of residential development or sand extraction were reasonably probable within the reasonably near future of the date of taking.  The only evidence Defendant has presented is the testimony of Mr. Gaztambide, whose opinion is "seriously undermined" – in the words of Judge McGiverin – by admissions and evidence that show his claims "are either unsupported or contrary to existing facts."  See Docket No. 155 at 9. The unfounded opinions of Mr. Gaztambide do not show these uses are reasonably probable, and therefore, all evidence of these uses should be excluded from trial.  Similarly, Mr. Gaztambide's appraisal of the sand deposits blatantly violates basic principles of valuation under federal case law and therefore should be excluded as well.

Notably, Defendant's objections do not provide any support for Mr. Gaztambide's baseless expert opinion or his improper appraisal of the sand deposits.  Instead, just like Mr.

---

[1] In February, 2005, the United States did not oppose Defendant's efforts to introduce untimely new evidence and seek reconsideration of District Judge Cerezo's December 23, 2004 Order (Docket No. 89) that Defendant's proposed use of residential development should be excluded from trial.  See Docket No. 155 at 3-5.  Moreover, the United States agreed to re-open discovery in order to investigate Defendant's newly produced documents and newly proposed use of sand extraction.  However, after two more years of litigation, Defendant still has not presented any competent evidence that its proposed highest and best uses were reasonably probable.

Gaztambide's opinion itself, Defendant's objections are wholly unsupported by any evidence in the record, and are replete with misstatements of fact and misrepresentations of law. Furthermore, the objections contain new arguments that were not raised in the earlier briefing, and which this Court therefore need not consider under First Circuit precedent. Even if the Court were to consider Defendant's new arguments, none of these arguments demonstrates that the proposed uses of residential development or sand extraction were reasonably probable, or that Mr. Gaztambide's appraisal of the sand deposits constitutes proper valuation evidence. Accordingly, the Court should overrule Defendant's objections and adopt the recommendation of Judge McGiverin by granting: (1) the United States' motion to exclude Defendant's highest and best use evidence (Docket No. 132); and (2) the United States' motion in limine to exclude all evidence relating to Defendant's appraisal of sand deposits (Docket No. 133).

## STANDARD OF REVIEW

Where, as here, the district judge has referred pending motions to a magistrate judge, the adversely affected party may file objections to the magistrate judge's report and recommendation within ten days. See 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72; Local Rule 72(d); see also Fonseca-Arroyo v. Puerto Rico Elec. Power Auth., 367 F. Supp. 2d 198, 199 (D.P.R. 2005). The district judge shall then make a de novo determination of those portions of the report or specified proposed recommendations to which specific objection has been made. See 28 U.S.C. § 636(b)(1); Fonseca-Arroyo, 367 F. Supp. 2d at 199.

The First Circuit has held that "an unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate." Paterson-Leitch Co. v. Mass. Municipal Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

Accordingly, courts have refused to consider new arguments raised for the first time in the objections to a magistrate's recommendation. See Fonseca-Arroyo, 367 F. Supp. 2d at 199-200 (declining to consider new arguments raised for first time in objections to magistrate's report); Dennehy v. Frambes, 385 F. Supp. 2d 121, 124 (D.P.R. 2005) (same).

## ARGUMENT

**I.**    **THE COURT SHOULD OVERRULE DEFENDANT'S OBJECTIONS AND ADOPT THE MAGISTRATE'S RECOMMENDATION BECAUSE THE PROPOSED USES OF RESIDENTIAL DEVELOPMENT AND SAND EXTRACTION ARE OVERLY SPECULATIVE AND THEREFORE CANNOT SERVE AS THE BASIS FOR JUST COMPENSATION.**

In his Report and Recommendation, Judge McGiverin concluded that Defendant's appraiser, Mr. Gaztambide, failed to demonstrate through sufficient evidence that the proposed uses of residential development and sand extraction were reasonably probable in the reasonably near future. Based on this finding, Judge McGiverin properly recommended that the Court grant the United States' motion to exclude Defendant's proposed highest and best use evidence on the grounds that these proposed uses were speculative and therefore could not serve as the basis for just compensation as a matter of law.

**A.**    **Defendant Bears the Burden of Showing That the Proposed Uses of Residential Development and Sand Extraction Are Reasonably Probable in the Reasonably Near Future.**

The landowner bears the burden of proof in an eminent domain case to establish just compensation for the condemned property. See Nat'l R.R. Passenger Corp. v. Certain Temp. Easements, 357 F.3d 36, 39 (1st Cir. 2004). The Supreme Court has held that just compensation, as a matter of law, cannot be predicated upon speculative uses. Olson v. United States, 292 U.S. 246, 257 (1934); see also United States v. 320.0 Acres of Land, 605 F.2d 762, 814-15 (5th Cir.

6

1979).  It is thus well-settled that in order for a landowner to claim just compensation based on a proposed use, he must show that the use is reasonably probable within the reasonably near future – and hence, not a speculative use.  See Olson at 255-57; 320.0 Acres of Land, 605 F.2d at 814-15.  "The trial judge has the responsibility under Rule 71A(h) to screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable."  320.0 Acres of Land, 605 F.2d at 815 (citing United States v. Reynolds, 397 U.S. 14, 19-20 (1970)); see also United States v. Certain Land Situated in the City of Detroit, 450 F.3d 205, 211 (6th Cir. 2006); United States v. 7.92 Acres of Land, 769 F.2d 4, 10 (1st Cir. 1985).

Just compensation is to be determined at the time of the taking considering the property in its condition and situation at that time.  See United States v. Miller, 317 U.S. 369, 374 (1943); Reynolds, 397 U.S. at 16.  Accordingly, if the property was subject to zoning and land use restrictions at the time of the taking, then that factor must be considered in evaluating the property.  See 320.0 Acres of Land, 605 F.2d at 818-19; see also United States v. 27.93 Acres of Land, 924 F.2d 506, 512 (3rd Cir. 1991); United States v. 174.12 Acres of Land, 671 F.2d 313, 315-16 (9th Cir. 1982).  However, in accordance with the Supreme Court's holding in Olson, if the landowner can demonstrate a reasonable probability that the zoning regulations would change or that a variance could be obtained that would allow the proposed use in the reasonably near future, then the landowner may present evidence of that reasonable probability to the jury. See Olson, 292 U.S. 246, 255 (1934); United States ex rel. T.V.A. v. Powelson, 319 U.S. 266, 275 (1943); Virgin Islands v. 2.7420 Acres of Land, 411 F.2d 785, 786 (3rd Cir. 1969). However, if the landowner fails to show that a zoning change or variance was reasonably

7

probable, then the judge must exclude all evidence of that proposed use. See 320.0 Acres of Land, 605 F.2d at 818; 27.93 Acres of Land, 924 F.2d at 513-14.

An expert opinion as to whether there is a reasonable probability of a zoning change must have a factual foundation; it is insufficient to merely assert that there is a reasonable probability of a zoning change. H&R Corporation v. District of Columbia, 351 F.2d 740, 742-43 (D.C. Cir. 1954); 320.0 Acres of Land, 605 F.2d 762, 819 n.130 ("as with all opinion evidence, there must be some foundation in fact"). The foregoing applies with equal force when the property is subject to regulations that preclude a particular use unless a permit for that use has been issued by the regulating authority. See United States v. 62.50 Acres, 953 F.2d 886, 890-91 (5th Cir. 1992); United States v. 8,698.06 Acres of Land, 326 F. Supp. 546, 548 (S.D. Tex. 1971).

**B.      Defendant Has Failed to Show That a Zoning Change or Variance for Residential Development Was Reasonably Probable.**

It is undisputed that on the date of taking, there was no residential development on the Subject Property, and that applicable environmental and land use regulations prohibited residential development.[7] Accordingly, in order to present evidence of the proposed use of residential development, Defendant must show that it was reasonably probable to obtain a zoning change or variance that would permit residential development in the reasonably near future. See 320.0 Acres of Land, 605 F.2d at 819; 27.93 Acres of Land, 924 F.2d at 512. Defendant has

---

[7] Defendant contends that on the date of taking, the government's use of the Subject Property as an FAA radio beacon facility had resulted in the development of "an access road, a building (with a concrete slab), a parking lot, and a tower (with a metal grid imbedded underground in silica sand)." See Docket No. 156 at 3, 13. As explained more fully in Part I.D below, the existing FAA facility, which was constructed prior to enactment of the B-2 zoning regulations, was confined to a small fraction of the 34-acre Subject Property, and Defendant's own appraiser disregarded the existing FAA facility in arriving at his opinion that the highest and best use was for residential development and sand extraction.

8

attempted to meet this burden by presenting the opinion of Mr. Gaztambide, who contended that it was reasonably probable that the Puerto Rico Planning Board would approve residential development on the Subject Property.  However, as Judge McGiverin properly concluded, Mr. Gaztambide's opinion is contradicted by his own testimony and by documents from his own files that show his opinions are contrary to established fact.  Docket No. 155 at 10-12.

Mr. Gaztambide stated in his appraisal of the fee simple interest that the Puerto Rico Planning Board had approved residential development projects on nearby land zoned B-2. See Docket No. 132, Ex. B, 36.  However, Mr. Gaztambide admitted that he has no documentary evidence to show that any nearby residential developments were located on land zoned B-2.  Id. Ex. D, 255:21-24, 256:1-6, 259:16-24, 263:11-23, 267:2-9, 269:9-12, 277:11-15. In fact, Mr. Gaztambide's claim is directly contradicted by documents in his own work file, which indicate that none of the nearby residential developments were located on land zoned B-2.[3]  Id. Ex. D, 242:11-15, 267:2-9.  Significantly, the only document in Mr. Gaztambide's work file concerning a residential development project on B-2 land is an application submitted in 1999 by landowner Juan Piza-Blondet for a residential development on a portion of the Main Tract that is zoned B-2 and located immediately adjacent to the Subject Property.  Id. Ex. D, 271:14-24, 272:1.  The fact that this application still has not been approved more than seven years after it was submitted seriously undermines Mr. Gaztambide's opinion that the Planning Board "routinely" granted

---

[3]  As Judge McGiverin points out, the nearby residential developments cited by Mr. Gaztambide were located on property zoned CR or AD, which are zones that permit a far broader range of uses than are allowed in a B-2 zone.  The uses permitted in a CR zone include golf courses, parking lots, scientific research institutions, museums, ranger stations, police stations, first aid units, public parks, and walkways. In an AD zone, existing uses and new lots are permitted. By contrast, the permitted uses in a B-2 zone are limited to fishing, scientific studies, and passive recreational activities.  Docket No. 155 at 5, 10.

zoning variances in 1998, or that the Planning Board would approve residential development on the Subject Property in the "reasonably near future."

Mr. Gaztambide further claimed that the Planning Board would readily change the zoning of the Subject Property because B-2 zoning is only appropriate for wetlands, and therefore is the wrong zoning designation for the Subject Property.  Docket No. 132, Ex. D, 80:5-18, 81:22-24, 82:1-4.  However, Mr. Gaztambide's claim contradicts his own written appraisal report, in which he states that the B-2 zone not only includes wetlands, but also "associated systems like mangrove forests and salty ponds."[4]  Docket No. 132, Ex. B, 28.  Furthermore, Mr. Gaztambide admitted that he did not speak to anyone at the Planning Board to confirm his suspicion that the Subject Property was improperly zoned B-2.  Id. at 6.  In sum, because Mr. Gaztambide failed to present any hard evidence to support his opinion regarding the reasonable probability of residential development, Judge McGiverin properly recommended that this proposed use should be excluded as speculative.  See Docket No. 155 at 12; see also 27.93 Acres of Land, 924 F.2d 513-14 (excluding evidence of proposed commercial use when zoning regulations prohibited the use and landowner failed to demonstrate reasonable probability of variance or zoning change).

---

[4] Defendant's objections contain repeated assertions that the Subject Property contains "no mangroves" and that the Subject Property "cannot be analogized to a B-2 mangrove forest or salt pond."  See Docket No. 156 at 3, 5.  However, these statements do not support Mr. Gaztambide's opinion that a zoning change was reasonably probable, because there is no evidence in the record that the presence or absence of mangroves is dispositive of whether the Planning Board would grant a zoning change or variance.  Furthermore, the undisputed fact that the Subject Property is interlaced with fifteen acres of wetlands and is designated as a low-lying area that is prone to flooding irrefutably indicates that the B-2 zoning designation is proper.

10

**C.     Defendant Has Failed to Show that a Permit for Sand Extraction Was Reasonably Probable**.

It is further undisputed that on the date of taking, there was no sand extraction activity on the Subject Property, and that a permit would be required from the Puerto Rico Department of Natural Resources ("DNR") in order to <u>legally</u> extract sand.[5]  Accordingly, Defendant must show that it was reasonably probable to obtain a sand extraction permit on the Subject Property in order to present evidence of this proposed use.  See <u>62.50 Acres of Land</u>, 953 F.2d at 891.

Again, the only evidence Defendant has produced to meet this burden is Mr. Gaztambide's opinion. Mr. Gaztambide stated that he was 100% certain that the DNR would allow sand extraction on the Subject Property, based on his claim that sand extraction had been allowed prior to 1998 on the Main Tract.  See Docket No. 132, Ex. D, 197:5-12, 198:14-18, 199:3-6.  However, at deposition, Mr. Gaztambide conceded that he had no tangible evidence to show that sand extraction ever had been legally permitted on nearby property that was similarly zoned B-2, interlaced with wetlands, and located in a low-lying flood-prone zone.[6]  <u>Id.</u> Ex. D, 296:16-19.  Significantly, Mr. Gaztambide did not speak to anyone at the DNR about the reasonable probability of obtaining a sand extraction permit for the Subject Property.  However,

_____

[5] The United States does not contest the fact that the Subject Property – like the entire surrounding vicinity – contains silica sand deposits.  <u>See</u> Docket No. 133, Ex. G, 133:21-24, 134:1-10; Ex. H.  Rather, the United States disputes that it would be reasonably probable to obtain a permit from the DNR to <u>legally</u> extract the silica sand from the Subject Property.

[6] Although Mr. Gaztambide claims that Mr. Piza-Blondet has extracted sand from portions of the Main Tract governed by the more permissive CR zoning, Judge McGiverin properly notes that there is no evidence that this sand extraction was conducted on land that is similarly zoned B-2 and interlaced with wetlands.  <u>See</u> Docket No. 155 13 n.4.  Moreover, because Mr. Piza-Blondet previously has been cited for illegal sand extraction, Judge McGiverin could not assume that the prior sand extraction conducted on the Main Tract was compliant with the law.  <u>Id.</u>

the United States' fact witness Julio Toro, Director of the DNR division responsible for granting

sand extraction permits, testified that it was a lengthy and "extremely difficult" process to obtain

a sand extraction permit at the time of the taking in 1998.  Docket 132, Ex. G, 7:12-23, 8:4-12.

Accordingly, Judge McGiverin concluded that Defendant had failed to produce sufficient

evidence to support Mr. Gaztambide's opinion that a sand extraction permit was reasonably

probable within the reasonably near future.  See Docket No. 155 at 14; see also 62.50 Acres of

Land, 953 F.2d at 888-91 (excluding proposed use of clam shell mining when defendant's expert

failed to consult with any agency officials about the likelihood of obtaining permit, and agency

representative expressed "considerable doubt" about whether permit would be granted).

> **D.**    **Defendant's Objections Fail to Present Any Evidence to Support Mr.
> Gaztambide's Opinion That Residential Development or Sand Extraction
> Were Reasonably Probable.**

Defendant's objections fail to present any evidence to support Mr. Gaztambide's opinion

about the reasonable probability of obtaining a zoning change or variance to allow residential

development or a permit to allow sand extraction.  Instead, the objections merely contain a series

of unsupported assertions, many of which misstate the facts in evidence and misrepresent the

relevant case law.  In addition, all of Defendant's objections contain new arguments that were

not presented to the Magistrate in the briefing below, and which the Court therefore need not

consider in its ruling. See Paterson-Leitch, 840 F.2d at 990-91.

Throughout its objections, Defendant repeatedly alludes to the fact that on the date of

taking, the Subject Property was developed with an FAA radio beacon facility, suggesting that

this development meant that residential development and sand extraction were reasonably

probable.  However, the existing FAA facility, which was constructed in the 1950s well before

12

the enactment of the B-2 zoning regulations, is confined to a small fraction of the 34-acre

Subject Property.[7]  By contrast, Mr. Gaztambide claims that residential development and sand

extraction were reasonably probable for the <u>entire</u> nineteen acres of non-wetlands, not just the

small portion developed with the FAA facility.  Moreover, prior to raising this argument in its

objections, neither Defendant nor Mr. Gaztambide had ever advanced this theory that the

existing FAA facility was a reason that residential development and sand extraction were

reasonably probable.  In fact, Mr. Gaztambide expressly stated he appraised the Subject Property

"as vacant."  <u>See</u> Docket No. 156, Ex C, 27, 30.  Accordingly, it is improper for Defendant to

attempt to bolster Mr. Gaztambide's opinion with new theories advanced for the first time here.

<u>See</u> Fed. R. Civ. P. 26(a)(2)(B) (expert must provide a "complete statement of all opinions to be

expressed and . . .  the data or other information considered by the witness in forming the

opinions"); <u>see</u> <u>also</u> <u>Fonseca-Arroyo</u>, 367 F. Supp. 2d at 199-200.  For these reasons, and as

explained more fully below in response to Defendant's specific objections, the existing FAA

facility does not show that residential development or sand extraction were reasonably probable.

    Along these same lines, Defendant's first objection claims that Judge McGiverin failed to

take into account the actual use of the Subject Property as an FAA radio beacon facility.

<u>See</u> Docket No. 156 at 6.  It is well-settled that in a federal eminent domain case, the use for

which the United States has acquired the property should be disregarded unless there is a

prospective demand for that use by others outside the government.  <u>See</u> <u>United States v.</u>

---

[7]According to FAA records, the FAA facility has existed on the Subject Property since the
1950s, and thus predates the environmental and land use regulations that governed on the date of
taking.  <u>See</u> FAA documents (Exhibit A).  Aerial photographs depict that the FAA facility is
confined to a small portion of the 34-acre Subject Property.  <u>See</u> Docket No. 156, Ex. C, 7.

Chandler-Dunbar Co., 229 U.S. 53, 80-81 (1913); United States v. 320.0 Acres of Land, 605 F.2d 762, 783 n.26 (5th Cir. 1979).  In accordance with this principle, Mr. Gaztambide states in his written appraisal report that he valued the Property "as vacant," and disregarded the government's actual use of the Property.  See Docket No. 156, Ex. C, 27, 30.  Thus, Defendant's claim that Judge McGiverin improperly disregarded the actual use of the Property is undermined by both federal case law and Defendant's own appraisal report.  Moreover, Judge McGiverin did properly take into account the fact that on the date of taking, the actual use of the Subject Property was not residential development or sand extraction.  Because residential development and sand extraction were merely proposed uses for the Subject Property, Judge McGiverin properly found that Defendant must demonstrate that these proposed uses were reasonably probable in the reasonably near future in order to present evidence of these uses at trial.  See Docket No. 155 at 7 (citing Olson, 292 U.S. at 255-57; 7.92 Acres of Land, 769 F.2d at 10).

Defendant's second objection claims that Judge McGiverin "overlooked" the proposed wetlands mitigation bank in analyzing whether sand extraction permits would be reasonably probable for the non-wetlands portion of the Subject Property.  Docket No. 156 at 6.  Defendant asserts that "the mitigation bank would greatly increase the landowner's chance of extracting sand and/or developing the upland portion of the subject property."  Id. at 5.  However, this unsupported claim does not bolster Mr. Gaztambide's opinion, because there is no evidence that the DNR would consider the proposed mitigation bank in determining whether to grant a sand extraction permit.  Notably, Mr. Gaztambide did not contend that wetlands mitigation was a reason that sand extraction or residential development were reasonably probable.  See Gaztambide Dep. (Exhibit 2) 110:20-24, 111:1-23; 197:5-12, 198:1-18.  In fact, Mr.

Gaztambide's specifically testified that wetlands mitigation was <u>not</u> required in order to obtain approval for residential development. <u>See</u> <u>Id.</u> 112:20-24, 113:1-8. In addition, Mr. Gaztambide determined in his fee simple appraisal that based on the proposed use of mitigation, the value for the wetlands was $140,000, or $9,000 per *cuerda*. Docket No. 155 at 15. Thus, Mr. Gaztambide's opinion regarding wetlands mitigation (which was not addressed in the underlying motions) is separate and distinct from his opinion regarding residential development and sand extraction. Accordingly, the proposed wetlands mitigation does not support Mr. Gaztambide's opinion about the reasonable probability of residential development or sand extraction.

Defendant's third objection argues that Judge McGiverin failed to consider the environmental impacts of the existing FAA facility in assessing the reasonable probability of a zoning change or a variance to allow residential development on the Subject Property. <u>See</u> Docket No. 156 at 9. This argument, too, is entirely without merit because Defendant cites no evidence in the record to support its unfounded assertion that the existing FAA facility "greatly increased the landowner's chances of obtaining a variance or a rezoning." <u>Id.</u> at 3. Although Defendant cites the deposition testimony of Mr. Toro of the DNR in a thinly veiled effort to mislead the Court, Mr. Toro does not work for the Planning Board and his testimony therefore does not support Defendant's argument that the Planning Board would likely grant a zoning change or variance on account of the existing FAA development. Furthermore, Mr. Gaztambide did not consult Mr. Toro (or any other agency official) in forming his expert opinions about the reasonable probability of obtaining a zoning change or variance for residential development. <u>See</u> Docket No. 132, Ex. D, 294:12-24, 295:1-4. In addition, as previously stated, Mr. Gaztambide never claimed that his opinion about the reasonable probability of obtaining a

zoning change or variance for residential development was based on the environmental impacts

of the existing FAA facility.[9] Accordingly, the environmental impacts of the existing FAA

facility do not support Mr. Gaztambide's opinion about the reasonable probability of residential

development or sand extraction on the Subject Property.

Defendant's fourth objection asserts that the Magistrate "incorrectly focuses on the

zoning classification of the subject tract (B-2) and not on the actual characteristics of the land at

the time of the taking."  Docket No. 156 at 6.  However, the law is clear that if the property in a

federal eminent domain proceeding was subject to zoning restrictions at the time of the taking,

---

[9] When asked at deposition, Mr. Gaztambide testified that his opinion about the reasonable probability was based solely on the permits and documents in his appraisal report and work file:

| | |
|---|---|
| Q | Okay.  So . . . if I'm to understand you, the conclusion about your reasonable probability analysis is based on the permits you have seen for the residential subdivision, the R1 and R3 Haciendas de Tortuguero subdivision, the subdivisions indicated in the aerial photographs - - |
| A | Yes. |
| Q | - - and the declaration that you prepared that includes a number of exhibits? |
| A | That's correct. |
| Q | Is it based on anything else, your reasonable probability determination, is it based on any other information besides this that you stated on Page 36? |
| A | It could very well be.  I cannot answer yes or no at this point in time.  As we go through the documents, we might run into something that wasn't addressed in the particular paragraph so I can't corner myself into saying yes, that's all because honestly, I don't remember if that's - - |
| Q | If you considered any other documents, would they be in your work file? |
| A | Oh, yes.  Oh, yes. |
| Q | So everything that you would have considered in coming to this conclusion about the reasonable probability would be either in those, in the aerial photograph, in the permits you've discussed, in your declaration or in your work file, is that right? |
| A | Yes . . . |

See Gaztambide Dep. (Exhibit B) 110:20-24, 111:1-23.  Under Rule 26(a)(2)(B), Defendant should not now be permitted to untimely bolster Mr. Gaztambide's opinion with new theories that were not included in his expert report or revealed at his deposition.

then that factor must be considered in evaluating the property.  See 320.0 Acres of Land, 605

F.2d at 818-19 ("the judge must take into account any regulatory restrictions applicable to the

property and the proposed use"); see also 27.93 Acres of Land, 924 F.2d at 512.   If the

landowner fails to show the reasonable probability of a zoning change or permit, then all

evidence of that proposed use must be excluded as a matter of law.  See 320.0 Acres, 605 F.2d at

818-19; 27.93 Acres, 924 F.2d at 512.  Accordingly, Judge McGiverin properly applied these

principles of federal law in finding that Defendant's proposed uses are not reasonably probable

in the reasonably near future.

　　　Similarly, Defendant's fifth objection claims that the Magistrate "does not consider the

fact that variances were routinely granted in 1998 for residential development and/or sand

extraction."  Docket No. 156 at 6.  This assertion misstates the facts in evidence, because

Defendant has not produced any evidence that in 1998, residential development or sand

extraction was allowed on any property similar to the Subject Property.  Although Mr.

Gaztambide claims to have analyzed variances allowing residential development on nearby

properties, as previously noted, none of those residential developments were on property that

was similarly zoned B-2.  Moreover, Defendant's assertion is fatally undermined by the fact that

Mr. Piza-Blondet's application filed in 1999 for residential development on part of the Main

Tract that is zoned B-2 has not been approved in more than seven years.  See Docket No. 155 at

10, 11.  Although Defendant claims that Mr. Piza-Blondet previously extracted sand on portions

of the Main Tract that are governed by the more permissive CR zoning and that do not contain

wetlands, there is no evidence that sand extraction has ever been permitted on any property that

is similarly zoned B-2 and interlaced with wetlands.  Id, at 13.

17

Defendant's sixth objection claims that the Magistrate's ruling "conflicts with the prior ruling of this Court (Docket No. 113) wherein it was determined that the proper method of valuation was a question best decided by the jury."  Docket No. 156 at 7.  This objection misstates the purpose of the United States' underlying motion, which does not seek a ruling on the proper valuation method, but rather asks for a judicial determination under Rule 71A(h) that Defendant's proposed uses are speculative and should be excluded.  The Supreme Court has held that under Rule 71A(h), "except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual, that may be presented."  Reynolds, 397 U.S. at 19.  Thus, this Court "has the responsibility under Rule 71A(h) to screen the proffered potential uses and exclude from jury consideration those which have not been demonstrated to be reasonably practicable and reasonably probable uses."  320.0 Acres of Land, 605 F.2d at 815; see also 341.45 Acres, 633 F.2d at 111.  Accordingly, it was proper for Judge McGiverin to recommend that the Court exclude Defendant's proposed uses because Defendant failed to show they were reasonably probable.  See 320.0 Acres of Land, 605 F.2d at 815.

Defendant's seventh objection maintains that Judge McGiverin's ruling "improperly compared the subject tract to the main tract, zoned B-2, as the subject tract was developed at the time of the taking and segregated from the main tract."[9]  This statement is factually incorrect

---

[9]  Defendant asserts elsewhere in the objections that because the Subject Property was segregated from the Main Tract in 1997, it is improper to appraise the Subject Property using the "before and after" method, as the United States' appraiser has done.  See Docket No. 155 at 3-4 n.4. Defendant's argument reflects a fundamental misunderstanding of this Court's prior rulings and federal eminent domain law.  As this Court previously found in its November 11, 2004 Order, the segregation of the Subject Property in 1997 is completely irrelevant for valuation purposes, because Mr. Piza-Blondet retained ownership of both the Subject Property and the Main Tract and therefore satisfies the "unity of ownership" factor for the "before and after" method.  See Docket No. 82 at 1 (citing Baetjer v. United States, 143 F.2d 391 (1st Cir. 1944)).

18

because the Subject Property was vacant except for the FAA facility, and was treated "as vacant" by Mr. Gaztambide in his written appraisal reports. See Docket No. 156, Ex. C, 27, 30. Furthermore, in his appraisal of the fee simple estate, Mr. Gaztambide himself compared the Subject Property to portions of the Main Tract that were zoned CR and developed with residential housing. See Docket No. 132, Ex. B, 48-49. Accordingly, Judge McGiverin properly considered the fact that the Planning Board had not approved the residential development application for the Main Tract.

Similarly, Defendant's eighth and final objection asserts that Judge McGiverin "over-emphasized the length of time a 1999 permit application for sand extraction in the main tract has taken, as the main tract was not impacted with development the way the subject tract was in 1998 prior to the taking." This assertion, too, is factually erroneous, because the 1999 application on the Main Tract was for residential development, not sand extraction. See Docket No. 155 at 10, 11. As previously stated, Defendant has provided no evidence that sand extraction permits have been granted for any nearby property that is similarly zoned B-2 and interlaced with wetlands – despite the fact that silica sand is abundant throughout the vicinity of the Subject Property. Moreover, there is no competent evidence in the record that the existing FAA development on the Subject Property meant that sand extraction was reasonably probable. Although Defendant cites Mr. Toro's statement that it would be "easier" to obtain a permit on property that had already been impacted, this statement does not demonstrate that it was reasonably probable that a sand extraction permit would be granted, particularly in light of Mr. Toro's testimony that it was "extremely difficult" to obtain such a permit. Accordingly, it was proper for Judge McGiverin to conclude that based on the lack of evidence to support Mr.

Gaztambide's opinion, the proposed uses of residential development and sand extraction were speculative and therefore must be excluded from use at trial.  Docket No. 155 at 12, 14.

## II.     THE COURT SHOULD OVERRULE DEFENDANT'S OBJECTIONS AND ADOPT THE MAGISTRATE'S RECOMMENDATION BECAUSE DEFENDANT'S APPRAISAL OF THE SAND DEPOSITS VIOLATES THE UNIT RULE AND IMPROPERLY "DOUBLE COUNTS" THE VALUE OF THE SAND.

In his Report and Recommendation, Judge McGiverin found that Mr. Gaztambide's appraisal of the sand deposits on the Subject Property violated the "unit rule" by aggregating the value of the surface and the minerals, and that the appraisal improperly "double counts" the value of the sand.  Docket No. 155 at 15-20.  Thus, Judge McGiverin properly recommended that the Court grant the United States' motion in limine to exclude Defendant's appraisal of sand deposits.[10]

### A.     Defendant's Appraisal of the Sand Deposits Should Be Excluded Because It Violates the Unit Rule by Separately Valuing the Sand Deposits.

In determining fair market value, the landowner is entitled to have all factors of value - including the existence of minerals – taken into consideration.  See United States v. 91.90 Acres of Land, 586 F.2d 79, 88 (8th Cir. 1978); Georgia Kaolin Co. v. United States, 214 F.2d 284, 286 (5th Cir. 1954).  However, it is well-settled that the landowner must value the property as an integrated whole, and may not separately value the land's various components and add them together.  See 91.90 Acres of Land, 586 F.2d at 87; 158.76 Acres of Land, 298 F.2d at 561 ("it is not permissible to determine separately the value of the mineral deposits and add this to the

---

[10]  Judge McGiverin addressed this issue notwithstanding the fact that it would be rendered moot by his finding that the Defendant had presented no credible evidence that sand extraction would be permitted in the reasonably near future and that consequently all evidence of sand extraction should be excluded.  See Docket No. 155 at 15 n.5.

value of the land as a unit."); <u>Georgia Kaolin</u>, 214 F.2d at 286 ("there can be no recovery for both the value of the land and its mineral deposits as two separate items").

Here, it is undisputed that Mr. Gaztambide prepared two separate appraisal reports, one of which valued the fee simple interest of the Subject Property, and the other of which valued the sand deposits on the Subject Property.  Docket No. 155 at 15-16.  Mr. Gaztambide's appraisal of the fee simple utilized the comparable sales methodology to arrive at a market value of $1,120,000.  <u>Id.</u> at 15.  Because that report treated the Subject Property as an integrated whole, it complied with the unit rule.  <u>See</u> <u>91.90 Acre of Land</u>, 586 F.2d at 87.

However, Mr. Gaztambide's separate appraisal of the sand deposits did <u>not</u> treat the Subject Property as a single unit, and instead independently appraised the sand underlying the surface.  Therefore, Mr. Gaztambide's separate appraisal of the sand deposits violates the unit rule because it seeks to introduce evidence of the value of the sand deposits separate from the appraised value of the entire fee simple.  <u>See</u> <u>91.90 Acres of Land</u>, 586 F.2d at 87 ("the landowner is not entitled to have the surface value of the land and the value of underlying minerals aggregated to determine market value").  Accordingly, Judge McGiverin properly found that Mr. Gaztambide's appraisal of the sand deposits violates the unit rule, and therefore constitutes improper valuation evidence that should be excluded from use at trial.  Docket No. 155 at 20 (citing <u>91.90 Acres of Land</u>, 586 F.2d at 87; <u>Georgia Kaolin</u>, 214 F.2d at 286).

Significantly, Defendant's objections do not challenge Judge McGiverin's finding that the appraisal of the sand deposits violated the unit rule.  Accordingly the Court should adopt Judge McGiverin's recommendation and exclude Defendant's appraisal of the sand deposits.

**B.      Defendant's Appraisal of the Sand Deposits Should Be Excluded Because It Improperly Double Counts the Value of the Sand Deposits That is Already Reflected in the Fee Simple Appraisal.**

As a corollary to his finding about the unit rule, Judge McGiverin also found that the appraisal of the sand deposits impermissibly "double counts" the silica sand on the Subject Property, because any such value was already reflected in the appraisal of the fee simple that analyzed sales of comparable sand-laden properties.  In the case of properties containing minerals, it is axiomatic that when sales of similar mineral-laden properties exist, the parties to those transactions are presumed to have taken into account any value of the underlying minerals in the purchase price.  See United States v. 494.10 Acres of Land, 592 F.2d 1130, 1132 (10th Cir. 1979) ("the parties to such transactions are presumed to have taken into consideration all the elements of value to be attributed to the land."); 13.98 Acres of Land, 702 F. Supp. at 1123-24 (same).  Accordingly, when property containing minerals has been valued using comparable sales, the landowner may not recover additional just compensation for the separate value of the minerals because any such value is already reflected in the value of the fee simple.   See, e.g., United States v. 13.98 Acres of Land, 702 F. Supp. 1113, 1122-24 (D. Del. 1988).

The notion of impermissible double counting is best illustrated in the case United States v. 13.98 Acres of Land, where the court ruled that the landowner could not recover additional value for soil deposits because such value already was reflected in the value of the fee simple. See id.  The court in 13.98 Acres noted that each of the comparable sales used to appraise the fee simple contained similar soil deposits, and that any value of this mineral was necessarily included in the value of the fee simple.  Id. at 1123-24.  Accordingly, the court ruled that to

allow the landowner to receive additional value for the soil deposits would be to "improperly sanction double counting." Id. at 1123.

Here, as was the case in 13.98 Acres, all three of the comparable sales utilized by Mr. Gaztambide to appraise the fee simple interest contained silica sand deposits. See Docket No. 155 at 20. Because those properties all contained sand, the value of the sand deposits – if any – was included in the price paid for those properties, and therefore is reflected in Mr. Gaztambide's appraisal of the fee simple interest. See 13.98 Acres of Land, 702 F. Supp. at 1123; 494.10 Acres of Land, 592 F.2d at 1132. Thus, Defendant's separate appraisal of the sand deposits double counts the value of the sand, and accordingly, Judge McGiverin properly found that it should be excluded. See 13.98 Acres of Land, 592 F. Supp. at 1123.

Defendant's objections do not challenge Judge McGiverin's finding that Mr. Gaztambide's appraisal of the sand deposits constitutes impermissible double-counting. Accordingly the Court should adopt Judge McGiverin's recommendation on this issue and exclude Defendant's appraisal of the sand deposits from use at trial.

### C. Defendant's Appraisal of the Sand Deposits Should Be Excluded Because It Improperly Capitalizes Income from a Sand Extraction Operation.

It is well-settled that business income and lost profits are not compensable in a federal eminent domain case. See United States ex rel. Tenn. Valley Auth. v. Powelson, 319 U.S. 266, 281-86 (1943); A.G. Davis Ice Co., Inc. v. United States, 362 F.2d 934, 936 (1st Cir. 1966). In cases involving the condemnation of land with minerals, courts have refused to permit the landowner to introduce valuation evidence that is based on lost profits or business income from a hypothetical mining business. See Cloverport Sand & Gravel Co., Inc., v. United States, 6 Cl. Ct. 178, 190-92 (Cl. Ct. 1984); 91.90 Acres, 586 F.2d at 86-88. Rather, in order to present

23

valuation evidence based on income that could be generated from minerals, federal courts require the landowner to capitalize <u>royalty</u> income, rather than business income or lost profits from a hypothetical mining operation.  <u>See United States v. 103.38 Acres of Land</u>, 660 F.2d 208, 212-13 (6th Cir. 1981); <u>United States v. 100.80 Acres of Land</u>, 657 F. Supp. 269, 273-74.[1]

Here, it is undisputed that Mr. Gaztambide's appraisal of the sand deposits capitalized an income stream from a hypothetical sand extraction operation to arrive at an opinion of market value of $3 million to $6 million.  <u>See</u> Docket No. 155 at 15-16; <u>see</u> <u>also</u> Docket No. 133, Ex. D, 27; Ex. C, 185:14-23, 187:7-14.  Mr. Gaztambide admitted that he did not value the royalty income that could be generated from the sand deposits.  <u>See</u> Docket No. 133, Ex. C, 186:4-7, 187:8-14.  Accordingly, Mr. Gaztambide's appraisal of the sand deposits improperly capitalizes the income from a sand extraction operation rather than the royalty income, and therefore should be excluded.  <u>See</u> <u>Cloverport</u>, 6 Cl. Ct. at 190-92; <u>91.90 Acres of Land</u>, 586 F.2d at 86-88.

Although Judge McGiverin did not make a finding that the appraisal of the sand deposits improperly values lost business income, Defendant argues that it was appropriate for Mr. Gaztambide to capitalize the income from a hypothetical sand extraction business.  <u>See</u> Docket No. 156 at 8, 9.  Because this argument does not address specific findings in the Report and Recommendation, it is irrelevant.  <u>See</u> <u>Fonseca-Arroyo</u>, 367 F. Supp. 2d at 199 (defendant must specify magistrate's findings or recommendations that are objectionable).  Moreover, this

---

[1] Defendant asserts that "the United States has analogized this case to an oil or coal case," and contends that the cases cited by the United States in its underlying brief are therefore distinguishable. Docket No. 156 at 8.  This statement is patently false, because the cases cited by the United States in its underlying brief concern hard rock minerals such as sand, gravel and clay, which are analogous to the silica sand deposits on the Subject Property. <u>See</u> <u>Cloverport</u>, 6 Cl. Ct. at 190-92 (rejecting valuation of lost profits from a sand and gravel business); <u>91.90 Acres of Land</u>, 586 F.2d at 88 (rejecting valuation of lost profits from a clay mining business).

argument is also unsupported by case law, because the case cited by Defendant does <u>not</u> stand for the proposition that sand deposits may be valued by capitalizing business income. <u>See</u> <u>United States v. 100.80 Acres of Land</u>, 657 F. Supp. 269, 274 (M.D. N.C. 1987) (finding that capitalization of royalty income – <u>not</u> business income – was appropriate methodology for valuing sand deposits).  Accordingly, Defendant's irrelevant and erroneous argument does not undermine Judge McGiverin's finding that the appraisal of the sand deposits should be excluded.

## CONCLUSION

For the foregoing reasons, the United States requests that this Court overrule Defendant's objections and adopt Judge McGiverin's Report and Recommendation by granting (1) the United States' motion to exclude Defendant's highest and best use evidence (Docket No. 132); and (2) the United States' motion to exclude all evidence relating to Defendant's appraisal of sand deposits (Docket No. 133).

Respectfully submitted this 7th day of June, 2007, by:

ROSA E. RODRIGUEZ-VELEZ
United States Attorney

JOSE M. PIZARRO-ZAYAS
Assistant United States Attorney
Torre Chardon, Suite 1201
350 Carlos Chardon Ave.
San Juan, PR 00918
Tel: (787) 766-5656
Fax: (787)766-6219

s/ Jeffrey M. Tapick
JEFFREY M. TAPICK
Bar No. G00206
Attorney, United States Department of Justice
Environment & Natural Resources Division
P.O. Box 561, Ben Franklin Station
Washington, D.C. 20044
Jeffrey.tapick@usdoj.gov
Tel: (202) 305-0297
Fax: (202) 305-0398

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 7ʰ day of June, 2007, a true and correct copy of the foregoing unopposed motion for enlargement of time was electronically filed and served via electronic notification to:

> Maurice V. Piza, Esq.
> 5500 Prytania Street
> New Orleans, LA 70115
> maurpi1@yahoo.com
>
> David C. Vidrine, Esq.
> 2000 Old Spanish Trail, Suite 103
> Slidell, LA 70458
> DVidrine@mumphreylaw.com
>
>
> s/ Jeffrey M. Tapick
> JEFFREY M. TAPICK