IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
UNITED STATES OF AMERICA         :
                                 :
           Plaintiff             :
                                 :
       v.                        :CIVIL NO. 98-1664(CCC)
                                 :CIVIL NO. 98-2344(CCC)
33,92536 ACRES OF LAND, MORE     :
OR LESS, SITUATED IN VEGA BAJA,  :
COMMONWEALTH OF PUERTO RICO,     :
AND JUAN PIZA BLONDET, AND       :
UNKNOWN OWNERS                   :
                                 :
           Defendants            :
                                 :
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF:

CARLOS E. GAZTAMBIDE

was taken on April 5, 2006 at the offices of CARLOS

GAZTAMBIDE & ASSOCIATES, Banco Popular Center, Suite

1515, 208 Muñoz Rivera Avenue, Hato Rey, Puerto Rico,

commencing at 9:40 a.m.

BONAFIDE & CERTIFIED REPORTING
P.O. BOX 9022272
SAN JUAN, PUERTO RICO 00902-2272
(787) 250-8507

SHEET 29   PAGE 110

1    A    Exactly. For example, you can see this big residential development here --
3    Q    I'll ask you about that in a minute.
4    A    Yes.
5    Q    Just wanted to make sure that's what we're talking about.
7    A    Yes, yes.
8    Q    And then on Page 36, finally you also state that your conclusion is based on an exhibit of this appraisal, the declaration prepared by Carlos E. Gaztambide, juris doctor, MAI, that includes numerous exhibits that prove development of the subject property is possible, is that right?
14   A    Yes.
15   Q    And your declaration is, is included at the end of your appraisal report?
17   A    I think it is.
18   Q    As Exhibit G, I believe, is that right?
19   A    Let's see. Yes, that's correct.
20   Q    Okay. So to summarize Page 36, if I'm to understand you, the conclusion about your reasonable probability analysis is based on the permits you have seen for the residential subdivision, the R1 and R3 Haciendas de Tortuguero subdivision, the subdivisions

PAGE 111

1 indicated in the aerial photographs --
2    A    Yes.
3    Q    -- and the declaration that you prepared that includes a number of exhibits?
5    A    That's correct.
6    Q    Is it based on anything else, your reasonable probability determination, is it based on any other information besides this that you stated on Page 36?
9    A    It could very well be. I cannot answer yes or not at this point in time. As we go through the documents, we might run into something that wasn't addressed in the particular paragraph so I can't corner myself into saying yes, that's all because honestly, I don't remember if that's --
15   Q    If you considered any other documents, would they be in your work file?
17   A    Oh, yes. Oh, yes.
18   Q    So everything that you would have considered in coming to this conclusion about reasonable probability would be either in those, in the aerial photograph, in the permits you've discussed, in your declaration or in your work file, is that right?
23   A    Yes. I would like to, if you will allow me to make a clarification, on this sentence we wrote, we read

PAGE 112

1 here on Page 36 when it says, "Based on the above, there is a reasonable probability that the subject may be approved for medium density residential development if adequate protection to...", let's stop there, okay and says, "...or mitigation of the wetland is provided."
6        The, these are the two alternatives; either you protect the wetland or you mitigate but the appraisal in reality, these are the two alternatives but the appraisal in reality stops here where it says "protection to", because I'm appraising the 19 "cuerdas" upland as land for residential development and the balance as lands for conservation so I'm not considering mitigation, although mitigation is always an alternative but I didn't wanted to interject that, that concept here because it's much more difficult to grasp and to visualize, you know, cut the pie and say this is developable, this is not, this has a value A, this has value B and that sort of is tied to what you see there, out there.
20   Q    I appreciate your candor in explaining that to me. Let me jus ask you then, if you're saying that residential development is reasonably probable if adequate protection to the wetland is provided --
24   A    Yes.

PAGE 113

1    Q    -- what is the basis for your conclusion? Is that from a regulation that you're deciding that mitigation would be required in order to get a development approval for median residential --
5    A    No. Mitigation is not required unless you impact the wetland. If you don't impact the wetland, all you have to do is protect it, designing a way that you protect.
9    Q    And I just, all I'm asking is, is there a regulation that says you must protect the wetland?
11   A    Oh, yes, or at least in the permit they will tell you we will allow you to develop the upland as long as you do A, B, C and D.
14   Q    So the basis of this statement is in essence that you believe the development permit would require protection of the wetlands?
17   A    Oh, yes.
18       MR. P.E. HARRISON: And let me interject an objection. Let me just object to the extent we're calling for a legal conclusion here. Ironically, Mr. Gaztambide is a lawyer but we're using him as an appraiser.
23       MR. TAPICK: Fair enough, fair enough.
            EXAMINATION CONTINUED

SHEET 50   PAGE 194

1 unit residential project virtually within the perimeter of the Piza property and he has been approved to remove
3 the sand deposits, sell the sand and substitute it with
4 borrowed fill, as a normal activity within this
5 development permit. This area is zoned B2."
6    A    That statement is incorrect.
7    Q    It's incorrect?
8    A    It's incorrect.
9    Q    Can you tell me what's incorrect about it?
10   A    That, the information I originally got when
11 the appraisal was prepared back in June, they had
12 informed me that he was allowed to sell the sand. It
13 turned out to be that he was not. He was allowed to
14 remove the sand but not to sell it.
15        I think he, I've heard as a "chisme" that he
16 bartered it but that's a problem that he had to deal
17 with.
18   Q    Do you recall where Mr. Hernandez' property is
19 in relation to the subject property?
20   A    From the top of my head, I have a vague
21 recollection.
22   Q    Is there any document in your work file that
23 indicates where that is?
24   A    There are some photos there but I don't think

PAGE 195

1 the location is the location of the, I have a vague, a
2 vague idea.
3    Q    How did you determine that the area of his
4 project is zoned B2?
5    A    Because in the general area, this property is
6 pretty well inland with respect to the road and in that
7 area is already B2.
8    Q    So you determined based on what you could
9 ascertain from the photographs where the property is
10 located in relation to the road --
11   A    Yes.
12   Q    -- that it's zoned B2?
13   A    Uh-huh.
14   Q    Okay. So I presume you looked at the zoning
15 map as the source of the zoning then?
16   A    Yes.
17   Q    Do you have any other documentation discussing
18 his six unit residential development project, aside from
19 those photographs?
20   A    No. I don't recall who gave me this
21 information initially. I don't, I hate to say this but
22 it could have been Benjamin Pomales but I really don't
23 remember.
24   Q    And --

PAGE 196

1    A    And afterwards -- I'm sorry. Afterwards this
2 is why I made the clarification at the onset today, that
3 the extraction permit could be two fold, two types, you
4 know. A permit like Mr. Piza got, a formal permit in
5 which you can extract the sand and sell it and
6 extraction permits which are incidental to construction
7 in which you can move the sand but not sell it.
8    Q    And you haven't seen a copy of this permit?
9    A    No.
10   Q    And we don't know who Jose Hernandez is?
11   A    I don't know who he is.
12   Q    We don't know what quantity he was allowed to
13 move?
14   A    No.
15   Q    Now, then on Page 24 you state at the top,
16 "Furthermore, our engineer consultant opines that the
17 extraction and sale of deposits like the ones of the
18 subject are incidental to any development permit and are
19 customarily attainable." Who is the engineer
20 consultant?
21   A    That's Pomales.
22   Q    Mr. Pomales.
23   A    Has to do with the same issue.
24   Q    And you believe Mr. Pomales was retained for a

PAGE 197

1 period of time by Mr. Piza, is that correct?
2    A    I'm going to be very honest with you. I don't
3 know what the relationship was but he was presented to
4 me as a consultant.
5    Q    Now, based on this information that you've
6 stated in your report and that we have just discussed,
7 you determined that the use of sand extraction, the
8 extraction of sand and the sale of that sand, would be
9 legally permissible on the subject property. Is that a
10 fair statement?
11   A    It's based primarily on the historical fact
12 that he had been permitted previously.
13   Q    Was he ever permitted to extract sand from the
14 33 acres that was expropriated in this case?
15   A    I don't know.
16   Q    You don't know or you can't remember from the
17 documents?
18   A    No, I don't know because I don't have evidence
19 prior, the oldest evidence I have is 1988 and I think as
20 of 1988 that land was already leased to FAA so I can
21 come to the conclusion that he could not have requested
22 a permit from the land he had under lease agreement but
23 that's just my conclusion based on, based on the
24 documentation I have.

SHEET 51  PAGE 198

1  Q  So your finding of legal permissibility is
2  based on this information plus your understanding of the
3  historical granting of permits on property that Mr. Piza
4  owns in Vega Baja?
5  A  Primarily.
6  Q  And some of those documents are contained in
7  your work file, is that correct?
8  A  Yes.
9  Q  Did you speak to anybody at the Department of
10 Natural Resources about the permitting process for sand
11 extraction?
12 A  I did not. What I don't know is either Dr.
13 Joyce or Juan checked that.
14 Q  Did you rely on Dr. Joyce to provide you with
15 information that you used in making your legal
16 permissibility determination?
17 A  I don't think so. Again, I say I base it
18 primarily on, on historical data.
19 Q  As of the date of taking, were there any
20 permits for extracting sand on the 33 acres parcel?
21 A  No.
22 Q  Were you aware, are you aware of whether there
23 were any permits that had been applied for sand
24 extraction on the subject property as of the date of

PAGE 199

1  taking?
2  A  I'm not aware.
3  Q  And in your report at no point do you make the
4  conclusion that it's reasonably probable that such
5  permits would be issued, is that correct?
6  A  That's correct.
7  Q  Now, turning to the question of physical
8  possibility, you say that, "The potential for sand
9  extraction has been determined in the accompanying
10 report by Dr. James Joyce."
11 A  Uh-huh.
12 Q  Correct? So you based your physical
13 possibility determination on Dr. Joyce's report?
14 A  Yes.
15 Q  Okay. Did you do any independent
16 investigation or talk to anyone else about how much sand
17 is on the site?
18 A  No. I relied on his report.
19 Q  Did you do any independent investigation or
20 rely on anybody else to determine the quality of the
21 sand on that site?
22 A  No, I relied on his report.
23 Q  So you didn't rely on any past or historical
24 sale of sand on the property, on the property in, in

PAGE 200

1  making your determination about physical possibility?
2  A  Can you restate it. I lost my --
3  MR. P.E. HARRISON: And I want to enter an
4  objection so, you know --
5  THE DEPONENT: Go ahead.
6  MR. P.E. HARRISON: Objection. Asked and
7  answered. You got what he did, he relied upon the
8  report so, okay.
9  MR. TAPICK: Are you instructing him not
10 answer or --
11 MR. P.E. HARRISON: No, no, he can answer.
12         EXAMINATION CONTINUED
13 BY MR. TAPICK:
14 Q  And do you need me to repeat the question?
15 A  Yes, please.
16 Q  My first question was about the quality of the
17 sand, I believe and the question is, did you do any
18 independent investigation or rely on anybody else to
19 determine the quality of sand?
20 A  No, no. This why I recommended that Dr. Joyce
21 be retained and I relied on his expertise.
22 Q  So you did not rely on past, past documents or
23 documents of past sand extraction or sale in making your
24 physical possibility determination --

PAGE 201

1  A  No.
2  Q  -- is that correct? Okay. Now, turning to
3  the question of financial feasibility you state that,
4  "The demand for sand in Puerto Rico is fueled by the
5  construction industry." On Page 24. Is that correct?
6  A  That's correct.
7  Q  So you go on to say that, "It is reasonable to
8  anticipate the financial feasibility of such an
9  extraction operation.", correct?
10 A  Yes.
11 Q  Okay. Now, is the silica sand that Dr. Joyce
12 describes as being present on the property used in the
13 construction industry?
14 A  No, it's used in the industries. It's where I
15 mention, "The sand of the character at the subject has
16 strong demand for industrial production."
17 Q  Who is interested in purchasing this sand,
18 purchasing this sand?
19 A  Owens Illinois.
20 Q  For what purpose?
21 A  They, they have, there's a factory out in Vega
22 Baja, very close, relatively close to the subject, that
23 silica sand is a, a primary of raw material for their
24 production of glass.